EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| RPR & BJJ<br><br>Peticionarios<br><br><br>*Ex parte* | Certiorari<br><br>2021 TSPR 83<br><br>207 DPR ____ |

Número del Caso: CC-2020-653


Fecha: 17 de junio de 2021


Tribunal de Apelaciones:

    Panel VI


Abogada de la parte peticionaria:

    Lcda. Linette Sánchez Quiñones


Oficina del Procurador General:

    Lcdo. Fernando Figueroa Santiago
    Procurador General

    Lcda. Celia M. Molano Flores
    Procuradora General Auxiliar


Materia: Derecho de Familia/ Procesal Civil - La petición de inscripción instada por los padres intencionales en casos de maternidad subrogada no tiene que ser un trámite judicial contencioso y la mujer gestante no es parte indispensable del proceso de jurisdicción voluntaria que pretenda la filiación por métodos de procreación asistida. El reconocimiento voluntario es el mecanismo para la inscripción registral original de un menor nacido por subrogación gestacional.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


RPR & BJJ

    Peticionarios

                    CC-2020-0653      *Certiorari*

*Ex parte*


Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo


En San Juan, Puerto Rico, a 17 de junio de 2021.

    La controversia que atendemos en esta ocasión está relacionada con una petición judicial de inscripción por reconocimiento voluntario de un menor nacido por técnicas de procreación asistida a nombre de la madre intencional. Es decir, la mujer que gestionó el proceso de fertilización *in vitro* con los espermatozoides de su esposo y los óvulos de una donante anónima para que el embrión fuera implantado en el útero de una mujer sin vínculo genético con éste que llevaría el embarazo a término para el matrimonio.

    Hoy resolvemos que la mujer gestante y su entonces pareja consensual no son partes indispensables en el procedimiento que pretende  la inscripción original del

menor con el nombre de la madre intencional y que este proceso no debe ser un trámite judicial contencioso. Establecemos, además, que el reconocimiento voluntario es el mecanismo para establecer la filiación materna de menores gestados mediante técnicas de subrogación gestacional. Veamos.

I.

Por su deseo de tener un hijo propio, el matrimonio peticionario compuesto por RPR y BJJ[1] intentó sin éxito algunos tratamientos reproductivos. Como la madre intencional tuvo dificultad en llevar varios embarazos a término, en el 2018 la pareja recurrió al método de la subrogación gestacional. La mujer gestante sería una joven soltera con dos hijos propios que había tenido una experiencia anterior con la subrogación gestacional y había entregado al bebé sin retractos ni complicaciones. Luego de las evaluaciones físicas y psicológicas en la clínica de fertilidad, la mujer accedió a portar el embarazo del embrión formado por fertilización *in vitro,* sin vínculo genético con éste porque los óvulos utilizados eran de una donante anónima.

A los tres días del nacimiento prematuro, el matrimonio presentó ante el Tribunal de Primera Instancia una petición para inscribir al menor como hijo suyo. Cabe señalar que la

---

[1] A fin de mantener la confidencialidad de los asuntos sensitivos de familia que tratamos en esta Opinión, utilizaremos las siglas de los nombres de los peticionarios, de la mujer gestante y su expareja consensual, así como del menor sujeto de la solicitud de inscripción registral como hijo del matrimonio peticionario. También omitimos detalles particulares del caso para que, en la medida de lo posible, la familia no pueda ser identificada y preservar así su derecho fundamental a la intimidad familiar.

mujer gestante compareció ante el foro primario como parte con interés en el proceso *ex parte* y se sometió voluntariamente a la jurisdicción del Tribunal.

El matrimonio solicitó, en primer término, que el foro primario aceptara la renuncia voluntaria de la mujer gestante a los derechos y responsabilidades sobre el menor que pudieran surgir a su favor por razón del parto. Para acreditar tal renuncia, la petición fue acompañada con una declaración jurada suscrita por la mujer gestante ante una abogada notaria el día posterior al parto. En segundo término, el matrimonio solicitó una orden para inscribir al menor con sus nombres como madre y padre, respectivamente, para que la intención original habida entre la pareja y la mujer gestante coincidiera con la realidad registral original.

Evaluada la petición, el Tribunal de Primera Instancia ordenó que ésta fuera notificada a la Procuradora de Asuntos de Familia y al Departamento de la Familia. Por igual, proveyó para que esta agencia gestionara un estudio social del entorno del matrimonio peticionario. A pocos días de la orden, ante una intervención quirúrgica de emergencia y la falta de un plan médico para costear los tratamientos que el menor requería por ciertas condiciones congénitas, la Procuradora de Asuntos de Familia presentó un urgente informe fiscal en el que se allanó a que el Tribunal ordenara al Registro Demográfico a inscribir al menor con la información del padre biológico, pero requirió que la esposa (madre intencional) presentara una

solicitud de adopción. Con la premura que ameritaba, el foro primario emitió la orden y ese día el menor fue inscrito como hijo del peticionario BJJ.

En la primera comparecencia, luego de escuchar a las partes, incluida a la mujer gestante, el foro primario emitió una resolución en la que, como medida cautelar dadas las condiciones de salud presentadas, concedió a la madre intencional las facultades tutelares sobre el menor. A pocos días de esta comparecencia, la Unidad de Adopción del Departamento de la Familia emitió un informe de adopción favorable a la madre intencional.

En tanto, en la segunda comparecencia testificó el ginecólogo-obstetra, con subespecialidad en endocrinología reproductiva e infertilidad, que tuvo a cargo el proceso de reproducción asistida para el matrimonio peticionario. También testificó la trabajadora social de la Unidad de Adopción del Departamento de la Familia que realizó el estudio social sobre el hogar y el trasfondo social del matrimonio. En las comparecencias, el foro primario recibió como prueba la copia del acuerdo de subrogación gestacional, así como el consentimiento para la transferencia de los embriones, entre otros documentos.

El 15 de agosto de 2019 el Tribunal de Primera Instancia emitió la sentencia correspondiente para conceder la petición de reconocimiento voluntario y ordenar al Registro Demográfico la inscripción de la filiación del menor con la madre

intencional. De las determinaciones de hechos destaca que la mujer gestante dio a luz de forma natural al menor, sin estar vinculado genéticamente con ella. Surge también que en el proceso ni el Departamento de la Familia ni la Procuradora de Asuntos de la Familia cuestionaron la validez del acuerdo de subrogación suscrito entre el matrimonio y la mujer gestante. Además, que la mujer gestante renunció a cualquier derecho concedido por ley sobre el menor por razón del parto. Por último, que la trabajadora social del Departamento de la Familia recomendó conceder la adopción del menor a la madre intencional.

Con tal cuadro fáctico y ante la ausencia de legislación particular sobre los embarazos subrogados, el foro primario analizó el ordenamiento jurídico sobre la filiación y el reconocimiento voluntario. Determinó que, ante la falta de ley aplicable, su deber era resolver conforme a la equidad, según disponía el Código Civil de Puerto Rico entonces vigente.[2] Así, expresó:

> [E]n este caso no se presentó evidencia alguna que demostrara ánimo de lucro, explotación o ventaja que tuvieran los peticionarios al procrear al menor MVJP, que no fuera el deseo normal de una pareja en tener a un hijo que estuviera al menos genéticamente vinculado a uno de ellos [...]. Entendemos que, aunque haya ausencia de legislación específica que estructure o regule los procedimientos relativos a una subrogacía [*sic*] gestacional o la reproducción humana asistida, las disposiciones aplicables contenidas en los Artículos 17 y 19-A de la Ley del Registro Demográfico, antes citadas, permiten la inscripción de un hijo por reconocimiento voluntario de un padre o **madre**.

---

[2] Cód. Civ. PR art. 7, 31 LPRA § 7 (derogado 2020).

Ciertamente el nacimiento del menor MVJP es el resultado del amor, el deseo, los cuidados y la perseverancia que tuvieron los peticionarios en todo el proceso de maternidad subrogada, por lo que es el menor MVJP hijo de los peticionarios.[3]

No conforme, la Procuradora de Asuntos de Familia solicitó la reconsideración de la determinación. En el escrito aceptó que no ha negado que el menor es hijo de la madre intencional y que en el proceso hubo toda la prueba necesaria para conceder la adopción a su favor. Su contención era que en este caso la declaración de la adopción por parte del tribunal de instancia era necesaria porque la madre intencional no tiene vínculo genético con el menor.

La posición de la Procuradora quedó recogida en la siguiente expresión: "la concepción social de que la adopción estigmatiza negativamente a sus componentes no debe ser óbice para negar la realidad jurídica que hoy nos rige: el único procedimiento para desvincular al menor de sus lazos biológicos y vincularlo con quien no tiene relación consanguínea para filiar, es la adopción".[4] A su juicio, aceptar la determinación del Tribunal de Primera Instancia sería validar un trámite no regulado que podría prestarse para determinaciones inconsistentes en los tribunales.

Tras la denegatoria de la reconsideración, la Oficina del Procurador General de Puerto Rico acudió ante el Tribunal de

---

[3] *Apéndice de la Solicitud de certiorari civil*, págs. 100-101 (énfasis suplido).

[4] *Íd.*, pág. 107.

Apelaciones. En el recurso de apelación planteó que el foro primario abusó de su discreción al ordenar la inscripción del menor en el Registro Demográfico como hijo de la madre intencional.[5] Aceptó que el acuerdo de subrogación nunca estuvo en controversia, que la mujer gestante fue parte de la petición y que ésta claramente renunció a todos los derechos que tuviera sobre el menor, incluida la custodia y la patria potestad. Sin embargo, recalcó que el único remedio legal disponible para la madre intencional era la adopción. Oportunamente, el matrimonio peticionario presentó su oposición al recurso.

Con la posición de las partes, el Tribunal de Apelaciones emitió una sentencia en la cual revocó al foro primario. En el dictamen recurrido una mayoría de jueces apelativos entendió que la mujer gestante y su entonces pareja consensual eran partes indispensables en la petición de inscripción promovida por el matrimonio. El razonamiento para revocar el dictamen primario fue el siguiente:

> Nada en los documentos que ante nos obran evidencia que la [mujer gestante] y su compañero consensual, […], fueran debidamente incluidos en la acción como partes demandadas, a fin de imprimir legitimidad a la dilucidación del proceso. En principio, sabido es que, en materia de filiación, el ordenamiento jurídico establece una presunción de maternidad determinada por el parto, que, en la presente causa, le asiste a la [mujer gestante] por haber alumbrado al menor MVJP. Véase, Artículo 113, Código Civil (1930), 31 LPRA sec. 461. Del mismo modo, la norma aquí aplicable también provee para el reconocimiento de un hijo natural nacido fuera de un matrimonio,

---

[5] Advertimos que, conforme dispone la Regla 52.2(b) de Procedimiento Civil, 32 LPRA Ap. V, § 52.2 (2010 & Supl. 2019), el recurso adecuado ante el Tribunal de Apelaciones para los procedimientos de jurisdicción voluntaria es el *certiorari*.

> "[c]uando la madre fue conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo". Véase, Artículo
>
> 125, Código Civil (1930), 31 LPRA sec. 504. Ciertamente, al amparo de dicha doctrina y dados los términos de la relación habida entre la [mujer gestante] y [su entonces pareja consensual], a este, por igual, le asisten ciertas prerrogativas relacionadas al nacimiento del niño. Por tanto, la presencia de ambos en calidad de demandados en el trámite en disputa se hacía imprescindible. Además, según surge, tanto la [mujer gestante] como [su entonces pareja consensual] suscribieron el Acuerdo de Subrogacía [*sic*] Gestacional por el cual se efectuó el procedimiento que culminó con el nacimiento del menor MVJP, hecho que también los vinculaba como partes dentro del proceso judicial efectuado.[6]

Inconforme, tras la denegatoria de una moción de reconsideración, el matrimonio presentó el *certiorari* de epígrafe. En síntesis, argumentó que el foro apelativo abusó de su discreción al revocar la sentencia del Tribunal de Primera Instancia por alegada falta de partes indispensables y por crear una controversia ficticia sobre la validez del acuerdo de subrogación gestacional.

Concedida una orden en auxilio de jurisdicción para paralizar los efectos de la sentencia recurrida, ordenamos al Procurador General a mostrar causa por la cual no debíamos expedir el *certiorari* de epígrafe y revocar al foro apelativo. El Procurador General compareció en un breve plazo y aceptó que la sentencia recurrida era errónea en derecho al poner en controversia el acuerdo de subrogación y establecer que el foro primario no tenía jurisdicción para atender la petición

---

[6] *Íd.*, págs. 6-7.

de inscripción registral por ausencia de partes indispensables. Por lo tanto, coincidió en que corresponde revocar la sentencia emitida por el Tribunal de Apelaciones, pero solicitó que devolvamos el caso al foro apelativo para su resolución en los méritos o, de estimarlo conveniente, revoquemos la sentencia del Tribunal de Primera Instancia por no declarar la filiación adoptiva materna.

En los méritos, el Procurador General imputó error al foro primario al recurrir a la figura de la madre intencional, a pesar de no estar legalmente reconocida como un mecanismo válido para establecer la filiación natural. Fundamentó su posición en lo dispuesto en el derogado Código Civil respecto a que la madre estaba obligada al reconocimiento del hijo "cuando se pruebe cumplidamente el hecho del parto y la identidad del hijo".[7] Según la postura asumida por el Procurador, el interés filiatorio de la madre intencional podía concretarse únicamente por el mecanismo legal de la adopción que está dirigido a deshacer la filiación natural adjudicada a la mujer gestante por el hecho de dar a luz al menor y luego adjudicar la pretendida filiación no biológica.

Ante el cumplimiento con nuestra orden, estamos listos para resolver este recurso en sus méritos.

II.

**A. Procedimientos de jurisdicción voluntaria**

---

[7] CÓD. CIV. PR art. 125, 31 LPRA § 504 (derogado 2020).

En Puerto Rico existe la distinción entre los asuntos de jurisdicción voluntaria y los de jurisdicción contenciosa. El concepto de jurisdicción voluntaria viene de la frase latina *juris dicere*, que significa "decir el derecho".[8] Desde la tradición romana, los casos de jurisdicción voluntaria eran aquellos en que los jueces decidían cuestiones que las partes, de común acuerdo y voluntariamente, le sometía. En la actualidad, se entiende como "aquel ámbito de asuntos en que, por disposición de ley y a solicitud de los interesados, se requiere la intervención del juez para su tramitación, aún cuando no se promueva controversia alguna entre las partes".[9]

Desde la vigencia en Puerto Rico de la *Ley de enjuiciamiento civil española*, se consideraba que los actos de jurisdicción voluntaria eran "todos aquéllos en que sea necesaria, o se solicite, la intervención del juez, sin estar empeñada [disputada] ni promoverse cuestión alguna entre partes conocidas y determinadas".[10] Así, la actual Regla 3.1(b) de Procedimiento Civil establece:

> (b) El tribunal tendrá facultad para conocer de los procedimientos de jurisdicción voluntaria. Se podrá acudir al tribunal con un recurso de jurisdicción voluntaria con el fin de consignar y perpetuar un hecho que no sea objeto de una controversia judicial en ese momento y que no pueda

---

[8] *Jurisdicción voluntaria, Informe y reglamentación*, Secretariado de la Conferencia Judicial, Tribunal Supremo de Puerto Rico, 1997, pág. 3. Versión en línea https://www.poderjudicial.pr/Documentos/SecretariadoConf/Informe-sobre-Jurisdiccion-Voluntaria-Octubre-1997.pdf (última visita 6 de abril de 2021).

[9] *Íd.*, pág. 4.

[10] Art. 1811 de la Ley de enjuiciamiento civil española. *Véanse*, Rivera v. Corte, 68 DPR 673, 675-676 (1948); Ex parte Nadal, 5 DPR 110, 113 (1904).

resultar en perjuicio de una persona cierta y determinada.[11]

Un procedimiento de jurisdicción voluntaria inicia mediante la presentación de una solicitud *ex parte* y no se limita a la comparecencia ante el tribunal de una sola parte.[12] La jurisdicción voluntaria por su esencial naturaleza no contenciosa suele emplearse para peticiones comunes como la declaratoria de herederos, la expedición de cartas testamentarias, la adveración de testamentos ológrafos, la disposición de bienes de menores, el cambio de nombre, el divorcio por mutuo consentimiento, el nombramiento de tutores y defensores, la adopción y otros similares establecidos en las respectivas leyes particulares y habilitadoras.[13] A los mencionados procedimientos pueden añadirse los de autorización o administración judicial, así como los procedimientos sobre emancipación, filiación, declaración de incapacidad o dispensa de parentesco.

En un caso de jurisdicción voluntaria "no se promueve acción alguna entre partes conocidas y determinadas. Los peticionarios son los únicos interesados en el remedio que se solicita. Puede, desde luego, convertirse el procedimiento en contencioso si compareciere una parte oponiéndose o pretendiendo un interés adverso al de los peticionarios".[14] De

---

[11] 32 LPRA Ap. V, § 3.1(2010).

[12] Batiz v. Tribunal Superior, 104 DPR 41, 45 (1975).

[13] *Íd.*, esc. 3; *Rivera*, 68 DPR en la pág. 677.

[14] *Rivera*, 68 DPR en la pág. 676.

surgir una controversia genuina, el foro primario debe adjudicarla "mediante un trámite dotado de múltiples características análogas a las de un juicio contencioso".[15] No obstante, según la Regla 1 de Procedimiento Civil, este trámite debe llevarse de forma tal que garantice "una solución justa, rápida y económica de todo procedimiento".[16] Es decir, "la adjudicación de controversias debe hacerse libre de formalismos y sutilezas puramente legalistas".[17]

Por otra parte, la Regla 72 de Procedimiento Civil dispone que "[c]uando no se haya previsto un procedimiento específico en estas reglas, el tribunal podrá reglamentar su práctica en cualquier forma que sea compatible con éstas o con cualquier disposición de ley aplicable".[18] Además, cuando en Puerto Rico no existe un estatuto que regule determinado procedimiento, el artículo 7 del Código Civil entonces vigente exigía llenar esa laguna y resolver el caso.[19] La disposición equivalente en el nuevo Código Civil de Puerto Rico establece:

> El tribunal tiene el deber inexcusable de resolver diligentemente los asuntos ante su consideración, ateniéndose al sistema de fuentes del ordenamiento jurídico establecido.
>
> El tribunal que rehúse fallar a pretexto de silencio, obscuridad, o insuficiencia de la ley,

---

[15] *Batiz*, 104 DPR en la pág. 46 (*citado en* Vilanova v. Vilanova, 184 DPR 824, 858(2012)).

[16] 32 LPRA Ap. V, § 1.

[17] *Batiz*, 104 DPR en la pág. 46.

[18] 32 LPRA Ap. V, § 72.

[19] 31 LPRA § 7 (derogado 2020). *Véase*, *Vilanova*, 184 DPR en la pág. 850.

o por cualquier otro motivo incurrirá en responsabilidad.[20]

Cabe precisar también que la jurisdicción voluntaria no existe para eludir los procedimientos ordinarios prescritos por ley. Si la ley aplicable exige que la reclamación de un derecho en casos contenciosos sea promovida por medio de una demanda y que el demandado sea traído a la jurisdicción del tribunal mediante un emplazamiento, la parte está obligada a seguir ese trámite.[21]

**B. Acumulación de parte indispensable**

La Regla 16.1 de Procedimiento Civil regula el mecanismo de acumulación indispensable de parte en un pleito civil. Específicamente, esta norma procesal dispone que "[l]as personas que tengan un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas, según corresponda".[22]

Sobre esta norma procesal, en tiempos recientes este Tribunal ha reiterado, en primer término, que es parte de la protección constitucional que prohíbe que una persona sea privada de su libertad o propiedad sin el debido proceso de ley. En segundo término, que responde a la necesidad de incluir a una parte indispensable para que el dictamen

---

[20] Cód. Civ. PR art. 6, 31 LPRA § 5316 (2020). En este sentido, el artículo 2 del nuevo Código Civil establece que "[l]as fuentes del ordenamiento jurídico puertorriqueño son la Constitución, la ley, la costumbre y los principios generales del Derecho. *Íd.* § 5312.

[21] *Rivera*, 68 DPR en la pág. 677.

[22] 32 LPRA Ap. V, § 16.1.

judicial que pueda ser emitido sea completo para las personas que ya son partes en el pleito.[23]

Por lo tanto, la Regla 16.1 de Procedimiento Civil pauta que las cuestiones litigiosas no pueden adjudicarse correctamente sin la presencia de una parte cuyo interés o derecho puede verse seriamente afectado por una determinación judicial.[24] La ausencia de una parte indispensable priva al tribunal de jurisdicción para resolver la controversia. De incidir esta ausencia de parte, la acción incoada debe ser desestimada.[25] La falta de parte indispensable es un planteamiento tan relevante que puede traerse en cualquier parte del proceso, incluso los foros apelativos pueden levantarlo *motu proprio* por incidir en su jurisdicción.[26]

Ahora bien, el "interés común" al que hace referencia la Regla 16.1 no debe interpretarse por criterios puramente semánticos.[27] Dado que este no se refiere a cualquier interés en el pleito, sino que tiene que ser un interés real e inmediato, no especulativo ni a futuro, que impida

---

[23] Allied Management Group, Inc. v. Oriental Bank, res. el 30 de junio de 2020, 2020 TSPR 52; Rivera Marrero v. Santiago Martínez, 203 DPR 462, 479 (2019); López García v. López García, 200 DPR 50, 63-64 (2018); Colón Negrón *et al.* v. Mun. Bayamón, 192 DPR 499, 510 (2015).

[24] Bonilla Ramos v. Dávila Medina, 185 DPR 667, 677 (2012).

[25] *Íd.*; Pérez Rosa v. Morales Rosado, 172 DPR 216, 223 (2007).

[26] *Pérez Rosa*, 172 DPR en las págs. 223-224; Romero v. S.L.G. Reyes, 164 DPR 721, 733 (2005).

[27] Sánchez v. Sánchez, 154 DPR 645, 678 (2001).

la confección de un remedio adecuado porque podría afectar o destruir radicalmente los derechos de esa parte ausente.[28]

Ciertamente, la determinación sobre la necesidad de acumular una parte por ser indispensable es una tarea que le corresponde a los tribunales, según los hechos específicos de cada caso y el tipo de pleito.[29] Debe enfatizarse que **la interpretación para determinar quién es una parte indispensable tiene un alcance restringido** porque "en rara ocasiones es imposible resolver la controversia sin la presencia de la parte ausente".[30]

En el análisis contextual del asunto debe hacerse "un ejercicio de consideración pragmática de los intereses implicados".[31] Sobre esto, en *Romero v. S.L.G. Reyes* este Tribunal expresó:

> Los tratadistas son contestes en que la interpretación de esta regla requiere de un **enfoque pragmático**, es decir, requiere de una evaluación individual a la luz de las circunstancias particulares que se presentan **y no de una fórmula rígida para determinar su aplicación.** Por lo tanto, los tribunales tienen que hacer un juicioso análisis que considere la determinación de los derechos de un ausente y las consecuencias de no ser unido como parte en

---

[28] *López García*, 200 DPR en la pág. 64. *Véanse, además*, *Romero*, 164 DPR en la pág. 733; Deliz *et als.* v. Igartúa *et als.*, 158 DPR 403, 435 (2003); Cepeda Torres v. García Ortiz, 132 DPR 698, 704 (1993).

[29] García Colón v. Sucn. González, 178 DPR 527, 549 (2010); *Pérez Rosa*, 172 DPR en la pág. 223; *Deliz et als.*, 158 DPR en la pág. 434; *Sánchez*, 154 DPR en la pág. 678; Granados v. Rodríguez Estrada II, 124 DPR 593, 605 (1989); Hernández Agosto v. López Nieves, 114 DPR 601, 606 (1983) ("[l]a acumulación obligatoria de partes […] exige distinguir entre diversos géneros de casos").

[30] *García Colón*, 178 DPR en la pág. 549 (*citando a* Mun. De Ponce v. A.C. *et als.*, 153 DPR 1, 16 (2000)).

[31] Cirino González v. Adm. Corrección *et al.*, 190 DPR 14, 46 (2014).

el procedimiento. Es importante determinar si el tribunal podrá hacer justicia y conceder un remedio final y completo sin afectar los intereses del ausente".[32]

Para lograr el análisis contextual y pragmático es necesario hacer una evaluación jurídica de factores tales como el tiempo, el lugar, el modo, las alegaciones, la prueba, la clase de derechos, los intereses en conflicto, el resultado y la formalidad.[33] Como hemos expresado, "lo fundamental es determinar si el tribunal puede hacer justicia y conceder un remedio final y completo a las partes presentes sin afectar los intereses de la parte ausente".[34]

**C. Contornos contemporáneos de la figura de la filiación**

Para dilucidar la controversia ante nuestra consideración, hay que delimitar los contornos contemporáneos de la figura jurídica de la filiación en el Derecho puertorriqueño. Esta delimitación es importante porque, como veremos, el reconocimiento voluntario es una herramienta para establecer la filiación jurídica paterna y materna de forma directa para la persona que no tiene un estado filiatorio anterior o contradictorio al pretendido por el reconocimiento.

En sentido estricto, la filiación es "la relación jurídica que procede del vínculo natural entre padres e

---

[32] *Romero*, 164 DPR en las págs. 732-733 (énfasis suplido).

[33] Mun. de San Juan v. Bosque Real, S.E., 158 DPR 743, 756 (2003); *Deliz et als.*, 158 DPR en la pág. 434; *Sánchez*, 154 DPR en la pág. 678.

[34] *Pérez Rosa*, 172 DPR en la pág. 223.

hijos".[35] El vínculo natural al que hace referencia la referida definición surge del hecho natural de la procreación, es decir, la procedencia biológica de los hijos respecto a los padres. De ordinario, hay "una inicial realidad biológica [que es] recogida y regulada por el ordenamiento jurídico con el fin de distribuir derechos y obligaciones entre los progenitores y los seres procreados por ellos".[36] Esta filiación suele denominarse la filiación biológico-jurídica.

Ahora bien, aunque el elemento biológico es un principio básico en materia filiatoria, no es suficiente para establecer como realidad jurídica que una persona desciende de la otra. En múltiples ocasiones, hemos expresado que el vínculo biológico por sí solo no basta para que nazca el vínculo jurídico filiatorio.[37] No podemos ignorar que existen casos donde no es posible constatar quiénes son los padres biológicos de una persona. En otras ocasiones, hay más de una persona a quien se le podría identificar como padre o madre de alguien o, aunque se sepa quiénes son los padres, la ley no puede darle eficacia jurídica al hecho del parentesco biológico.[38] Así

---

[35] Rivera Marrero v. Santiago Martínez, 203 DPR 462, 475 (2019).

[36] *Sánchez*, 154 DPR en la pág. 660 (*citando a* L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 7ma ed., Madrid, Ed. Tecnos, 1997, Vol. IV, pág. 249; *reiterado en Rivera Marrero*, 203 DPR en la pág. 476; Sánchez Rivera v. Malavé Rivera, 192 DPR 854, 862 (2015); Beníquez v. Vargas, 184 DPR 210, 226 (2012); Vázquez Vélez v. Caro Moreno, 182 DPR 803, 809 (2011); Mayol v. Torres, 164 DPR 517, 529 (2005)).

[37] *Sánchez Rivera*, 192 DPR en las págs. 863-864; *Vázquez Vélez*, 182 DPR en las págs. 809-810; Castro v. Negrón, 159 DPR 568, 580 (2003); Calo Morales v. Cartagena Calo, 129 DPR 102, 112 (1991).

[38] *Beníquez*, 184 DPR en las págs. 227-228 (*citando a* R. Serrano Geyls, *Derecho de familia de Puerto Rico y legislación comparada*, San Juan,

pues, "la relación biológica no es una condición necesaria ni suficiente de la relación filial".[39]

La filiación "sintetiza el conjunto de relaciones jurídicas, que determinadas por la paternidad y la maternidad, vinculan a los padres con los hijos dentro de la familia".[40] Corresponde al estado civil de la persona establecido por "la situación que, dentro de una familia, le asigna el haber sido engendrada en ella o el estar en ella en virtud de la adopción o **de otro hecho legalmente suficiente al efecto**".[41] La filiación "origina una serie de derechos y obligaciones entre los miembros de la familia, dando seguridad y publicidad al estado civil de la persona y, como tal, caracteriza su capacidad de obrar y el ámbito propio de su poder y responsabilidad".[42]

La filiación jurídica puede ser la que opera por presunciones *juris tantum* derivadas del matrimonio, así como del parto en el caso de la mujer. Estas presunciones de filiación están basadas en las máximas latinas *mater semper certa est* ("la madre siempre es conocida"), *pater semper incertus est* ("el padre siempre es desconocido") y, de la

---

Ed. Programa de Educación Jurídica Continua de la UIPR, 2002, Vol. II, pág. 886) (énfasis suplido).

[39] González Rosado v. Echevarría Muñiz, 169 DPR 554, 562 (2006). *Véase, además, Mayol*, 164 DPR en las págs. 531-532.

[40] *Sánchez*, 154 DPR en la pág. 678.

[41] *Beníquez*, 184 DPR en la pág. 226 (*citando a Castro*, 159 DPR en las págs. 579-580) (énfasis suplido).

[42] *Sánchez*, 154 DPR en la pág. 670; Almodóvar v. Méndez Román, 125 DPR 218, 232 (1990).

solución legal al aforismo anterior que es la fórmula *pater est quem nuptiae demostrant* ("el padre es quien demuestra las nupcias").[43] Este Tribunal ha expresado que la presunción de paternidad aplicable al cónyuge de una madre refleja, entre otras cosas, el supuesto empírico de que los hijos de una mujer casada suelen ser hijos de su marido.[44]

La filiación por presunciones controvertibles de la paternidad y la maternidad estaba instaurada en el artículo 113 del derogado Código Civil.[45] Hay que advertir que, al darle carácter de presunción, el legislador reconoció "el principio de que aun la probabilidad racional en que se funda no es absoluta ni equivalente a la verdad".[46]

Desde *Ocasio v. Díaz* —decisión que dio plena vigencia al axioma constitucional que prohíbe el discrimen por razón de nacimiento y proclamó la igualdad y dignidad del ser humano en materia filiatoria—, este Tribunal por vía de *dictum* en un escolio erosionó la categoría absoluta de la presunción de filiación matrimonial al criticar que un esposo tenga que convertirse en padre del hijo de otro sin que los óvulos de su esposa se hubieran unido con sus espermatozoides.[47] Por esta razón, desde el 1942, a pesar de la presunción de la filiación

---

[43] *Beníquez*, 184 DPR en las págs. 229-230; Moreno Álamo v. Moreno Jiménez, 112 DPR 376, 379 (1982).

[44] *González Rosado*, 169 DPR en la pág. 562.

[45] Cód. Civ. PR art. 113, 31 LPRA § 461 (derogado 2020).

[46] *Moreno Álamo*, 112 DPR en la pág. 380.

[47] Ocasio v. Díaz, 88 DPR 676, 733 esc. 10 (1963).

matrimonial del entonces vigente artículo 113, era posible que un hombre reconociera como hijo suyo al fruto de su relación con una mujer casada con otro. A juicio de este Tribunal, a pesar de la presunción instaurada en el artículo 113, la situación creada por el legislador de entonces permitía a dos hombres a inscribir como suyo al hijo de una mujer. Así, debía prevalecer como padre el que lo inscribió primero en el Registro Demográfico como hijo suyo y asumió el cumplimiento de las obligaciones paternales.[48]

Debemos recordar que, en *Moreno Álamo v. Moreno Jiménez*, a tono con los pronunciamientos jurisprudenciales previos en materia filiatoria, resolvimos que la presunción de paternidad matrimonial establecida en el artículo 113 del derogado Código Civil podía ser impugnada con cualquier prueba idónea y concluyente que la revirtiera. Allí, este Tribunal razonó que después de *Ocasio v. Díaz* la declaración del estatus de hijo no podía ampararse en una presunción categórica y restrictiva, casi absoluta, excluyente de las normas usuales de evidencia, determinada prueba y demás circunstancias del nacimiento.[49] Con este enfoque respondimos "**a la necesidad de trascender la interpretación literal del mencionado artículo**, en abono del verdadero espíritu que en materia filiatoria rige en Puerto Rico".[50]

---

[48] *Íd.*

[49] *Moreno Álamo*, 112 DPR en las págs. 385-386.

[50] *Mayol*, 164 DPR en las págs. 550-551; *Moreno Álamo*, 112 DPR en la pág. 387 (énfasis suplido).

Hoy no dudamos que tal como la presunción de paternidad por matrimonio, y posteriormente por reconocimiento voluntario, del derogado Código Civil de 1930, según fue enmendado por la Ley Núm. 215-2009, podía ser impugnada con cualquier prueba idónea y concluyente que la revirtiera, así también corresponde reconocerlo para la presunción de maternidad por el parto establecida en tal artículo. Hay que recordar que los tribunales no podemos aislarnos de la realidad social contemporánea que permite descartar presupuestos de hechos al lograr establecer otros de forma científicamente verificable. Así, hoy reconocemos que **es posible que, tras recibir cualquier prueba idónea y concluyente, el tribunal descarte la presunción de maternidad de la mujer que aparenta tenerla por la presunción que reconocía el parto en el artículo 113 del derogado Código Civil.**[51]

El ordenamiento establece estas presunciones para evitar que la cuestión filiatoria permanezca abierta indefinidamente por conflictos entre los supuestos padres, de ordinario, en perjuicio de menores de edad, así como para que existiera estabilidad jurídica en el estado civil de la persona.[52] Por tal principio de estabilidad jurídica es que el ordenamiento impuso términos perentorios de caducidad para la impugnación

---

[51] CÓD. CIV. PR art. 113, 31 LPRA § 461 (derogado 2020). *Véase*, *Mayol*, 164 DPR en las págs. 550-551; Ortiz v. Peña, 108 DPR 458, 462 (1979).

[52] *González Rosado*, 169 DPR en la pág. 562.

de las constancias filiatorias registrales e insiste en estrictos requisitos de legitimación activa.[53]

Como expresamos, en virtud de la enmienda introducida por la Ley Núm. 215-2009, el artículo 113 del derogado Código Civil establecía que "[e]l reconocimiento voluntario crea una presunción de paternidad a favor del reconocedor".[54] Así, además de la filiación que surge tras el proceso civil de la adopción, la del reconocimiento surgía por declaraciones de personas que afirman la filiación respecto de otra y se comprometen a asumirla legalmente. Por lo tanto, la filiación puede darse por un acto jurídico que impone derechos y obligaciones específicas a las partes con consecuencias indelebles y cuya trascendencia es innecesario recalcar.[55]

Conviene precisar que la filiación adoptiva, distinguible de la filiación por reconocimiento, que desde el origen estaba estatuida en el artículo 125 del Código Civil de 1930 para la filiación extramatrimonial, se refiere a "un acto jurídico solemne, el cual supone la ruptura total del vínculo jurídico-

---

[53] *Íd.*

[54] 31 LPRA § 461 (derogado 2020). *Véase*, *Bonilla Ramos*, 185 DPR en la pág. 673 (caso donde examinamos la enmienda traída por la Ley Núm. 215-2009 para atemperar los artículos 113 al 117 del Código Civil a los tiempos actuales. El legislador consideró que, dado los adelantos científicos, era plausible que, establecida una presunción de maternidad o paternidad, ésta no fuera cónsona con la realidad biológica. El anterior artículo 113 solo establecía la presunción matrimonial, pero tras la enmienda de 2009 quedaron establecidas dos posibles presunciones de paternidad. Así quedó establecido que, además del marido de la madre, es padre presunto aquel que sin estar casado con la madre reconoce voluntariamente al menor).

[55] *Sánchez Rivera*, 192 DPR en la pág. 862. Sobre la trascendencia de la filiación, véanse *Mayol*, 164 DPR en las págs. 529-531; *Almodóvar*, 125 DPR en las págs. 232-234.

familiar de una persona con su parentela biológica y la consecuente filiación de ésta con aquel o aquellos que han expresado la voluntad de que legalmente sea su hijo".[56] No hay duda de que esta modalidad prescinde del fundamento biológico para permitir que, por ficción de ley, el acto jurídico sustituya el hecho natural con iguales deberes y obligaciones jurídicas y sociales que aquellas existentes en la filiación natural.[57]

El derogado Código Civil reconocía la acción para impugnar la presunción de paternidad o de maternidad dispuesta en el mencionado artículo 113. Según disponía el artículo 115, la presunción de maternidad podía impugnarse por la simulación del parto o por la sustitución inadvertida del hijo durante el alumbramiento o después de éste. Las personas legitimadas para la acción serían la presunta madre y la madre biológica, además del hijo y el presunto padre. A juicio de la doctora y exjuez apelativa Migdalia Fraticelli Torres, la presunta madre podía ser "desde la que 'aparentemente lo parió' hasta quien lo inscribió en el registro con su apellido por sustitución inadvertida y aún con conciencia de la falsedad de la inscripción".[58] En el caso de la maternidad subrogada la "presunta madre" sería la mujer gestante, pues, la maternidad

---

[56] *Beníquez*, 184 DPR en la pág. 233.

[57] *Íd.*, págs. 233-234.

[58] M. Fraticelli Torres, *Relevancia actual y secuela jurisprudencial de Ocasio v. Díaz*, 50 Rev. Der. Pur. 101, 116-117 (2010).

quedaría cobijada por la presunción producida por el parto.[59]

El entonces artículo 117 reconocía que la "madre legal" debía impugnar la presunción de maternidad "dentro del plazo de caducidad de seis meses, contados a partir de la fecha de que advenga en conocimiento de la inexactitud de la filiación […]".[60] Sin embargo, según provisto por la enmienda de la Ley Núm. 245-2011 al mencionado artículo, la madre legal no podía impugnar la maternidad inexacta si, con conocimiento de esta realidad, voluntariamente consintió a la inscripción del nacimiento del menor en el Registro Demográfico como hijo suyo.[61]

La filiación por reconocimiento voluntario o forzoso del hijo de personas no casadas legalmente estaba antes

---

[59] *Íd.*

[60] Cód. Civ. PR art. 117, 31 LPRA § 465 (derogado 2020). En *Almodóvar v. Méndez Román* reconocimos dos modalidades para impugnar la presunción de paternidad matrimonial y que la acción impugnatoria de la filiación extramatrimonial es una figura encaminada a desvirtuar, no la paternidad *per se* o directamente la condición de hijo, sino el acto de reconocimiento voluntario. *Véase, además*, *González Rosado*, 169 DPR en las págs. 565-567; *Mayol*, 164 DPR en la pág. 540.

[61] El segundo párrafo del entonces artículo 117 reconocía a la madre biológica, así como a la madre legal, el plazo de caducidad de un año desde la inscripción del nacimiento para impugnar la presunción de maternidad, esto en contradicción al plazo de seis meses dispuesto en el primer párrafo. Según la doctora Fraticelli Torres, "[l]a referencia 'a la madre legal' en este párrafo no está clara. ¿Quién es la madre legal? Nótese que la ley habla antes de 'la madre presunta' y 'la madre biológica'. Las trata como entes distintos. Entonces, nos preguntamos, 'la madre legal', ¿es quien aparece como madre en el Registro Demográfico o es la que parió al hijo, pero luego fue privada de su compañía? […] ¿Qué prueba debe presentarse para prevalecer en la acción de impugnación? Obviamente, el demandante debe probar preponderantemente 'la inexactitud de la filiación' con cualquier prueba admisible en un tribunal. Este criterio es similar al adoptado en el caso de *Moreno Álamo v. Moreno Jiménez*, 'la imposibilidad de la paternidad' del presunto padre". Fraticelli Torres, *supra*, pág. 119.

regulada en el artículo 125 del derogado Código Civil que,

en lo pertinente, disponía:

> Son hijos naturales los nacidos, fuera de matrimonio, de padres que al tiempo de la concepción de aquéllos hubieran podido casarse, sin dispensa o con ella.
>
> **El hijo natural puede ser reconocido por el padre <u>o la madre</u>** conjuntamente, o por uno solo de ellos, en el acta de nacimiento, o en otro documento público.
>
> […]
>
> La madre estará obligada al reconocimiento del hijo natural […] cuando se pruebe cumplidamente el hecho del parto y la identidad del hijo.
>
> El hijo mayor de edad no podrá ser reconocido sin su consentimiento. **Cuando <u>el reconocimiento del menor de edad</u> no se realiza en el acta de nacimiento o en testamento, <u>será necesaria la aprobación del juez</u>** de la sala del Tribunal de Primera Instancia en que resida el menor, con intervención del fiscal.[62]

Sobre el reconocimiento voluntario, hemos expresado

que se entiende por "aquella declaración hecha por ambos

padres (o por uno de ellos aisladamente), por cuya virtud

acreditan que una persona es hijo o hija suya, siempre que

ello se haga en las condiciones y mediante las formas

prescritas por las leyes".[63] En tanto, el reconocimiento

---

[62] 31 LPRA § 504 (derogado 2020) (énfasis suplido). Adviértase que omitimos el párrafo tercero y los cuatro numerales contenidos en este párrafo, relacionado al reconocimiento forzoso del padre al hijo natural, porque en *Ocasio v. Díaz*, 88 DPR en la pág. 750, este Tribunal dispuso que dicho párrafo quedó tácitamente derogado por efectos de las Leyes Núms. 229 de 1942, 243 de 1945 y 17 de 20 de agosto de 1952. En aquella ocasión expresamos que los requisitos de prueba señalados en el párrafo tácitamente derogado no aplicarían en cualquier acción o procedimiento filiatorio que estuviera en trámite o el que se instara. La doctora Migdalia Fraticelli Torres afirma que hoy estos solo ilustran situaciones que pueden ayudar a probar el hecho de la paternidad por preponderancia de prueba. *Véase*, Fraticelli Torres, *supra*, pág. 105.

[63] *González Rosado*, 169 DPR en la pág. 563 (*citando a* F. Puig Peña, *Compendio de Derecho Civil Español*, Madrid, Ed. Pirámide, Vol. V, pág. 394).

forzoso es aquel "que surge como consecuencia de una sentencia judicial emitida en una acción de filiación".[64]

Desde *Almodóvar v. Méndez Román* reconocimos el señalamiento doctrinal de que "[l]as personas que carecen de filiación conocida paterna o materna o de ambas, pasan a ostentar una u otra o las dos cuando los reconoce un varón, una mujer o una pareja".[65] En aquel momento expresamos que en **el reconocimiento voluntario queda al margen la cuestión si el reconocido es o no hijo biológico del reconocedor**.[66] Sin embargo, en *Mayol v. Torres* resolvimos que era posible impugnar un reconocimiento voluntario por la única razón de que la filiación jurídica no corresponde a la realidad biológica, es decir, que en Puerto Rico existía la acción para impugnar el reconocimiento voluntario por inexactitud.

No solo hemos afirmado jurisprudencialmente la posibilidad del reconocimiento voluntario de un hijo por parte de una mujer, como lo permitía el derogado Código Civil para la filiación no matrimonial, sino que el artículo 19-A de la *Ley del Registro Demográfico de Puerto Rico* dispone:

> Si el nacimiento es reconocido por uno solo de los padres será obligación del Registro Demográfico, cuando así lo requiera dicho padre o madre al momento de la inscripción, realizar la inscripción haciendo constar los dos apellidos del único que lo reconoce.
>
> Si con posterioridad a la inscripción surgiera la intención de un **reconocimiento voluntario, el Registro Demográfico viene en la obligación de sustituir el**

---

[64] *Castro*, 159 DPR en la pág. 611.

[65] *Almodóvar*, 125 DPR en la pág. 236 (*citando a* M. Albaladejo, *Curso de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1984, T. IV, pág. 226).

[66] *Íd.*, pág. 250.

**apellido del padre o <u>la madre</u>** de acuerdo a la documentación evidenciada.[67]

Ahora bien, contrario a la filiación adoptiva, el reconocimiento voluntario no puede ser eficaz en ningún aspecto si está en oposición con un título anterior que acredite otra filiación.[68] Dicho de otro modo, hasta que no se impugne exitosamente en el tribunal la filiación contradictoria registral, no procede el reconocimiento de otra filiación.[69]

Sabemos que, en todo caso, la declaración judicial de la condición de hijo debe ser bajo las reglas de evidencia, "de acuerdo con la preponderancia de las pruebas y conforme a conclusiones que, al tomar en consideración las circunstancias concurrentes en el caso, representen el balance más racional, justiciero y jurídico en la resolución del pleito".[70]

---

[67] Art. 19-A de la Ley Núm. 24 de 22 de abril de 1931, Ley del Registro Demográfico de Puerto Rico, 24 LPRA § 1133a (énfasis suplido).

[68] *Beníquez*, 184 DPR en la pág. 249; *Mayol*, 164 DPR en la pág. 541; *Castro*, 159 DPR en la pág. 588. Nótese que este Tribunal ha resuelto que, en ausencia de una inscripción contradictoria de paternidad en el Registro Demográfico, el reconocimiento voluntario tenía la eficacia probatoria que otorga la ley a los certificados de nacimiento. Pueblo v. Rosado, 88 DPR 456 (1963) (caso en que el acusado reconoció voluntariamente la paternidad al inscribir en el Registro Demográfico como hija suya a la niña de una mujer casada con otro).

[69] *Beníquez*, 184 DPR en la pág. 249.

[70] *Ocasio v. Díaz*, 88 DPR en la pág. 750. *Véase, además*, *Mayol*, 164 DPR en las págs. 547-549 (caso que advierte que los artículos 125 y 126 del hoy derogado Código Civil, pocas veces atendidos en la jurisprudencia, son dos artículos sobre los hijos naturales matizados o derogados en parte por leyes especiales, por la Constitución de 1952 y por nuestra jurisprudencia. Las leyes especiales posteriores redefinieron el concepto "hijos naturales" como todos "los hijos nacidos fuera del matrimonio", en abstracción de cualquier otra condición. **El reconocimiento podía darse por quien no tuviera lazos biológicos con el reconocido como hijo,** solo así tendría sentido la acción de

En fin, la filiación "es una relación fundamentalmente jurídica que responde a ciertos imperativos de la política pública [y al balance apropiado entre intereses diversos]".[71] El establecimiento de determinada política pública sobre la filiación conlleva establecer, entre otros asuntos, los procedimientos para determinarla, el papel de la voluntad de quien pretende determinada filiación, la posibilidad de reclamar la filiación o **la negación de la que existe en apariencia**.[72]

No olvidemos que, ante la inacción de la Asamblea Legislativa en materia de filiación y fundamentado en nuestra jurisprudencia:

> [H]emos sido consecuentes en flexibilizar la normativa puertorriqueña relativa al ámbito de la filiación a la luz de los recientes adelantos científicos y de las corrientes constitucionales modernas. Este proceder jurisprudencial ha encontrado su justificación en la importancia trascendental que reviste el estado filiatorio de un ser humano, de cuya certeza emanan aspectos importantes de naturaleza moral, patrimonial e, incluso, un interés público superior que atañe también al Estado.[73]

**D. Nuevo Código Civil y su aplicación a acciones pendientes**

A nivel mundial, la materia filiatoria es una de las áreas del Derecho de familia que ha sufrido las más profundas transformaciones en lo que va de siglo. Las nuevas leyes en el

---

impugnación de reconocimiento permitida en la última oración del entonces artículo 126 del Código Civil).

[71] *González Rosado*, 169 DPR en las págs. 561, 563.

[72] *Mayol*, 164 DPR en la pág. 533.

[73] *Beníquez*, 184 DPR en las págs. 229-230.

mundo occidental destacan por el común denominador de equiparar la filiación matrimonial y extramatrimonial, no distinguir entre clases o subtipos dentro de la filiación extramatrimonial, por la apertura al establecimiento de la filiación por la vía judicial y la posibilidad de la impugnación, con amplia admisibilidad a diversos tipos de prueba y el uso práctico de las pruebas biológicas.[74]

Cabe precisar que el actual Código Civil de Puerto Rico dispone que "[l]as normas que regulan las relaciones jurídicas familiares son de orden público e interés social, y tienen por objeto proteger el desarrollo integral de la persona en el entorno familiar".[75] Así, el artículo 556 establece que "[l]a filiación tiene lugar por vínculo genético, **por métodos de procreación asistida** o por adopción".[76] Establece el artículo 559 del Código que "**[u]n progenitor puede reconocer de cualquier modo al hijo**".[77] Así, el nuevo Código recoge el siguiente principio:

> Si uno solo de los progenitores reconoce e inscribe a la persona nacida, lo hace con sus dos apellidos en el mismo orden del progenitor que lo reconoce. El reconocimiento posterior del otro progenitor justifica la sustitución de uno de los apellidos en el nombre de la persona por el del progenitor que le reconoce con posterioridad.[78]

---

[74] *Mayol*, 164 DPR en la pág. 534.

[75] Cód. Civ. PR art. 363, 31 LPRA § 6462 (2020).

[76] *Íd.* § 7102 (énfasis suplido).

[77] *Íd.* § 7105 (énfasis suplido).

[78] *Íd.* § 5543.

Nótese que el contenido de este artículo es similar a lo que establece el artículo 19-A de la *Ley del Registro Demográfico*, antes citado.

Por su parte, el artículo 564 del Código Civil requiere que "[l]a declaración judicial del estado filiatorio no hará pronunciamiento sobre las circunstancias del nacimiento o el estado civil de los progenitores".[79] En tales casos, el estado filiatorio "puede establecerse con cualquier prueba admisible en un tribunal conforme a las Reglas de Evidencia".[80]

Sobre la presunción de la maternidad, el actual artículo 567 del Código Civil establece que "[e]l parto determina la maternidad, **excepto en casos de maternidad subrogada en los cuales la mujer gestante no tiene vínculo genético alguno con el hijo que se desprende de su vientre** y desde un principio su intención original fue llevar el embarazo a término para otra persona".[81] Como se sabe, las presunciones admiten prueba en contrario, en este caso "siempre que se demuestre la imposibilidad de la paternidad o la maternidad, y que se presente en los procedimientos y en los plazos dispuestos en este Código".[82]

Por otra parte, el ordenamiento actual reconoce expresamente la acción de impugnación de la maternidad de

---

[79] *Íd.* § 7114.

[80] *Íd.* § 7115.

[81] *Íd.* § 7121 (énfasis suplido).

[82] *Íd.* § 7123.

probarse que hubo un acuerdo de subrogación. Tienen acción legitimada para impugnar la maternidad reconocida jurídicamente la presunta progenitora, la madre biológica o la madre intencional.[83]

Sabemos que, de ordinario, las leyes no tienen efecto retroactivo, excepto cuando se dispone expresamente lo contrario.[84] Sin embargo, el alcance de esta norma no es otro que el de una regla de interpretación para el juzgador. Por lo tanto, el juzgador puede deducir del contexto de la ley, si es apropiado aplicar esa nueva disposición jurídica a acciones pendientes, sobre todo si no perjudica derechos de terceros o procesalmente es más beneficiosa para las partes ante el tribunal.[85] La doctrina reconoce que "si una ley establece un nuevo derecho o altera los anteriormente existentes, la ley se aplica desde su vigencia y puede invocarse la nueva situación, aunque los hechos hayan ocurrido con anterioridad a la vigencia de la nueva ley".[86]

En *Pérez Valdivieso v. León* este Tribunal resolvió que se podía invocar la entonces nueva causal de divorcio de separación por siete años, aunque parte del tiempo de separación hubiese transcurrido antes de aprobarse la reforma

---

[83] *Íd.* § 7124.

[84] *Íd.* § 5323.

[85] *Ocasio v. Díaz*, 88 DPR en las págs. 729-730.

[86] R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed. rev., San Juan, Pubs. JTS, 1987, pág. 396.

al Código Civil entonces vigente.[87] Aunque la intención legislativa no apareciera claramente de su contexto, en aquel caso se entendió que el estatuto que creaba la nueva causal de divorcio debía aplicarse con igual fuerza tanto a hechos pasados como a futuros.[88] Esto porque "la institución del matrimonio, su celebración, régimen y disolución, son cuestiones de interés público que los pueblos por medio de sus gobiernos se han reservado siempre el poder de regular con entera libertad".[89]

Hay que recordar también que la regla de interpretación sobre la irretroactividad de las leyes que afecten derechos adquiridos aplica solamente a estatutos de carácter sustantivo, no a disposiciones procesales o adjetivas, de interés público.[90] De tratarse de normas procesales o adjetivas, estas aplican a los casos pendientes, salvo que la Asamblea Legislativa disponga lo contrario. Establece la doctrina que "**[n]o es exactamente que tengan efecto retroactivo, sino que se aplican aun a casos que ya hayan comenzado,** aunque [antes] de ya estar en vigor la ley".[91]

Cabe precisar que las presunciones jurídicas tienen particular valor probatorio y, de ordinario, son utilizadas

---

[87] Pérez Valdivieso v. León, 52 DPR 512, 520-521 (1938).

[88] *Íd.,* pág. 519.

[89] *Íd.,* pág. 518.

[90] *Véase*, Cortés Córdova v. Cortés Rosario, 86 DPR 117, 123 (1962).

[91] R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico, op. cit.*, pág. 400 (énfasis suplido).

por el juez al momento de dictar sentencia por crear la convicción de determinado hecho. Sabemos que en el proceso judicial oportuno la filiación presunta por disposición de ley deberá ceder ante la prueba o demostración contraria. Así, si el asunto filiatorio llega al tribunal las presunciones legales tendrán el carácter de norma procesal dentro de la acción de reconocimiento con autorización judicial o de impugnación.[92]

El artículo 1806 del Código Civil de 2020 dispone expresamente que las disposiciones que perjudique derechos adquiridos según la legislación civil anterior no tienen efecto retroactivo.[93] Por otra parte, el artículo 1808 del Código Civil de 2020 establece:

> Las acciones y los derechos nacidos y no ejercitados antes de la entrada en vigor de este Código subsisten con la extensión y en los términos que le reconoce la legislación precedente; pero sujetándose, en cuanto a su ejercicio y procedimientos para hacerlos valer, a lo dispuesto en este Código. **Si el ejercicio del derecho o de la acción <u>se halla pendiente de procedimientos comenzados bajo la legislación anterior</u>, y estos son diferentes de los establecidos en este Código, pueden optar los interesados por unos o por otros.**[94]

Así, aunque este Tribunal tenía declarado que los derechos de filiación deben regularse por la legislación

---

[92] F. Rivero Hernández, *La presunción de paternidad legítima*, Madrid, Tecnos, 1971, págs. 324, 329-331.

[93] 31 LPRA § 11711.

[94] *Íd.* § 11713 (énfasis suplido). Nótese, además, que conforme al artículo 1811 del Código Civil de 2020 las nuevas disposiciones o procedimientos pueden ser aplicados a los expedientes de adopción, los de emancipación voluntaria y los de dispensa de ley pendientes ante los tribunales al momento de entrar en vigor la nueva legislación civil. *Íd.* § 11716.

vigente en el momento del nacimiento,[95] desde *Ocasio v. Díaz* entendimos que esto no era un principio intocable y mucho menos aplicable a las maneras de establecer la realidad filiatoria cuando de presunciones legales rebatibles en un proceso se trata. El legislador puede modificar la legislación vigente en el tiempo del nacimiento y la ley posterior puede aplicarse a los trámites judiciales pendientes.[96]

En *Ocasio v. Díaz* expresamos que, en su aspecto procesal, las normas probatorias del artículo 125 del derogado Código Civil perdieron tácitamente su vigencia y aplicación respecto a litigios y procedimientos filiatorios pendientes al 25 de julio de 1952 y a los que se iniciaran en o con posterioridad a esa fecha, sin tomar en cuenta la fecha del nacimiento.[97] Esto porque "[e]l respeto a los derechos adquiridos, a los hechos consumados, a las situaciones ya existentes, no se opone

---

[95] Este proceder estaba fundamentado en las diferencias entonces existentes entre los hijos legítimos, naturales e ilegítimos. En aquel momento, el Tribunal Supremo negaba el reconocimiento de nuevos derechos a los hijos naturales e ilegítimos nacidos previo a la aprobación de una ley porque se oponían o perjudicaban los derechos adquiridos por los hijos legítimos bajo la ley anterior, en particular los derechos hereditarios que eran de carácter sustantivo. *Véanse*, Lucero et al. v. Los Herederos de Vila, 17 DPR 152, 165-167 (1911); Charres v. Arroyo, 16 DPR 816, 821 (1910). En la actualidad no existe tal consideración a la hora de aplicar en materia filiatoria nuevos derechos, procesales y sustantivos, porque "independientemente de la forma en que los hijos adquieran la filiación, ésta produce idénticos efectos jurídicos en lo concerniente al estado de hijo". *Castro*, 159 DPR en las págs. 608-609.

[96] *Ocasio v. Díaz*, 88 DPR en la pág. 725.

[97] *Íd.* (en este caso el Tribunal expresó que "**[e]n su aspecto procesal, aun imperaban las normas de prueba** -con categoría de requisitos cuasi sustantivos- impuestas por el artículo 125 del Código Civil. Al adoptarse la Constitución y aprobarse la Ley Núm. 17 esas normas resultaron no aptas para implementar el nuevo régimen igualitario, perdieron entonces su vigencia […]" (énfasis suplido)).

al establecimiento de reformas sociales constitucionales ni a leyes que se dan en vista de situaciones pasadas".[98]

III.

Precisamos que ha militado a favor de la expedición de este recurso el hecho de que la cuestión planteada es un asunto novel no regulado directamente -ni prohibido- al momento de suscribirse el acuerdo de subrogación gestacional con el matrimonio peticionario y del nacimiento del menor concebido por métodos de procreación asistida sin vínculo genético con la mujer gestante.

En este caso el foro apelativo incidió al establecer que el foro primario no tenía jurisdicción para atender la petición judicial de inscripción registral por reconocimiento de los padres intencionales por ausencia de partes indispensables — la mujer gestante y su entonces pareja consensual— y al cuestionar la validez del acuerdo de subrogación habido con el matrimonio peticionario. A continuación, exponemos las razones por las cuales la sentencia recurrida es errónea en estos extremos, asunto que acepta el Procurador General en su comparecencia.

En primer lugar, el foro apelativo hizo una lectura sumamente expansiva de la figura de parte indispensable de la Regla 16.1 de Procedimiento Civil que derrota principios cardinales en la administración de la justicia como la eficiencia, la economía procesal y sobre todo el mejor

---

[98] *Íd.*, pág. 724.

bienestar del menor sujeto de inscripción registral. La determinación mayoritaria no consideró de forma pragmática e individualizada el tipo de caso en cuestión, los intereses implicados y el remedio pretendido. En estas circunstancias particulares, el foro primario concedió un remedio final y completo a las partes presentes, sin afectar los intereses de alguna parte ausente conocida y determinada.

Este Tribunal no puede avalar la determinación del foro apelativo de la falta de jurisdicción por la ausencia de la entonces pareja consensual de la mujer gestante como parte indispensable en la petición *ex parte* de inscripción registral de un menor nacido por procreación asistida. En este caso, la entonces pareja consensual de la mujer gestante suscribió el acuerdo de subrogación en el que afirmó que no deseaba tener más hijos propios. También declaró que no tenía interés en ningún tipo de derecho de patria potestad o custodia sobre el menor que pudiera nacer. Sus declaraciones, más que concederle algún interés o derecho sobre el menor, derrotarían cualquier pretensión de imputarle la paternidad.

Por otra parte, la entonces pareja consensual también suscribió el consentimiento para la transferencia de los embriones en el proceso de subrogación, pero su participación fue únicamente de carácter testimonial. Para la firma de ese documento, la mujer gestante fue advertida de su derecho a utilizar un testigo de conocimiento sobre el consentimiento de subrogación que la obligaba a ella, a

sus herederos, legatarios, causahabientes y mandatarios. Por esto, su entonces pareja consensual firmó el consentimiento como testigo.

En este caso, no hay controversia de que el padre biológico del menor es el peticionario BJJ, hecho confirmado por el testimonio de la mujer gestante, los expedientes médicos, la cadena de custodia del material genético y el testimonio del experto en endocrinología reproductiva e infertilidad que tuvo a cargo el procedimiento médico.

Ante este hecho y la inscripción registral ya efectuada, por intervención del foro primario, operaba la presunción de paternidad del artículo 113 del derogado Código Civil a favor del peticionario. Si consideramos los legitimados para impugnar tal presunción según disponía el artículo 114 de igual Código,[99] ciertamente no hay espacio para concluir que la entonces pareja consensual pudiera reclamar algún derecho, pues, el "presunto padre" y el "padre biológico" se confunden en la persona del peticionario BJJ.

Por lo tanto, el Tribunal de Apelaciones erró al establecer que, al amparo del artículo 125 del derogado Código Civil, le asistían ciertas prerrogativas relacionadas al nacimiento del menor a la entonces pareja consensual de la mujer gestante y, por ende, era parte

---

[99] Cód. Civ. PR art. 114, 31 LPRA § 462 (derogado 2020).

indispensable en la petición para la declaración del estado filiatorio con el matrimonio peticionario. Recordemos que, desde *Ocasio v. Díaz* está claramente establecido que las disposiciones utilizadas por el foro apelativo no tienen vigencia en nuestro ordenamiento. En particular, la referencia a que el padre está obligado a reconocer al hijo no matrimonial, "[c]uando la madre fue conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo".[100]

En cuanto a la mujer gestante como presunta parte indispensable, el foro apelativo olvidó constatar que en el proceso de jurisdicción voluntaria esta actuó como parte con interés y se sometió voluntariamente a la jurisdicción del Tribunal. La *Petición ex parte* ante el foro primario reza:

> Comparece la parte peticionaria de epígrafe, representada por la abogada que suscribe, junto a las partes con interés [y] muy respetuosamente exponen, alegan, solicitan:
>
> ........
>
> 3. La parte con interés, [CTR], es mayor de edad, soltera, [...] y **se somete voluntariamente a la jurisdicción del tribunal**.[101]

No podemos pasar por alto que, en el supuesto de que hubiera sido necesario, el derecho al emplazamiento es renunciable. Tal renuncia puede suceder cuando una parte se

---

[100] *Íd.* § 504.

[101] *Apéndice de la Solicitud*, pág. 44 (énfasis suplido).

somete voluntariamente a la jurisdicción del Tribunal.[102] En este caso la obligación de la mujer gestante de cooperar y comparecer en el proceso de inscripción estaba prevista en el acuerdo de subrogación, la cual cumplió también al suscribir la declaración jurada que acompañó la petición, y al testificar y ratificar ante la juez a cargo del proceso su renuncia a cualquier derecho sobre el menor.

Como advertimos, los procedimientos de jurisdicción voluntaria son aquellos donde no existe controversia entre las partes. La Regla 3.1(b) de Procedimiento Civil reconoce la facultad de los tribunales para atender procedimientos no contenciosos. Por otra parte, conforme a la Regla 72, cuando no hay un procedimiento específico para determinado asunto el tribunal puede reglamentar su práctica con las propias reglas procesales o con cualquier otra disposición de ley compatible e incluso por analogía.

En fin, la renuncia de la mujer gestante a cualquier derecho que el parto le pudo reconocer respecto al menor puede ser validada en un procedimiento no contencioso y sin necesidad de notificarle por emplazamiento de la petición que pretende la filiación con la madre intencional en un procedimiento de procreación asistida o subrogación.

En este caso, el procedimiento incoado por el matrimonio peticionario perseguía que el tribunal ordenara la inscripción del menor en el Registro Demográfico como

---

[102] *Sánchez Rivera*, 192 DPR en las págs. 872-873.

hijo suyo por reconocimiento voluntario con autorización judicial, **antes** de que el nacimiento fuese inscrito en el Registro demográfico, y tal interés no estaba contrapuesto con los intereses de la mujer gestante sin vínculo genético con el menor.[103] Ante estas circunstancias particulares, el procedimiento no puede ser uno contencioso por mero *fiat* judicial.

Aquí no existe controversia de que la mujer gestante no está vinculada genéticamente con el menor. Así, el proceso *ex parte* llevado por el matrimonio peticionario tuvo el efecto de derrotar con prueba idónea y concluyente la presunción legal de que el parto determina la maternidad e invocar la filiación natural materna por reconocimiento voluntario con la aprobación judicial a nombre de la madre intencional antes de la inscripción del nacimiento, conforme permitía el artículo 125 del derogado Código Civil para la filiación extramatrimonial.

En segundo lugar, el foro apelativo incidió al expresar *sua sponte* que era necesario considerar la legalidad del acuerdo de subrogación. Aunque la única contención del Procurador General era la inscripción directa del menor como hijo de la madre intencional y no mediante una declaración de adopción, la sentencia mayoritaria *sua sponte* cuestionó la validez jurídica del acuerdo:

> La cuestión que plantea el caso de epígrafe es una altamente compleja, cuya final disposición exige la

---

[103] *Cf.* Art. 21-B de la Ley del Registro Demográfico, 24 LPRA § 1137.

consideración de múltiples prerrogativas y obligaciones que el ordenamiento jurídico reconoce a todos los involucrados en el proceso. **El asunto de la subrogacía [*sic*] gestacional, para validarse en nuestra jurisdicción, exige que se complete un trámite alterno al meramente contemplado en un acuerdo privado entre las partes <u>que no necesariamente es legal</u>**. Es precisamente el interés apremiante del Estado de proteger a los menores de edad, el que se resguarda al exigirse el cumplimiento de ciertas formalidades legales que garantizan la adecuacidad de sus derechos civiles. Siendo así, intimamos fundamental que se dé plena observancia a los preceptos procesales y sustantivos involucrados, particularmente a aquellos imperantes al momento de suscribirse el *Acuerdo de Subrogacía* [*sic*] *Gestacional* que nos concierne, de modo que el asunto se disponga de manera justa y correcta.[104]

Advertimos que la postura de cuestionar *sua sponte* la validez del acuerdo no se justifica, además de que, en este tipo de circunstancia, añade un problema adicional. En primer lugar, no debemos obviar que en el nuevo Código Civil el legislador ha reconocido expresamente, como cuestión de orden público e interés social, la validez de los acuerdos de maternidad subrogada —sin establecer los requisitos—, la filiación por métodos de procreación asistida, la figura de la madre intencional y que la presunción de maternidad por el parto no recaerá en la mujer gestante sin vínculo genético con el menor que lleva el embarazo a término para otra persona. Asimismo, que es posible aplicar estas normas a las acciones y procedimientos judiciales pendientes al momento de la aprobación del nuevo Código Civil.[105]

---

[104] *Apéndice de la Solicitud*, pág. 8 (énfasis suplido).

[105] CÓD. CIV. PR art. 567, 31 LPRA § 7121 (2020).

Pero, además, una declaración de nulidad de un acuerdo de maternidad subrogada no solucionaría las cuestiones filiatorias del menor nacido por técnicas de reproducción asistida. Si el tribunal insiste *sua sponte* en no reconocer la validez del acuerdo de subrogación y atribuir la maternidad a la mujer gestante, tendría que afrontar el problema de que esta última no es su madre biológica y no desea relacionarse en modo alguno con el menor nacido por procreación asistida. Nos preguntamos, además, cuál sería el fin de obligar a la mujer gestante al reconocimiento forzoso del artículo 125 del Código Civil de 1930.

En conclusión, aunque pudiera existir alguna controversia sobre cuál era el procedimiento para inscribir a un menor nacido por subrogación gestacional a nombre de la madre intencional, en este caso la mujer gestante compareció al procedimiento de jurisdicción voluntaria como parte con interés y con su testimonio apoyó la petición de reconocimiento voluntario con autorización judicial. Traerla como parte demandada, como resolvió el foro apelativo, sería atribuirle unos derechos a los que palmariamente renunció en más de una ocasión, cuestión que el Procurador General aceptó en el recurso instado ante el Tribunal de Apelaciones.

En este caso el foro primario declaró la filiación del menor con la madre intencional por el reconocimiento voluntario, con apoyo en la prueba testifical, científica, pericial y documental presentada. La mujer que dio a luz al

menor sin vinculo genético renunció expresamente a cualquier derecho que le pudo haber concedido el parto, antes de cualquier inscripción registral. Tales actos tienen consecuencias jurídicas indubitables y el Procurador nunca ha cuestionado la validez de la renuncia a cualquier derecho por motivo del parto, solo la formalidad de la inscripción directa o por filiación natural a nombre de la madre intencional.

Ahora bien, no podemos avalar la contención del Procurador General. En este caso no procede la filiación adoptiva porque no existe una filiación jurídica previa con la mujer gestante y solo había una presunción legal que fue debidamente rebatida por prueba suficiente en derecho en el proceso judicial instado **antes de la inscripción del nacimiento,** además del reconocimiento en el nuevo Código Civil de la excepción a la presunción del parto en los casos de gestación subrogada o sin vínculo genético mientras el asunto filiatorio ante nuestra consideración estaba en trámite.

Reiteramos que en este caso fue probado que la mujer gestante no tiene vínculo genético alguno con el menor y que desde un principio su intención fue llevar el embarazo a término para el matrimonio peticionario. Ante tal escenario, el Tribunal de Primera Instancia estaba en posición de emitir una sentencia vinculante para las partes y autorizar el reconocimiento voluntario de la madre intencional, según provee el artículo 19-A de la *Ley del*

*Registro Demográfico* y lo permitía el derogado artículo 125 del Código Civil para la filiación extramatrimonial.[106]

Conforme surge de la doctrina legal discutida en el segundo acápite de esta *Opinión*, la relación biológica de la madre intencional con el menor nacido por subrogación gestacional no es condición necesaria para permitir la filiación por reconocimiento voluntario con autorización judicial. Bajo el Código vigente al momento del nacimiento en cuestión, habíamos establecido que la filiación que corresponde al estado civil de un menor puede ser establecida por el vínculo genético o por adopción, **pero también por otro hecho legalmente suficiente al efecto como lo es el reconocimiento voluntario, con o sin autorización judicial**. Nótese que el entonces artículo 117 del derogado Código Civil reconocía la posibilidad de que la madre legal fuera quien, con conocimiento de que no era la madre biológica, voluntariamente consintiera a la inscripción del nacimiento del menor en el Registro Demográfico como hijo suyo.

En este caso solo la madre intencional es quien ha ejercido la acción de reconocimiento voluntario ante el tribunal. La madre biológica, quien donó los óvulos utilizados en la fertilización *in vitro*, es desconocida, y la presunta madre por razón del parto renunció válidamente a cualquier derecho **antes** de la inscripción original del nacimiento. Ante tal realidad, **no hay ninguna filiación contradictoria al**

---

[106] 24 LPRA § 1133a.

**reconocimiento de la madre intencional, como tampoco existe un vínculo jurídico-familiar del menor con alguna parentela biológica materna conocida que requiera su ruptura por el acto solemne de la adopción.**

Sabemos que la adopción está diseñada para sustituir la filiación natural en circunstancias en que los padres biológicos de la criatura, por la razón que sea, no desean o no pueden asumir las responsabilidades de la paternidad. También cuando, con posterioridad, éstos no proveen el cuidado y afecto que debe recibir el menor y el estado tiene que intervenir para privar a los padres de la custodia y patria potestad. En este contexto, y a la luz de tales consideraciones y el interés público de proteger el mejor bienestar del menor, la adopción es un mecanismo efectivo, pero, a su vez, nadie puede dudar que es el más oneroso que existe para sustituir la filiación natural u original de un menor.

Así que, ante la necesidad de establecer la filiación original de un menor nacido por procreación asistida, no vemos razón para acudir al mecanismo más oneroso que existe en nuestro ordenamiento civil. En tal circunstancia, por principios fundamentales como la intimidad familiar y el derecho del menor a adquirir con prontitud el estado civil para el desarrollo integral de su personalidad en el entorno familiar, el mecanismo para establecer la filiación original debe ser el menos oneroso posible, como lo son el reconocimiento voluntario y la presunción matrimonial estatuida en nuestro Código Civil.

No olvidemos que desde 1942, a pesar de la presunción de filiación matrimonial del artículo 113 del derogado Código Civil, era posible que dos hombres inscribieran a un menor como hijo suyo, pero prevalecía como padre quien primero lo inscribiera en el Registro Demográfico hasta tanto la presunción o el reconocimiento voluntario fuera impugnado con éxito en el tribunal por inexactitud con la realidad biológica. Así, no vemos razón para que al amparo del artículo 125 del Código Civil de 1930, el artículo 19-A de la *Ley del Registro Demográfico*, y por el principio constitucional de igualdad, rechacemos esa posibilidad respecto a la mujer. Lo que hoy pautamos responde a principios de orden constitucional que no podemos obviar y elimina uno de los últimos reductos de discrimen sobre la mujer en materia filiatoria.[107]

Conviene recalcar que este no es un caso de aplicación retroactiva de una nueva legislación que perjudique derechos adquiridos bajo la legislación civil anterior. Se trata de reconocer que las normas filiatorias son de orden público e interés social y que tienen como fin la protección del desarrollo integral del menor dentro del seno familiar. Ante el claro carácter de normas adjetivas y de interés público, y a su vez procesales y probatorias —aspecto también reconocido en *Ocasio v. Díaz*—, no vemos cómo el reconocimiento expreso de

---

[107] *Véase*, Pavan v. Smith, 582 US _ (2017), 137 S. Ct. 2075 (2017) (caso que para afirmar el principio de no discriminación rechazó la postura del estado de Arkansas de que el certificado de nacimiento era un mecanismo para registrar solamente datos vitales, puesto que permitía la inscripción como padre de quien no tenía vínculo biológico o genético con el menor sujeto de la inscripción por operación de la presunción matrimonial).

la filiación por métodos de procreación asistida en el nuevo Código Civil y el hecho de que un progenitor puede reconocer de cualquier modo al hijo no puede ser aplicado a un procedimiento de reconocimiento voluntario con autorización judicial pendiente ante los tribunales al momento de aprobación de la nueva legislación civil.

Dicho de otro modo, como este caso trata de la manera de establecer la filiación materna de un menor nacido por procreación asistida, el artículo 1808 del nuevo Código Civil, relativo a las acciones y derechos pendientes —conforme lo autorizaba el artículo 125 del derogado Código Civil—, permite reconocer que en los hechos que nos ocupan no existe la presunción de maternidad porque la mujer gestante no tiene vínculo genético alguno con el menor sujeto de inscripción y desde un principio su intención fue llevar el embarazo a término para el matrimonio peticionario.

Por otra parte, esta decisión no desconoce la función del Registro Demográfico de custodiar y preservar las estadísticas vitales, entiéndase la información derivada de los certificados e informes de nacimiento, así como la función de tabular, analizar y publicar estadísticas vitales. Tampoco atribuye a los empleados del Registro Demográfico una función calificadora. La Ley habilitadora del Registro Demográfico es la que faculta al Secretario de Salud a establecer las instrucciones, formas, impresos y libros que sean necesarios para obtener y conservar los datos relacionados a los

nacimientos que ocurran en Puerto Rico.[108] De hecho, el artículo 19 de la *Ley del Registro Demográfico* enumera la información requerida y que el Registrador Demográfico "mantendrá en sus archivos [...] para los propósitos legales, sociales y sanitarios que se persiguen al inscribir el nacimiento".[109]

No existe duda de que la información que consta en el Registro Demográfico constituye evidencia *prima facie* del hecho que se pretende constatar.[110] Tampoco de que al Registro Demográfico solo tienen acceso los hechos o cualidades del estado civil expresamente declarados inscribibles en la legislación registral y que cualquier enmienda sustancial de sus constancias tiene que estar previamente autorizada por la ley y ordenada judicialmente.[111]

Ahora bien, el caso ante nuestra consideración trata de la inscripción registral por reconocimiento voluntario al amparo del entonces vigente artículo 125 del Código Civil de 1930, antes de que se diera cualquier otra declaración, informe o inscripción en el Registro Demográfico del menor nacido por técnicas de procreación asistida. Esto fue así porque el día siguiente al parto, en lugar de firmar el certificado de nacimiento que provee el hospital, la mujer gestante suscribió una declaración jurada en la que consintió a que RPR fuera

---

[108] *Véase*, los artículos 3, 17, 18, 18-A, 19 y 19-A de la Ley del Registro Demográfico, 24 LPRA §§ 1071, 1131- 1133a.

[109] *Íd.* § 1133.

[110] Delgado, Ex parte, 165 DPR 170, 187 (2005).

[111] *Íd.*, pág. 191.

designada como la madre legal de la criatura y de ahí los padres intencionales acudieron al tribunal para el reconocimiento voluntario con autorización judicial.

Además, el artículo 31 de la *Ley del Registro Demográfico* establece, en lo pertinente, lo siguiente:

> [L]uego de haber sido archivado en el Departamento de Salud, no podrá hacerse en los [certificados] rectificación, adición ni enmienda alguna que altere sustancialmente el mismo, sino en virtud de orden del Tribunal de Distrito, cuya orden, en tal caso, será archivada en el Departamento de Salud haciendo referencia al certificado a que corresponda; **Disponiéndose, <u>sin embargo</u>, que cuando el reconocimiento de un hijo natural se hiciere en documento público o en una declaración jurada <u>bastará</u> la presentación de dicho documento o declaración para que el encargado del Registro Demográfico <u>proceda</u> a inscribir el mismo, y a ese efecto, se llenará el correspondiente certificado de inscripción**; Disponiéndose, además, que en caso de que el nacimiento de tal hijo hubiera sido previamente inscrito se llevará al certificado los datos adicionales que resulten de tal reconocimiento".[112]

A la luz de esta autorización legislativa, que permite llevar al Registro los datos del reconocimiento sin necesidad de una orden judicial, en este caso no tenemos duda de que, aún bajo las disposiciones del derogado Código Civil, una sentencia emitida en virtud de una solicitud de reconocimiento voluntario con autorización judicial es un documento público auténtico suficiente en derecho para que corresponda la inscripción de un nacido por procreación asistida a nombre de la madre intencional. Así, aunque no existiera la nueva legislación civil, la sentencia emitida en el proceso *ex parte* es suficiente para inscribir los datos adicionales respecto a

---

[112] 24 LPRA § 1231 (énfasis suplido).

la filiación materna intencional, porque, por intervención judicial, en este momento el niño está inscrito con los dos apellidos del padre biológico.

En fin, el principio rector de lo que hoy resolvemos es que, si un menor nacido por procreación asistida carece de filiación conocida paterna o materna, o de ambas, ostentaría aquella del varón, mujer o pareja que lo reconozca, al margen de si el reconocido es o no hijo biológico del reconocedor. Ahora bien, para que tal reconocimiento voluntario pueda ser eficaz sin autorización judicial no puede estar opuesto a un título anterior oficialmente inscrito que acredite otra filiación.

Por lo tanto, aunque al momento del nacimiento del menor sujeto de inscripción en este caso no estaba claro cuál era el procedimiento para atender la inscripción de los nacidos por procreación asistida a nombre de la madre intencional, ahora afirmamos que el reconocimiento voluntario es el mecanismo para establecer el estado filiatorio materno cuando la mujer gestante no tiene vínculo genético con el menor y desde un principio su intención fue llevar el embarazo a término para otra persona. Este proceder tiene su justificación en la importancia trascendental que reviste el estado filiatorio de un ser humano.

IV.

Por los fundamentos expuestos, se expide el auto de *certiorari* y se revoca la sentencia del Tribunal de Apelaciones. Por consiguiente, prevalece la decisión del

tribunal de instancia que ordenó la inscripción del menor como hijo de la madre intencional. En vista de que la sentencia del foro apelativo revela los nombres de las partes y datos particulares del expediente de este caso que incluye información confidencial, se ordena que la sentencia emitida el 27 de agosto de 2020 sea extraída de las bases de dato electrónicas donde pueda aparecer publicada. Mediante una comparecencia especial, en un término de cinco días desde la notificación de esta Opinión, los funcionarios encargados de la divulgación de las sentencias apelativas deben acreditar que han cumplido con esta directriz. Con esta medida especial, protegemos el derecho fundamental de las partes a la vida privada y familiar.

Se dictará Sentencia de conformidad.


Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

RPR & BJJ

    Peticionarios

                          CC-2020-0653        *Certiorari*

*Ex parte*

SENTENCIA

En San Juan, Puerto Rico, a 17 de junio de 2021.

Por los fundamentos expuestos en la Opinión que antecede la cual se hace formar parte íntegra de la presente, se expide el auto de *certiorari* y se revoca la sentencia del Tribunal de Apelaciones. Por consiguiente, prevalece la decisión del tribunal de instancia que ordenó la inscripción del menor como hijo de la madre intencional. En vista de que la sentencia del foro apelativo revela los nombres de las partes y datos particulares del expediente de este caso que incluye información confidencial, se ordena que la sentencia emitida el 27 de agosto de 2020 sea extraída de las bases de dato electrónicas donde pueda aparecer publicada. Mediante una comparecencia especial, en un término de cinco días desde la notificación de esta Opinión, los funcionarios encargados de la divulgación de las sentencias apelativas deben acreditar que han cumplido con esta directriz. Con esta medida especial, protegemos el derecho fundamental de las partes a la vida privada y familiar.

Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión de Conformidad a la cual se unió el Juez Asociado señor Estrella Martínez. El Juez Asociado señor Colón Pérez emitió una Opinión de Conformidad. El Juez Asociado señor Martínez Torres

emitió una Opinión Disidente. La Jueza Asociada señora Pabón Charneco emitió una Opinión Disidente.


                                        José Ignacio Campos Pérez
                                        Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

RPR & BJJ                          CC-2020-0653

    Peticionarios

*Ex Parte*

Opinión de conformidad que emitió la Jueza Presidenta Oronoz Rodríguez a la que se unió el Juez Asociado señor Estrella Martínez.

En San Juan, Puerto Rico, a 17 de junio de 2021.

El Poder Judicial -como el intérprete máximo de nuestra Constitución y las leyes- tiene que proveer soluciones justas. Cuando nos enfrentamos a asuntos de Derecho de Familia que se anclan en principios constitucionales fundamentales como la libertad y la dignidad humana, ese deber tiene implicaciones sin par. Si a ello se añade que el impacto de nuestras decisiones recae en niños y niñas, la responsabilidad es aun más monumental.

Hoy aclaramos el procedimiento de filiación e inscripción de los hijos o las hijas que nacen mediante los tratamientos médicos de reproducción asistida y rechazamos que estas personas se deban someter a litigios tortuosos para establecer esa filiación.

Antes era imposible desconectar la gestación y el parto de la maternidad. También era impensable, para propósitos de los vínculos de filiación, desprender la gestación del material genético particular de los individuos que formarían la familia inmediata del menor. Hoy vivimos una realidad distinta. Los avances de la ciencia y la medicina fortalecen los métodos de reproducción asistida y miles de personas logran su anhelo de tener hijos e hijas. Sin embargo, la ausencia de legislación al momento de los hechos, o de una interpretación judicial que atempere los avances tecnológicos de reproducción asistida y los vínculos que con esta sobrevienen a nuestra realidad jurídica y social, crea inestabilidad, arbitrariedad y produce resultados nefastos.

Para que esto no ocurra, hay que ser sensibles a la realidad que viven estas familias. En palabras del Tribunal de Primera Instancia: "el nacimiento del menor M.V.J.P. es el resultado del amor, el deseo, los cuidados y la perseverancia que tuvieron los peticionarios en todo el proceso de maternidad subrogada, por lo que el menor M.V.J.P., es hijo de los peticionarios". La determinación del Tribunal de Apelaciones colocó al menor en un limbo jurídico y dio al traste con su mejor bienestar. Le negó a M.V.J.P. las protecciones legales que merece -y a las que tiene derecho- para vivir una vida digna junto a su familia. Esto jamás debió pasar pues nuestro ordenamiento jurídico provee las herramientas para que, desde un inicio, se le brindara al menor M.V.J.P. un remedio adecuado.

Hoy resolvemos que el reconocimiento voluntario es el mecanismo filiatorio para establecer la filiación materna de un menor gestado mediante el procedimiento de subrogacía gestacional. Además, rechazamos que el procedimiento de inscripción de ese menor sea un procedimiento contencioso. Concluimos que la mujer gestante y su entonces pareja consensual no son partes indispensables en el procedimiento de inscripción del menor gestado mediante la subrogacía gestacional. Por ende, estoy conforme con lo que consigna la Opinión del Tribunal.

Ahora, en la medida en que la reproducción asistida, en particular la maternidad subrogada, es un vehículo para hacer efectiva la igualdad reproductiva entre parejas fértiles e infértiles, heterosexuales y homosexuales –lo cual se ancla en la inviolabilidad de la dignidad y los derechos humanos— considero indispensable expresarme aparte sobre este asunto novel. Tenemos la oportunidad de: (a) controvertir la idea de que la parentalidad se construye de forma única y definitiva a través del parto; y (b) cuestionar el modelo tradicional de la procreación y la filiación mediante la revisión de la construcción de las relaciones de parentesco. Nuestra realidad jurídica e histórica lo exige.

**I**

## A. La inviolabilidad de la dignidad del ser humano

"La dignidad del ser humano es inviolable".[113] Con este principio cardinal comienza la Carta de Derechos de la

---

[113] Art. II, Sec. 1, Const. ELA, LPRA, Tomo 1.

Constitución del Estado Libre Asociado de Puerto Rico, Carta cuya enumeración precede, incluso, los artículos correspondientes a la estructura del gobierno. Su preeminencia responde al hecho de que la dignidad del ser humano es la piedra angular y básica de la democracia. Según expresó el delegado Jaime Benítez Rexach:

> "Porque antes que ninguna otra cosa, es la democracia una fuerza moral, y su moral radica precisamente en el reconocimiento que hace de la dignidad del ser humano, del alto respeto que esta dignidad merita y la responsabilidad en consecuencia que tiene todo el orden constitucional de descansar en ella, protegerla y defenderla. Por eso en nuestra primera disposición, además de sentar inicialmente esta base de la igualdad profunda del ser humano –igualdad que trasciende cualquier diferencia, bien sea diferencia biológica, bien sea diferencia ideológica, religiosa, política o cultural— por encima de tales diferencias está el ser humano en su profunda dignidad trascendente".[114]

En consecuencia, es la base plena y total de todo cuanto sigue en el orden que establece nuestra Constitución.[115] El reconocimiento de la dignidad humana es de tal magnitud que, incluso, es irrenunciable.

La naturaleza liberal y abarcadora de nuestra Carta de Derechos surgió, en parte, a consecuencia de la influencia que tuvieron tanto la Declaración Universal de los Derechos Humanos como la Declaración Americana de los Derechos y Deberes del Hombre. Nuestro principio rector se inspiró principalmente en los dos primeros artículos de la

---

[114] 2 Diario de Sesiones de la Convención Constituyente 1103 (1952).
[115] Íd., pág. 1372. *Véase*, además, 4 Diario de Sesiones de la Convención Constituyente 2561 (1952).

Declaración Americana de los Derechos y Deberes del Hombre.[116] Respecto a otras Constituciones, este principio tiene paralelismo con la Constitución de la República Federal Alemana de 1948.[117] Esa Constitución alemana consagra la inviolabilidad de la dignidad del ser humano como piedra angular al igual que nuestra Carta Magna.[118] Lo anterior demuestra que, matizado por el contexto histórico, "se quería formular una Carta de Derechos de factura más ancha, que recogiese el sentir común de culturas diversas sobre nuevas categorías de derechos".[119]

A tono con lo anterior, nuestra Carta de Derechos, en su Sección 19 establece un canon para su interpretación que, en lo pertinente, dispone: "La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de los derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente".[120]

Este texto perseguía que no se interpretase la Carta de Derechos como un catálogo exhaustivo. Según explicó José Trías Monge:

> "Se interesaba incorporar a la Constitución una disposición que reconociese el orden especialmente dinámico del derecho en este campo y permitiese añadir, tanto derechos derivables, ya o más tarde,

---

[116] J. Trías Monge, *Historia Constitucional de Puerto Rico*, 1era ed., Ed. UPR, Vol. III, 1982, pág. 170.

[117] J. Farinacci Fernós y G. Rivera Vega, *El uso de fuentes transnacionales en el derecho puertorriqueño*, 51 Rev. Jur. UIPR 189, 207-208 (2017). *Véase*, además, C. E. Ramos González, *La inviolabilidad de la dignidad humana: lo indigno de la búsqueda de expectativas razonables de intimidad en el derecho constitucional puertorriqueño*, 45 Rev. Jur UIPR 185, 189 (2011).

[118] Íd.

[119] Garib Bazain v. Hospital Español Auxilio Mutuo de Puerto Rico, 204 DPR 601 (2020) (Opinión disidente de la Jueza Presidenta Oronoz Rodríguez)(*citando* a Pueblo v. Figueroa Navarro, 104 DPR 721, 725 (1976)).

[120] Art. 19, Sec. II, Const. ELA, LPRA, Tomo 1.

de los expresamente enumerados, como nuevos derechos que fuesen adquiriendo reconocimiento a través de los años. De ahí surgía buena parte de la importancia de la nueva sección, pues obviamente proveía un texto expreso para hacer la Constitución un documento viviente en este campo y expandir el ámbito de los derechos humanos en Puerto Rico hasta el límite permisible por el avance de la democracia aquí o fuera de aquí".[121]

En consonancia, al interpretar nuestra Constitución debemos realizar un análisis multifactorial, que incluya las diversas fuentes que inspiraron nuestra Carta Magna. Solo así lograremos que, al analizar nuestra Constitución, se garantice la vigencia continuada de sus valores fundamentales frente a las nuevas realidades del país. Principalmente, en controversias noveles como la que nos ocupa la cual, sin duda, incide en derechos humanos y fundamentales.

**B. Derechos humanos, fundamentales e intereses libertarios**

Según mencionamos, la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico se inspiró, en gran parte, en la Declaración Universal de los Derechos Humanos, así como en la Declaración Americana de los Derechos y Deberes del Hombre. Ambas declaraciones tienen como base el reconocimiento de la dignidad intrínseca y de los derechos inalienables de todas las personas que componen la familia humana.[122] Asimismo, ambas declaraciones consagran,

---

[121] Trías Monge, _supra_ nota 4, pág. 208.
[122] _Véase_, Naciones Unidas, La Declaración Universal de Derechos Humanos, https://www.un.org/es/about-us/universal-declaration-of-human-rights (Última visita 20 de mayo de 2021). _Véase_, además, Organización de los Estados Americanos, Declaración Americana de los Derechos y Deberes del Hombre, http://www.oas.org/es/cidh/mandato/Basicos/declaracion.asp (Última visita 20 de mayo de 2021).

como derechos humanos, el derecho a la vida y el derecho a formar una familia.[123]

Consustancial con el derecho a la dignidad humana, la Declaración Universal de Derechos Humanos reconoce, además, el libre desarrollo de la personalidad.[124] Aunque la Constitución del Estado Libre Asociado de Puerto Rico no reconoce expresamente el derecho al libre desarrollo de la personalidad, sí consagra, como vimos, la inviolabilidad de la dignidad humana, el derecho fundamental a la vida y a la libertad.[125]

En cuanto al derecho a la vida, la Asamblea Constituyente tuvo muy presente el alcance del concepto "vida" como derecho inalienable del ser humano. A esos efectos, el delegado José Trías Monge expresó lo siguiente:

> "La palabra "vida" contiene toda una serie de derechos aparte del de la simple respiración, que no están incluidos necesariamente en la palabra "libertad" ni en la palabra "propiedad".
> […]
> Todos estos derechos que abonan y que son necesarios para el debido desenvolvimiento de la personalidad humana están comprendidos fundamentalmente en la palabra vida".[126]

Así, el derecho a la vida, entendido como un derecho fundamental del ser humano, es esencial y troncal, pues sin él los restantes derechos no tendrían existencia posible.

Bajo este crisol, es preciso reseñar que la protección que persiguen esos derechos humanos y fundamentales es la

---

[123] Íd.
[124] DUDH, supra nota 10, Art. 22.
[125] Art. II, Sec. 7, Const. ELA, LPRA, Tomo 1.
[126] 2 Diario de Sesiones de la Convención Constituyente 1503 (1952).

libertad individual. Nuestra Constitución consagra el derecho de las personas a su libertad de forma expresa.[127] Se sabe que el concepto libertad incluye mucho más que la mera restricción de libertad física.[128] El término libertad también incluye esas decisiones del ser humano tan enraizadas en las tradiciones y la conciencia de nuestro pueblo que se han reconocido como fundamentales.[129] Sin duda, la decisión de formar una familia o tener descendencia, son decisiones profundamente arraigadas al ser humano. Estas forman parte del ejercicio de sus intereses libertarios para aspirar y alcanzar su desarrollo pleno y disfrute de sus derechos individuales.

La maternidad subrogada como una técnica o método de reproducción asistida nos refiere, por necesidad, al ejercicio de los llamados derechos reproductivos. Sin duda, el derecho de toda persona a decidir de manera libre, responsable e informada si quiere procrear, cuándo, con qué frecuencia o de qué manera, corresponde al ámbito de la libertad y la vida privada de las personas, respecto del cual

---

[127] Art. II, Sec. 7, Const. ELA, LPRA, Tomo 1.

[128] *Véase*, <u>Silva Santiago v. Torres Padró</u>, 171 DPR 332 (2007)(Opinión disidente, Fiol Matta) (*citando* a <u>Lawrence v. Texas</u>, 539 US, 558, 574 (2003) y a <u>Planned Parenthood of Southeastern Pa. v. Casey</u>, 505 US 833, 851 (1992)("These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life"). *Véase*, además, <u>Washington v. Glucksberg</u>, 521 US 702, 719 (1997). *Véase*, <u>Cleveland Bd. Educ. V. LaFleur</u>, 414 US 632 (1974) ("Freedom of personal choice in matters of marriage and family life is one of the liberties protected by due process clause of the Fourteenth Amendment").

[129] <u>Washington v. Glucksberg</u>, 521 US 702, 721 (1997). ("[…] liberties which are, objectively, deeply rooted […] and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed"). <u>Snyder v. Massachusetts</u>, 291 US 97, 105 (1934)("so rooted in the traditions and conscience of our people as to be ranked as fundamental").

no debe haber injerencias arbitrarias por parte del Estado.[130] Se sobrentiende que este derecho es inalienable, inclusive para parejas infértiles o para aquellas personas que no puedan reproducirse de manera tradicional.[131] En ese sentido, la Corte Interamericana de Derechos Humanos reconoció que los derechos reproductivos son derechos humanos, pues se encuentran incorporados en la obligación de respeto y garantía de los derechos a formar una familia, a la libertad y la integridad personal.[132] De esta manera, ha interpretado que el Artículo 11 de la Convención Americana sobre Derechos Humanos, referente al derecho a la vida privada y a la familia, constituye el derecho de toda persona a organizar, con arreglo a la ley, su vida individual y social conforme a sus opciones y convicciones.[133] Ha expresado, además, que la decisión de ser, o no, madre o padre es parte del derecho a la vida privada e incluye la decisión de ser madre o padre en el sentido genético o biológico.[134] Asimismo, el acceso a las técnicas de procreación asistida -particularmente por parte de la mujer- se enmarca en el plano del reconocimiento y garantía de los derechos sexuales y reproductivos y del principio constitucional de protección integral de la familia

---

[130] Stephanie F. Schultz, Surrogacy Arrangements: Who Are the "Parents" of A Child Born Through Artificial Reproductive Techniques?, 22 Ohio N.U. L. Rev. 273, 276 (1995).
[131] Rebecca J. Cook, Human Rights and Reproductive Self-Determination, 44 AM. U. L. REV. 975, 1006 (1995).
[132] Artavia Murillo y otros v. Costa Rica, 28 de noviembre de 2012, Fondo, Reparaciones y Costas, párrafos 142, 143 y 145.
[133] Íd.
[134] Íd.

en sus manifestaciones más diversas, así como en el principio de igualdad y no discriminación.[135]

Pertinente a esta controversia, precisa contextualizar lo anterior dentro de los contornos de la subrogacía gestacional. Esto, pues en muchos casos ese procedimiento constituye el único mecanismo disponible para las personas que no pueden procrear por la vía sexual.

## C. La subrogacía gestacional

La reproducción asistida consiste en aplicar técnicas dirigidas a facilitar el nacimiento, cuando una pareja presenta problemas de infertilidad.[136] De modo sencillo, se entiende que la reproducción asistida se refiere a la asistencia médica para facilitar la fecundación de la mujer mediante el empleo de técnicas diversas, dando paso a la gestación y posterior nacimiento del hijo o hija. Entre las técnicas existentes están, por ejemplo, la fecundación *in vitro* y la maternidad subrogada.[137]

El Informe Warnock, en Gran Bretaña, definió el concepto de la subrogacía gestacional (*surrogacy*) en los términos siguientes:

> "Es la práctica mediante la cual una mujer gesta o lleva en su vientre un niño para otra mujer [o para

---

[135] D. NeJaime, The Nature of Parenthood, 126 Yale L.J. 2260, 2265-2266 (2017).
   "Courts and legislatures claim in principle to have repudiated the privileging of men over women and different-sex over same-sex couples in the legal regulation of the family. But in parentage law, such privileging remains. […] [T]hose who break from traditional norms of gender and sexuality--women who separate motherhood from biological ties (for instance, through surrogacy), and women and men who form families with a same-sex partner--often find their parent-child relationships discounted."
[136] Íd., pág. 2287.
[137] Íd., págs. 2298-2301.

un hombre], con la intención de entregárselo después de que nazca. La utilización de la inseminación artificial y los recientes desarrollos en la fertilización *in vitro* han eliminado la necesidad de relaciones sexuales para producir el embarazo de la mujer gestante".[138]

En Estados Unidos han definido el concepto de manera similar. Sin embargo, se ha precisado la definición de subrogacía gestacional mediante la diferenciación entre la modalidad de subrogacía gestacional tradicional y la que ocurre por medio de la donación de embriones o de material genético.[139] La subrogacía gestacional tradicional, se ha definido como un acuerdo mediante el cual se pacta que a la subrogada se le insertará, mediante fertilización *in vitro*, el material genético del padre intencional quien, generalmente es la pareja de la madre intencional.[140] A su vez, se ha reconocido como una modalidad de subrogacía gestacional tradicional, cuando se le insertan los óvulos de la madre intencional, previamente inseminados con el material genético del padre intencional.[141]

También existe la modalidad de subrogacía gestacional mediante la donación de embriones o material genético. A este procedimiento se le conoce como el acuerdo mediante el cual

---

[138] Dr. P. Silva-Ruiz, *Procreación Humana Asistida*, 33 Rev. Jur. UIPR 291, 296-297 (1999) (*citando* a D. Mary Warnock, Departamento de Salud de Gran Bretaña, *Report of the Committee of Inquiry into Human Fertilization and Embryology*, https://www.hfea.gov.uk/media/2608/warnock-report-of-the-committee-of-inquiry-into-human-fertilisation-and-embryology-1984.pdf, 42 (Última visita 20 de enero de 2021).(Traducción suplida).
[139] A. L. Campbell, *Determination of status as legal or natural parents in contested surrogacy births*, 77 ALR 5th 567, sec. 2 (2000). *Véase*, además, Y. Gómez Sánchez, *El derecho a la reproducción humana*, Ed. Jurídicas S.A., págs. 77-78.
[140] Íd.
[141] Íd.

se pacta que a la subrogada se le inserten los embriones de una donante anónima previamente inseminados con el material genético de otro hombre que puede ser o no el padre intencional.[142] Este proceso se distingue de la subrogacía gestacional tradicional, pues aquí la subrogada y la madre intencional no tienen vínculo genético alguno con la criatura que la subrogada carga en su vientre. Esta modalidad de subrogacía gestacional es la que atañe a la controversia que nos ocupa.

Las modalidades descritas tienen dos aspectos en común. En primer lugar, la intención de las partes se recoge en un acuerdo voluntario. En segundo lugar, la paternidad y la maternidad se procuran a través de un medio de reproducción asexual. En ese contexto, salta a la vista un reto jurídico de umbral: la realidad biológica no coincide con la realidad jurídica. Ello ha promovido una serie de retos para los ordenamientos jurídicos a nivel mundial. Uno de los más comunes ha sido cómo se determina el estado filiatorio de ese menor gestado por medio de técnicas de reproducción asistida como lo es la subrogacía gestacional.

**D. Derecho comparado: el estatus filiatorio de un menor gestado mediante subrogacía gestacional**

Diversas jurisdicciones han enfrentado los retos que supone la subrogacía gestacional en materia filiatoria. No existe un consenso. Sin embargo, resulta persuasivo explorar de forma breve el acercamiento de diversas jurisdicciones,

---

[142] _Íd._

que permiten la subrogacía gestacional, a la controversia sobre el estatus filiatorio de menores gestados mediante este método.

En Estados Unidos, por ejemplo, se ha utilizado como criterio de análisis la intención de las partes.[143] En Johnson v. Calvert, 5 Cal. 4th 84 (1993), el Tribunal Supremo de California resolvió que la intención de las partes, según el acuerdo de subrogacía gestacional, es lo que determina que los padres o madres del menor son aquellos cuya intención fue darle vida y criarlo como suyo. Ese Tribunal coincidió con el razonamiento que han compartido varios autores sobre el tema de subrogacía gestacional: "si no fuera por la intención de las partes, ese menor no hubiese existido".[144] En consonancia, sostuvo que, en el contexto de la subrogacía gestacional, "un acuerdo de procreación es necesario para traer un menor al mundo".[145] Por ello, concluyó que "la intención de las partes es la primera causa, o el motivo principal, de la relación reproductiva".[146]

Otras jurisdicciones que permiten, de forma expresa o implícita, la subrogacía gestacional han analizado el asunto de manera similar. En México, partiendo del reconocimiento del derecho al acceso a técnicas de reproducción asistida

---

[143] Johnson v. Calvert, 5 Cal. 4th 84, 93 (1993).
[144] Íd., págs. 93-95 (citando a J. Lawrence Hill, *What Does It Mean to Be a "Parent"? The Claims of Biology As the Basis for Parental Rights*, 66 NYU L. Rev. 353, 415 (1991) ("while all of the players in the procreative arrangement are necessary in bringing a child into the world, the child would not have been born but for the efforts of the intended parents [...] [T]he intended parents are the first cause, or the prime movers, of the procreative relationship.". (Traducción suplida).
[145] Íd., pág. 94. (Traducción suplida).
[146] Íd. (Traducción suplida).

para lograr el nacimiento de un hijo o hija y en referencia

a parejas con problemas de infertilidad, la Suprema Corte de

Justicia de la Nación ha resuelto que estos procesos

"tiene[n] siempre como punto de partida el elemento relativo

a la voluntad que deben otorgar las personas que deseen

someterse a las técnicas de reproducción asistida".[147]

> En el 2017, esa Suprema Corte determinó lo siguiente:

> [C]uando dentro del matrimonio se consiente a una técnica de reproducción asistida, uno de los factores fundamentales para determinar la filiación de los niños nacidos a través de dichas técnicas será **la voluntad de los padres; a la que se dio la categoría de voluntad procreacional, definida como el deseo de asumir a un hijo como propio aunque biológicamente no lo sea y, con esto, todas las responsabilidades derivadas de la filiación".**[148]

Posteriormente, en el 2018 la Suprema Corte de Justicia de

la Nación determinó por unanimidad que era posible validar

la "voluntad procreacional" para reconocer un vínculo de

filiación entre el recién nacido y su madre o padre

intencional aunque la legislación no contemplara ningún marco

normativo para los contratos de gestación subrogada.[149] La

Suprema Corte reiteró esta interpretación sobre la filiación

en un caso en el que se revocó la denegatoria de una solicitud

---

[147] Suprema Corte de Justicia de la Nación, Amparo directo en revisión 2766/2015, resuelto por la Primera Sala en sesión de 12 de julio de 2017 por unanimidad de cuatro votos de los señores Ministros Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz. Se reservaron su derecho a formular voto concurrente, Jorge Mario Pardo Rebolledo y Norma Lucía Piña Hernández (Presidenta y Ponente).
[148] Íd.; Tesis aislada 1a. LXXVIII/2018 (10a.) emitida por la Primera Sala, consultable en la Gaceta del Semanario Judicial de la Federación, Décima Época, Libro 55, junio de 2018, Tomo II, pág. 980. (Énfasis suplido).
[149] Suprema Corte de Justicia de la Nación, Amparo en Revisión 553/2018, Ciudad de México, SCJN, 2018.

que se presentó ante el Registro Civil (equivalente a nuestro Registro Demográfico) y en la cual la inscripción del nacimiento de un hijo que fue concebido mediante la subrogacía gestacional. Es decir, prevalece la manifestación de la voluntad que realizaron para consentir dicho procedimiento médico a fin de concebir un hijo o hija. También se enfatizó que, aunque en ese país no existe una regulación en materia de filiación respecto de los menores nacidos mediante las diversas técnicas de reproducción asistida, la falta de dicha regulación no puede constituir un impedimento para el reconocimiento, protección y vigencia de los derechos fundamentales de esas personas, toda vez que ello constituye una realidad fáctica. Por otro lado, ese tribunal destacó que la normativa civil permitía establecer la filiación sin demostrar el vínculo biológico. Lo anterior, en el contexto de la presunción de paternidad en relación con los hijos nacidos dentro del matrimonio, así como en el reconocimiento llevado a cabo respecto a los hijos nacidos fuera del matrimonio o en concubinato. Ello, pues esta última es una figura en virtud de la cual, voluntariamente, se asume la paternidad o la maternidad del hijo o hija. Como tal, sirve de instrumento para reconocer jurídicamente una situación de hecho que no corresponde a la realidad biológica. En conclusión, se dijo que es factible establecer la filiación de la persona nacida mediante el uso de alguna de las técnicas de reproducción asistida, particularmente la maternidad

subrogada, a través de la figura del reconocimiento voluntario.

Por su parte, en Puerto Rico el nuevo Código Civil, Ley Núm. 55-2020, en su Artículo 567 establece que la maternidad subrogada es la excepción a la presunción de que el parto determina la maternidad. Aunque la inclusión de dicho articulado en el nuevo Código Civil constituye un avance, en Puerto Rico no se ha aprobado legislación que regule directamente la subrogacía gestacional. Sin embargo, nuestra normativa local en materia filiatoria permite que el estatus filiatorio de los menores gestados mediante técnicas de reproducción asistida –como lo es la subrogacía gestacional— se establezca a través del mecanismo del reconocimiento voluntario.

**E. El reconocimiento voluntario como mecanismo filiatorio**

Hemos reconocido que la filiación es el estado civil de la persona, determinado por la situación que, dentro de una familia, le asigna el haber sido engendrada en ella o el estar en ella.[150] Ahora bien, existe un eje central en ese razonamiento: la filiación es la base de la familia. En ese sentido, es el vínculo en virtud del cual se distribuyen los derechos y las obligaciones entre los padres y las madres con sus hijos e hijas.[151] Por eso, el término filiación sintetiza el conjunto de relaciones jurídicas determinadas por la paternidad y la maternidad.[152]

---

[150] Castro v. Negrón, 159 DPR 586, 579-580 (2003).
[151] Íd., pág. 580.
[152] Sánchez v. Sánchez, 154 DPR 645, 660 (2001).

Se sabe que el elemento biológico no es el único factor que se debe considerar en acciones filiatorias.[153] En esa dirección, hemos expresado que la filiación no es "un desenfrenado culto a la biología, sino que responde, también, a ciertos intereses de los particulares y de la comunidad".[154]

En cuanto al reconocimiento voluntario, este Tribunal lo ha definido como un acto jurídico que consiste en la pura y simple afirmación de paternidad o maternidad.[155] La persona que lo realiza se declara padre o madre de su hijo o hija y le confiere a ese menor un estado civil y un *status filie* que lo liga al reconocedor o la reconocedora.[156]

En cuanto a la filiación materna, el Art. 113 del Código Civil de 1930, derogado, disponía que "el parto determina la maternidad".[157] Este artículo partía de la premisa de que el aspecto biológico era el único origen de la presunción de maternidad. Cabe señalar que, el recién aprobado Código Civil de 2020, incluyó cambios fundamentales respecto a esa presunción de la maternidad por razón del parto. A esos efectos, el Art. 567 del Código Civil de 2020, equivalente en lo pertinente al citado Art. 113 del Código Civil derogado, dispone lo siguiente: "El parto determina la maternidad, **excepto en casos de maternidad subrogada** en los cuales la mujer gestante no tiene vínculo genético alguno con el hijo que se desprende de su vientre y desde un principio su

---

[153] Mayol v. Torres, 164 DPR 517, 531 (2005).
[154] González Rosado v. Echevarría Muñiz, 169 DPR 554, 562 (2006).
[155] Castro v. Negrón, supra nota 38, pág. 584.
[156] Íd., pág. 585.
[157] 31 LPRA sec. 504.

intención original fue llevar el embarazo a término para otra persona".[158]

En atención a los cambios que introdujo el Código Civil de 2020 en nuestro ordenamiento jurídico, el Art. 556 de ese nuevo cuerpo normativo dispone que **"[l]a filiación tiene lugar** por vínculo genético, **por medios de procreación asistida** o por adopción".[159] Por último, cabe señalar que el Art. 1808 del nuevo Código Civil de 2020, dispone que "[s]i el ejercicio del derecho o de la acción se halla pendiente de procedimientos comenzados bajo la legislación anterior, y estos son diferentes de los establecidos en el Código, pueden optar los interesados por unos o por otros".[160]

Podemos colegir que se percibe una andadura hacia una postura más inclusiva respecto a los contornos de la filiación y las presunciones que dimanan de ella. No obstante, esa visión orbita alrededor de un principio cardinal: el mejor bienestar del menor. Ese principio también rige en otro tipo de filiación: la adoptiva. Sin embargo, ese tipo de filiación, por su naturaleza, responde a propósitos muy distintos a los que persiguen los mecanismos filiatorios discutidos.

**F. La adopción**

La adopción es un acto jurídico solemne, el cual supone la ruptura total del vínculo jurídico-familiar de un menor con su parentela biológica y la consecuente filiación del

---

[158] Art. 567, Código Civil de Puerto Rico, Ley Núm. 55-2020 (Código Civil de 2020). (Énfasis suplido).
[159] Íd., Art. 556. (Énfasis suplido).
[160] Íd., Art. 1808.

menor con aquella o aquellas personas que han expresado la voluntad de adoptarlo.[161]

El espectro sustantivo de la adopción está atendido en el Código Civil. Allí se recoge el conjunto de normas relativas a los requisitos para ser adoptante, la imposibilidad de serlo, quiénes pueden ser adoptados y las personas llamadas a consentir en la adopción. De otra parte, el aspecto procesal está regulado por la Ley de Adopción de Puerto Rico, Ley Núm. 61 de 27 de enero de 2018, 8 LPRA sec. 1081 et seq. (Ley Núm. 61-2018).

La Ley Núm. 61-2018 regula, entre otros escenarios, la adopción de los menores mediante la entrega voluntaria de la madre biológica. En cuanto a la entrega voluntaria, se trata de la madre biológica que lleva dentro de su vientre a una criatura suya, pero decidió darla en adopción a terceros mediante un acuerdo de adopción.[162] Lo anterior puede ocurrir en varias circunstancias.

Ahora bien, existe otro andamiaje procesal para aquellos casos de adopción que ocurren cuando el menor ya ha nacido. En esos casos, el procedimiento de adopción se lleva a cabo mediante el trámite voluntario de adopción. La Ley Núm. 61-2018 dispone que, bajo este trámite voluntario, el padre, la madre o aquella persona que ostente la patria potestad sobre el menor, podrá entregar la custodia de los menores, voluntariamente, al Departamento de la Familia para darlos

---

[161] Zapata et al. v. Zapata et al., 156 DPR 278, 286 (2002).
[162] 8 LPRA sec. 1082.

en adopción, previa renuncia de la patria potestad de su hijo o hija.[163] Finalizado el trámite de colocación y adopción del menor con un decreto judicial, la Ley Núm. 61-2018 dispone que el menor sea inscrito en el Registro Demográfico de Puerto Rico.[164]

Aclarado esto, reseño brevemente el rol que el Registro Demográfico desempeña el proceso de inscripción de menores como parte de la formalización de su estatus filiatorio.

**G. Ley del Registro Demográfico de Puerto Rico**

La Ley del Registro Demográfico de Puerto Rico, Ley Núm. 24 de 22 de abril de 1931, según enmendada, (Ley Núm. 24-1931), se estableció para registrar, coleccionar, custodiar, preservar, enmendar y certificar hechos vitales de las personas nacidas en Puerto Rico.[165] Sus propósitos representan un medio para conocer la exacta y auténtica situación jurídica de las personas.[166]

En aras de cumplir cabalmente con las facultades que la Ley le impone, el Registro Demográfico tiene a su cargo "el registro, colección, custodia, preservación, enmiendas y certificación de récords vitales; la colección de otros informes requeridos por esta parte; actividades relacionadas a ella, incluyendo la tabulación, análisis y publicación de estadísticas vitales".[167] En el contexto de los nacimientos,

---

[163] 8 LPRA sec. 1084.
[164] 8 LPRA sec. 1086k.
[165] Ley Núm. 24 de 22 de abril de 1931, según enmendada, 24 LPRA sec. 1042 (1).
[166] 24 LPRA sec. 1133.
[167] 24 LPRA sec. 1042(1), (11).

lo anterior se logra mediante la figura del Secretario de Salud quien, por disposición de Ley, viene obligado a establecer los reglamentos, formas y procesos que sean necesarios para obtener y conservar los datos relacionados a los nacimientos que ocurran en Puerto Rico. Solo de esa manera se puede reflejar la realidad jurídica del menor al momento de su nacimiento.

Por eso es preciso que, ante estas nuevas formas reproductivas, el Departamento de Salud atempere, de una vez y con sentido de urgencia los reglamentos, formas y procesos que reflejen la certeza y veracidad de la realidad jurídica de los menores al momento del nacimiento. Tal responsabilidad es trascendental pues la omisión o dilación en actualizar los reglamentos, formas y procesos al derecho positivo y a las nuevas realidades jurídicas de las personas al momento de su nacimiento da al traste con el propósito mismo que justifica la existencia del Registro Demográfico: la constancia, veracidad y certeza de los datos vitales y la realidad jurídica de las personas al momento de su nacimiento.

A tono con lo anterior, y respecto a la figura del reconocimiento voluntario, la Ley Núm. 24-1931 dispone que **"[s]i con posterioridad a la inscripción surgiera la intención de un reconocimiento voluntario, el Registro Demográfico viene en la obligación de sustituir el apellido del padre o la madre de acuerdo a la documentación evidenciada"**.[168]

---

[168] 24 LPRA sec. 1133a. (Énfasis suplido).

Nótese que la Ley Núm. 24-1931, en armonía con nuestro ordenamiento jurídico filiatorio, viabiliza el reconocimiento voluntario en el procedimiento de inscripción del menor sin distinción alguna respecto a la forma en que se procreó a ese menor. Tampoco diferencia sobre si quien reconoce es el padre o la madre intencional. Ciertamente, lo que se persigue es viabilizar el fiel cumplimiento con la veracidad y certeza sobre los datos vitales de las personas al momento de su nacimiento.

## II

A través de la historia se han diversificado los tipos de familia y las maneras de crear una familia. Respecto a la estructura de las familias, sin duda, las decisiones sobre procreación promueven las formas diversas de las relaciones reproductivas. Por eso, los impedimentos para procrear por la vía sexual –independiente de su tipo o razón— no pueden ser un vehículo que promueva la desigualdad jurídica. Tal actuación constituiría una afrenta a los derechos humanos y al interés libertario que tienen las personas de tomar la decisión de traer al mundo un hijo o una hija para criarla como suya.

En el caso que nos ocupa, el matrimonio peticionario decidió, dentro de la intimidad de su familia, ejercer su derecho a procrear mediante el proceso de subrogacía gestacional. Ello, tras intentar, sin éxito, un sinnúmero de alternativas para procrear por la vía sexual y mediante otras técnicas de reproducción asistida. Conforme a su intención de

procrear, el matrimonio peticionario se sometió a un procedimiento de inducción de ovulación y extracción de óvulos con el fin de fertilizar de forma *in vitro* los óvulos de una donante anónima con los espermatozoides del señor BJJ. De ese procedimiento salieron varios embriones. Luego de suscribir un acuerdo de subrogacía gestacional con la subrogada y el procedimiento médico de rigor, se transfirieron varios de los embriones fertilizados al útero de la subrogada.

Posteriormente, la subrogada suscribió una declaración jurada en la cual reafirmó su intención y compromiso de llevar el embarazo a término para ceder la custodia y patria potestad del menor al matrimonio peticionario. Ante este acuerdo de voluntades, y por no existir controversia o contención entre el matrimonio peticionario y la subrogada sobre quiénes serían el padre y la madre legal del menor, se presentó la *Petición Ex parte* que originó el recurso que atendemos.

Ese cuadro fáctico revela su incompatibilidad con la filiación adoptiva. De entrada, no cabe duda de que, en este caso, no surgió una filiación materna por razón del parto. Primero, la subrogada no está vinculada genéticamente con el menor. En ese sentido, la presunción por maternidad del parto es improcedente porque carece de base biológica que la sustente y es contraria a la intención de las partes. Se añade que, aun cuando se interprete que esa presunción se activó únicamente por el alumbramiento, la subrogada renunció a los derechos que se le pudieran reconocer por razón del parto y,

posteriormente, se reafirmó en esa renuncia libre, consciente y voluntaria. Ante esa realidad no cabe hablar de derechos por razón del parto. Esta postura es cónsona con las enmiendas que introdujo el nuevo Código Civil del 2020 una de las cuales indica, expresamente, que el parto determina la maternidad, **excepto en los casos de maternidad subrogada.**

En consecuencia, estamos ante una filiación materna que se debe establecer mediante el mecanismo de reconocimiento voluntario a favor de la madre intencional. El nuevo Código Civil de 2020 también introdujo un aspecto fundamental en materia filiatoria respecto a menores gestados mediante subrogacía gestacional que apoya esta postura: "la filiación tiene lugar […] por métodos de reproducción asistida […]".[57] Ello, a su vez, va de la mano con el procedimiento de inscripción que provee el Registro Demográfico respecto al reconocimiento voluntario de un padre o una madre. No puede ser de otra manera pues, de lo contrario, al momento de la inscripción se haría constar un hecho vital y una realidad jurídica del menor M.V.J.P. que no es veraz ni certera. Lo anterior, estaría en contravención total con los propósitos y la existencia misma del Registro Demográfico.

No podemos pasar por alto un asunto medular: la intención de la madre intencional fue concebir al menor M.V.J.P. como suyo. En esa dirección, tanto la madre como el padre intencional realizaron todas las gestiones para que el menor M.V.J.P. existiera. La mujer gestante que portó y alumbró al

---

[57] Código Civil de 2020, <u>supra</u> nota 46, Art. 556.

menor M.V.J.P. mediante los medios de subrogacía gestacional fue un vehículo protector de la vida humana, pero no su creadora. A pesar de que ella viabilizó la procreación, esa encomienda no hubiese surgido a no ser por la intención y los actos afirmativos del matrimonio peticionario de concebir al menor como suyo. Por lo tanto, el punto de partida no es la viabilidad, sino la existencia misma del menor, deseada y promovida por la madre o el padre intencional.

Bajo esa realidad, es fundamental rechazar enfáticamente la postura equivocada del Procurador General quien argumentó que la única manera de establecer la filiación materna, en este caso, era mediante un procedimiento de adopción.

La filiación adoptiva, en tales circunstancias, no puede ser la vía para establecer la filiación de un menor gestado mediante la subrogacía gestacional. Primero, en nuestro caso nunca existió un vínculo jurídico-familiar con la mujer gestante que exigiera la ruptura de tal vínculo para lograr la filiación posterior del menor con el matrimonio peticionario. Segundo, la obligatoriedad de la filiación adoptiva tampoco es razonable, toda vez que no responde a los propósitos que persigue proteger la adopción como figura jurídica. Tercero, obligar a las personas impedidas de procrear por la vía sexual, a establecer el vínculo filiatorio con el menor que desearon concebir como suyo mediante un proceso de adopción le imprime un sello de desigualdad filiatoria al menor y a su madre intencional.

En ese sentido, cuando la intención de las personas impedidas a procrear por la vía sexual no sea adoptar, sino ejercer su derecho a procrear una hija o hijo como suyo mediante la subrogacía gestacional, estas personas tienen disponible el reconocimiento voluntario para establecer la filiación de ese menor.

Está claro que las personas que pueden procrear por la vía sexual no tienen que someterse a un proceso de adopción si no lo desean. ¿Por qué entonces obligar a las personas que se encuentran física, biológica o genéticamente impedidas de procrear por la vía sexual a establecer la filiación materna del hijo o la hija que tanto anhelaron mediante un procedimiento de adopción? Máxime, cuando ello es contrario a su intención y a los propósitos mismos de la adopción como figura jurídica. Tal contención es insostenible al confrontarse con derechos humanos y fundamentales.

De otro lado, se evidencia que la incompatibilidad de la adopción con los procedimientos de subrogacía gestacional tiene ramificaciones considerables. No solamente es una figura incompatible con la subrogacía gestacional en su forma y procesos, sino también en su aplicación a las personas que deciden ejercer su derecho a procrear mediante técnicas de reproducción asistida. Sostener lo contrario es peligroso pues circunscribe la controversia que examinamos a la aplicación de disposiciones que no se diseñaron, y tampoco se legislaron, para atender estos asuntos. La consecuencia es que se atenta contra el mejor interés del menor en tanto, por

ejemplo, se atrasa y dilata la estabilidad familiar. Aquí, lo único que solicita el matrimonio peticionario es que permitamos el reconocimiento voluntario materno y vindiquemos su intención original de lograr la existencia misma del menor que tanto anhelaron para continuar fungiendo su rol de padre y madre como lo han hecho hasta el momento.

Al conceder la solicitud del matrimonio peticionario, este Tribunal demuestra sabiduría ante los adelantos tecnológicos que crean cambios vertiginosos en las dinámicas sociales. Al adoptar una regla clara basada en la intención y la voluntad de las partes, asegura que una pareja infértil, como cualquier otra que invirtió tiempo, dinero y emoción en concebir un hijo o una hija, se declare como madre y padre de ese niño o niña. Tal resultado es cónsono con las prerrogativas protegidas constitucionalmente de tomar decisiones íntimas dentro de los distintos tipos de familias, como lo es el derecho a procrear.

Indiscutiblemente, la determinación que emitimos promueve la igualdad dentro de los distintos tipos de familia y las nuevas formas de procreación. Hoy hacemos valer ese precepto cardinal de que la dignidad del ser humano es inviolable y que es imperativo crear y preservar las condiciones que permitan que toda persona pueda tomar aquellas decisiones que promuevan su bienestar y felicidad. Tales principios son esenciales para una sociedad libre en la cual se salvaguarde el derecho a tomar decisiones esenciales sobre su desarrollo personal y sus interacciones familiares

y sociales sin miedo a sufrir la violencia institucional, la estigmatización o a ser discriminado por tales decisiones. Queda un trecho considerable por recorrer, pero no podemos minusvalorar el paso importante que damos hoy en protección de la dignidad y la igualdad del ser humano.


                              Maite D. Oronoz Rodríguez
                                   Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

RPR, BJJ

    Peticionarios

                        CC-2020-653      *Certiorari*

    *Ex parte*

Opinión de Conformidad emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 17 de junio de 2021.

> "Para que los nuevos procesos experimentales se desarrollen con las máximas garantías y que el progreso científico no se alcance a costa de la dignidad humana, es necesario fijar jurídicamente los límites por los que puedan discurrir dichas noveles investigaciones, ya que la propia naturaleza humana impone constantemente la necesidad de ir más allá […]".[169]

Repetidamente, el Derecho queda rezagado ante el avance de la ciencia y, en lo que a este caso se refiere, por el rápido desarrollo de noveles técnicas de reproducción asistida y la antes impensable

---

[169] S. Vilar González, *La gestación subrogada en España y en el derecho comparado*, Madrid, Ed. Wolters Kluwer España, 2018, págs. 17-18.

gestación subrogada. Son estos cambios vertiginosos, los cuales abren grandes brechas entre la realidad social y la normativa legal, los que suscitan controversias como las que se encuentran ante nuestra consideración.

Así pues, en el día de hoy, -- tras hacer una evaluación acertada de las innovadoras controversias ante su consideración -- una mayoría de mis compañeros de estrado acertadamente determinan que cierta gestadora y su ex pareja no debían ser considerados partes indispensables en una acción civil *ex parte,* donde determinados padres intencionales solicitaron al Tribunal de Primera Instancia que se le ordenara al Registro Demográfico de Puerto Rico (en adelante, "Registro Demográfico") inscribirles como progenitores del menor MVJP en su certificado de nacimiento original. De igual forma, esta Curia correctamente sentencia que el "reconocimiento voluntario es el mecanismo para establecer la filiación materna de menores gestados mediante técnicas de subrogación gestacional".[170] Con dicho proceder, estamos conformes.

Empero, por considerar que ésta resultaba ser la ocasión perfecta para abundar un poco más sobre el trasfondo, consecuencias y naturaleza legal de la gestación subrogada, emitimos la presente Opinión de Conformidad en la cual emprendemos dicha tarea. Veamos.

I.

---

[170] Véase, *Opinión del Tribunal*, pág. 2.

Los hechos medulares que dieron margen al presente litigio no están en controversia. Allá para julio de 2018, RPR y BJJ (en adelante, "matrimonio RPR-BJJ") -- en conjunto, padres intencionales -- otorgaron un *Acuerdo de subrogacía gestacional* (en adelante, "*Acuerdo*") con CTR, la subrogada gestacional, y su entonces pareja consensual, JRP.

En lo pertinente a las controversias que nos ocupan, el referido *Acuerdo* rezaba de la siguiente manera:

> La Subrogada acuerda voluntariamente a que se le transfieran a su útero los embriones de los Padres Intencionales con el fin de lograr un embarazo. **De surgir un embarazo, la Subrogada acuerda llevar el embarazo a término, parir el bebé o los bebés y, al momento del nacimiento, entregar la custodia del bebé o de los bebés a los Padres Intencionales.**
>
> ....
>
> **La Subrogada no desea mantener una relación materno filial con el bebé o los bebés que nazcan como resultado de los procedimientos médicos descritos** en el presente acuerdo. La Subrogada informa que su pareja est[á] esterilizado y no desean tener m[á]s hijos propios.
>
> **La Subrogada se compromete a cooperar y consentir en todo procedimiento privado, administrativo y/o judicial necesario para incluir en el certificado de nacimiento original los nombres de los Padres Intencionales como el padre y madre legales del bebé o los bebés.** A su vez, se compromete a cooperar y consentir en todo procedimiento privado, administrativo y/o judicial si es necesario proceder con la enmienda del certificado de nacimiento original para incluir el nombre de la Madre Intencional.
>
> ....
>
> Los Padres Intencionales han solicitado los servicios legales de la licenciada Linette Sánchez Quiñones para estructurar y coordinar todos los aspectos legales de un procedimiento de subrogacía gestacional. **A su vez, la Subrogada ha sido orientada para que sea asesorada legalmente por un abogado independiente.**

.... 

> **Los Padres Intencionales y la Subrogada han sido referidos a una evaluación psicológica con la doctora en psicología, Debra Reuben. La psicóloga emitirá un informe sobre la capacidad de entendimiento y voluntariedad de las partes para consentir en un acuerdo de subrogacía. El informe de evaluación psicológica preliminar confirma la adecuacidad del rol de cada una de las partes, la estabilidad emocional y preparación de la Subrogada y de los Padres Intencionales para llevar a cabo un procedimiento de subrogacía.**

> La Subrogada ha sido evaluada por el médico escogido por los Padres Intencionales para llevar a cabo el tratamiento de reproducción asistida.

> .... 

> **La Subrogada y la Pareja de la Subrogada entienden y [consienten] que todo bebé o bebés que nazcan fruto del tratamiento de fertilización *in vitro* mediante subrogacía gestacional son <u>hijos legítimos de los Padres Intencionales</u> y no de la Subrogada y su Pareja.**

> **La custodia del bebé o los bebés será transferida a los Padres Intencionales inmediatamente se verifique el parto. <u>El bebé o los bebés se presumirán hijos legítimos de los Padres Intencionales para todos los propósitos y efectos médicos, morales y legales</u>.** (Énfasis suplido). *Apéndice*, pág. 56-72.

En virtud de lo anterior, y luego de que se le implantaran a CTR ciertos embriones, -- creados con el material genético de una donante anónima y el padre intencional --, nació el menor MVJP. **Dicho niño fue el resultado de la entrañable intención del matrimonio RPR-BJJ de ser padres, y sólo se materializó tras haber culminado un proceso que -- según evidencia el *Acuerdo* -- incluyó evaluaciones psicológicas, discusiones extensas y la firma**

**del contrato antes mencionado, donde la CTR renunció a cualquier derecho sobre el menor.**

Así las cosas, RPR y BJJ presentaron ante el Tribunal de Primera Instancia una acción civil *ex parte*, mediante la cual solicitaron que: 1) se aceptara la renuncia voluntaria de la patria potestad y maternidad de CTR;[171] 2) se les adjudicara la patria potestad del menor, al igual que la maternidad y paternidad; y 3) que se les designara como madre y padre del menor, en el certificado de nacimiento original de éste. Celebrado el trámite procesal correspondiente -- lo cual comprendió la comparecencia de la Procuradora de Asuntos de Familia y el Departamento de Familia --, el foro primario concedió el petitorio del matrimonio RPR-BJJ.

En particular, sobre RPR, ordenó al Registro Demográfico inscribir al menor MVJP con el nombre de ésta como su madre natural.[172] Ello, debido a que durante los trámites judiciales el foro primario ya había ordenado que el menor MVJP fuera inscrito con los apellidos del padre intencional, quien -- a su vez -- se personó en dicha institución gubernamental y lo reconoció como hijo.

Inconforme con dicho proceder, la Oficina del Procurador General -- en representación de la Procuradora de

---

[171] **Adjuntaron una declaración jurada de CTR a esos efectos.** Dicho escrito expresa que "[m]ediante la presente **renuncio a los derechos de patria potestad** que, por razón de maternidad que surge del parto, tengo sobre el menor; entiendo plenamente que dicha renuncia significa que no tendré la potestad de tomar decisiones importantes sobre la persona de dicha menor […]". (Énfasis suplido). Véase, *Apéndice*, pág. 73.

[172] Fundamentó su conclusión en lo esbozado en el Art. 19-A de la Ley del Registro Demográfico de Puerto Rico, *infra*, y el Art.7 del Código Civil de Puerto Rico de 1930, *infra*.

Asuntos de Familia -- recurrió ante el Tribunal de Apelaciones. En esencia, adujo que el Tribunal de Primera Instancia había errado y abusado de su discreción al ordenar al Registro Demográfico que inscribiese al menor MVJP como hijo biológico de RPR. Esto, ya que -- a su juicio -- aplicaba la filiación adoptiva.

Evaluados los argumentos de las partes, el foro apelativo intermedio revocó la *Sentencia* del Tribunal de Primera Instancia. Lo anterior, por entender que CTR, subrogada gestacional, y JRP, su ex pareja, eran partes indispensables en el presente caso, ello conforme a lo dispuesto en la Regla 16.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 16.1.[173]

Insatisfecho con lo resuelto por el Tribunal de Apelaciones, comparece ante nos el matrimonio RPR-BJJ, mediante una *Solicitud de certiorari civil* y una *Moción de orden provisional en auxilio de jurisdicción*. En esencia, nos solicita que revoquemos la *Sentencia* del foro apelativo intermedio y confirmemos la determinación del Tribunal de Primera Instancia. Ello, no solamente por considerar que CTR y JRP no son partes indispensables en el caso de marras,

---

[173] A pesar de fundamentar su determinación en la alegada falta de parte indispensable, el foro apelativo intermedio añadió que **"[e]l asunto de la subroga[cí]a gestacional, para validarse en nuestra jurisdicción, exige que se compete un trámite alterno al meramente contemplado en un acuerdo privado entre las partes que no necesariamente es legal"**. (Énfasis suplido). Véase, *Apéndice*, pág. 8.

Valga también señalar que uno de los miembros del Panel del Tribunal de Apelaciones que atendió la causa de epígrafe emitió un acertado *Voto disidente*. Allí, señaló que CTR y JRP no eran partes indispensables de la acción *ex parte* instada por el matrimonio RPR-BJJ. Además, aseveró que la determinación del foro primario había sido correcta como cuestión de derecho.

sino también por entender que procede su inscripción, es decir, del matrimonio RPR-BJJ, como padres del menor MVJP, según fue ordenado por el foro primario. Ante ello, -- y una vez paralizado el pleito ante los foros de menor jerarquía -- esta Curia le ordenó a la Oficina del Procurador General que mostrara causa por la cual no se debía expedir el recurso de *certiorari* antes mencionado y revocar la *Sentencia* emitida por el foro apelativo intermedio.

Enterada de lo anterior, la Oficina del Procurador General compareció mediante el correspondiente *Escrito de mostrar causa*. En éste, acepta que el Tribunal de Apelaciones erró al determinar que había falta de partes indispensables en el presente pleito y al fundamentar su conclusión en el cuestionamiento del *Acuerdo* de gestación subrogada, el cual ninguna de las partes -- incluyendo la referida dependencia gubernamental -- ha impugnado. Siendo ello así, solicitan que se expida el recurso ante nuestra consideración y se devuelva el caso al foro apelativo intermedio para que sea atendido en los méritos.

En la alternativa, la Oficina del Procurador General nos solicita que establezcamos que el mecanismo procesal adecuado para establecer la filiación materna en un caso como el que nos ocupa es la adopción. Ello, por entender que el acto del parto establece la filiación materna "y quien interese la 'ruptura' [de] tal vínculo debe seguir los procedimientos reconocidos en nuestra jurisdicción […]".[174]

---

[174] Véase, *Escrito de mostrar causa*, pág. 18.

Examinados los planteamientos de ambas partes, como ya mencionamos, una mayoría de este Tribunal resuelve que la gestadora y su entonces pareja no son partes indispensables en un procedimiento *ex parte* que pretende la inscripción de un menor a nombre de la madre intencional. De igual forma, se determina que "si un menor nacido por procreación asistida carece de filiación conocida paterna o materna, o de ambas, ostentaría aquella del varón, mujer o pareja que lo reconozca, al margen de si el reconocido es o no hijo biológico del reconocedor".[175] Esto, sin autorización judicial, siempre que no haya un título anterior inscrito que acredite otra filiación.

Tal como adelantamos, estamos conformes con el curso de acción -- correcto en derecho y justo -- seguido por una mayoría de esta Curia. Sin embargo, consideramos imprescindible hacer un examen cuidadoso de la figura y orígenes de la gestación subrogada, antes de adentrarnos a evaluar sus consecuencias filiatorias, por ello esta Opinión de Conformidad. Nos explicamos.

## II.

De entrada, -- y por tratarse de un componente indispensable en cualquier discusión sobre técnicas de reproducción asistida y la gestación subrogada --, conviene comenzar este escrito realizando una breve reflexión sobre el alcance que históricamente ha tenido el concepto *familia*;

---

[175] Véase, *Opinión del Tribunal*, pág. 50.

su composición, desarrollo y diversas acepciones.[176]  Para ello, tomamos como punto de partida lo sentenciado por la entonces Juez Asociada de este Tribunal, Hon. Anabelle Rodríguez Rodríguez, en el caso *A.A.R., Ex parte*, 187 DPR 835 (2013). Allí, hace poco menos de una década atrás, ésta apropiadamente expresó:

> Actualmente, aceptamos la existencia de varios tipos de familias. A modo de ejemplo podemos enumerar las siguientes: la[s] familias monoparentales, producto de técnicas de reproducción asistida; aquellas en las que existen vínculos biológicos respecto de uno de sus miembros y no respecto del otro, lo que ocurre en instancias de reconocimientos de complacencia; familias en las que el menor convive sólo con su madre o con su padre; las llamadas familias reconstruidas, 'en las que el menor puede pasar a convivir con un progenitor y su pareja o cónyuge', lo que se observa, por ejemplo, en ocasión de la custodia compartida, y las familias en las que el menor, fruto de la unión de un hombre y una mujer '(unidos previamente y posteriormente separados, divorciados o muerto uno de los dos) conviva con su progenitor o progenitora biológica y otra persona del mismo sexo de aquél'.
> …
>
> **Es por ello que circunscribir la categoría *familia* a aquella unión marital entre un hombre y una mujer con fines reproductivos exclusivamente resulta hoy en día anacrónico. Ignorar que el ámbito jurídico debe cristalizar los arreglos sociales existentes redundaría en impartir una Justicia a medias. No podemos negar lo que ocurre a nuestro alrededor, no existe una única y monolítica familia.**
> …

---

[176] Según discutiremos más adelante, las **técnicas de reproducción asistida** son "el conjunto de métodos biomédicos, que conducen a facilitar, o sustituir, a los procesos biológicos naturales que se desarrollan durante la procreación humana". (Citas omitidas). *Vilar González, op. cit.,* pág. 19. Por otra parte, la **gestación subrogada** es "una forma de reproducción asistida, por medio de la cual una persona, denominada gestante, acuerda con otra persona, o con una pareja, denominadas comitente, gestar un embrión con el fin de que la persona nacida tenga vínculos jurídicos de filiación con la parte comitente". (Citas omitidas). *Vilar González, op. cit.,* pág. 29.

**En este sentido, los tribunales no podemos aferrarnos a una realidad que dejó de ser tal. Se ha dicho que '[e]l más largo aprendizaje de todas las artes es aprender a ver'.** (Citas omitidas). (Énfasis suplido). *AAR, Ex parte*, 187 DPR 835, 1011-1012 (2013) (Rodríguez Rodríguez, opinión disidente).

El significado que tradicionalmente se le ha dado al concepto *familia*, como se puede apreciar en lo antes dicho, ha evolucionado. Y es que:

En pleno siglo XXI, ya no puede hablarse de una única concepción de familia. El concepto tradicional, apoyado en la institución del vínculo jurídico-formal del matrimonio heterosexual, con estructura jerarquizada, monógama y nuclear, superordinado a los intereses particulares de sus integrantes, con una fuerte división de los roles asignados al hombre y la mujer, ha dado paso a un concepto de familia amplio, con base contractual o voluntarista, estructura igualitaria y configuración plural, subordinada a la satisfacción de los intereses individuales de cada uno de sus componentes. (Énfasis suplido). Vilar González, *op. cit.*, pág. 23-24.

En ese sentido, es momento, pues, que el Derecho haga espacio para acoger y, más importante aún, reconocer, las familias no tradicionales -- y sus maternidades y paternidades -- dentro de nuestro entendido normativo. Algo que, sin lugar a dudas, incide en el análisis del desarrollo e implicaciones jurídicas de las técnicas de reproducción asistida, en especial de la gestación subrogada.

III.

A.

Dicho ello, cabe aquí recordar que, allá para el 1880, en Viena, Austria, ocurrió el primer intento -- aunque fallido -- de fertilizar un óvulo mamífero *in vitro*. S.L.

Crockin & H.W. Jones, *Legal Conceptions: The Evolving Law and Policy of Assisted Reproductive Technologies*, Baltimore, The Johns Hopkins University Press, 2010, pág. 13. A poco menos de un siglo de ese intento, en el Reino Unido, ocurrió el primer nacimiento vivo humano a través de fertilización *in vitro*, a saber, la fusión de un óvulo y espermatozoide, fuera del cuerpo humano. *Vilar González, op. cit.*, pág. 20; *Crockin & Jones, op. cit.*, pág. 13. Asimismo, en el 1985, en Ohio, se viabilizó el primer uso exitoso de la subrogacía gestacional. *Crockin & Jones, op. cit.*, pág. 15.

Así pues, con el devenir de estos desarrollos científicos, que han dado luz a nuevas criaturas humanas, los juristas se han encontrado con términos difíciles de definir. El concepto de gestación subrogada ha sido uno de ellos. Sin embargo, estudiosos del tema han sentenciado que, en general, sus contornos incluyen:

> [U]n contrato, en el que podrá mediar precio o realizarse gratuitamente, con dos partes intervinientes: por un lado, los futuros padres que efectúan el encargo -en adelante, padres comitentes-, que podrán ser una persona o una pareja, matrimonio o no, de carácter heterosexual u homosexual, y que pueden aportar sus propios gametos o no; y, por otro, la mujer -en adelante, madre subrogada, gestante, portadora, etc.- que se compromete a gestar en su vientre a un niño, al que entregará a los padres comitentes una vez producido el parto. Ello, conllevará la consiguiente renuncia a todos los derechos que pudieran corresponder a la gestante sobre el niño, fundamentalmente, la filiación que le pertenecería como madre.[177] (Citas omitidas). Vilar González, *op. cit.*, pág. 30.

---

[177] A través del presente escrito utilizaremos el término de "gestación subrogada" al referirnos a la categoría global de dicho fenómeno, ya que somos de la opinión que es más preciso que maternidad subrogada. Esto, dado que **"la maternidad engloba una realidad mucho más amplia que la**

Comprendida dentro de la categoría antes expuesta, se encuentra la subrogación tradicional (*traditional surrogacy*), mediante la cual una mujer suple el óvulo, además de gestar la criatura. Crockin & Jones, *op. cit.*, pág. 209 ("A traditional surrogate is a woman who supplies both the egg, that is, the genetic component, and the gestational role of carrying the pregnancy."). Por otra parte, la **subrogación gestacional** (*gestational surrogacy*) solamente involucra el acto de gestar, sin que exista ninguna conexión genética entre la gestadora y la criatura. *Íd.* ("A gestational surrogate or gestational carrier supplies no genetic material and simply gestates the conceptus.").[178]

Como consecuencia directa de los avances antes definidos, se ha materializado un cambio de paradigma en el ámbito legal. Por ejemplo, sobre los acuerdos de gestación

_____

**mera gestación y porque la gestante en ningún momento es, ni pretende convertirse, en madre del niño, sino que lo entregará a los comitentes tan pronto como sea posible, renunciando a los derechos derivados de la maternidad, en su caso**". (Énfasis suplido). *Vilar González, op. cit.*, pág. 32.

No obstante, y en cuanto al uso del término "la gestante" o "la subrogada gestacional", hacemos la aclaración que se ha comenzado a vislumbrar el uso de lenguaje inclusivo en ciertos estatutos de gestación subrogada, incluyendo en la nueva legislación del estado de Nueva York. Allí, en vez de señalar "la gestante" -- lo cual parte de ciertas presunciones, incluyendo que la persona gestante se identifica como mujer y utiliza pronombres femeninos -- exponen el término *person acting as surrogate*. Véase, N.Y. Fam. Ct. Act § 581-102 (McKinney). Habiendo hecho tan importante aclaración, a través de la presente *Opinión de Conformidad* utilizaremos los términos esbozados en la literatura, pero exhortando a que en el futuro se mantengan dichas consideraciones presentes.

[178] Véase, también, G. Labadie Jackson, *Bioética y Derecho de Familia: acotaciones y clareos de la gravidez subrogada*, 76 Rev. Jur. UPR 1291, 1293-1295 (2007).

subrogada y sus implicaciones para los tribunales, se ha

dicho que:

> **Both traditional and gestational carrier arrangements (also called gestational surrogacy) have challenged longstanding family law principles and presumptions, with varying and often inconsistent results from state to state. Before the advent of IVF and gestational surrogacy, it was literally impossible for a woman to deliver a child without being the biological mother.** In recent years, **medical advances have forced courts to define parentage in light of, or in contrast to, existing adoption and parentage laws** (in the context of both disputed and consensual parentage or custody claims); to determine the constitutionality of statutes intended to restrict or govern such arrangements; to decide forum-shopping or jurisdictional disputes when multiple states or countries are involved; and to assess liability for the myriad of professionals who help navigate these new ways of making babies and families. (Énfasis suplido). Crockin & Jones, *op. cit.*, pág. 211-212.

En otras palabras, la evolución de esta tecnología

reproductiva ha causado grandes debates al momento de

determinar la normativa aplicable, ya que dichos procesos

contemplan realidades que -- en muchas ocasiones -- no han

sido consideradas por los tribunales ni los legisladores.[179]

Como consecuencia, la regulación de esta área del derecho ha

sido variada y frecuentemente contradictoria. Un análisis de

los ordenamientos jurídicos de diversas jurisdicciones revela

-- en lo relacionado al tema objeto de estudio -- que éstas

han determinado prohibir, no regular, o permitir ciertas

---

[179] "Defining motherhood when the components of genetics, gestation, and intention can be found between or among two or even three women has perplexed both courts and legislatures." Crockin & Jones, *op. cit.*, pág. 212.

variaciones de la gestación subrogada, mientras que otras han aprobado totalmente los acuerdos de esta naturaleza.

En España, por ejemplo, se ha dispuesto -- por medio de la Ley 14/2006, de 26 de mayo -- que "[s]erá nulo de pleno derecho el contrato por el que se convenga la gestación, con o sin precio, a cargo de una mujer que renuncia a la filiación materna a favor del contratante o de un tercero". Es decir, dichos acuerdos no son exigibles ante los tribunales.

Por otro lado, en Francia, la gestación subrogada no está permitida, inclusive se han dispuesto sanciones penales a esos efectos. *M.R. Díaz Romero*, *Autonomía de la voluntad y contrato de gestación subrogada: efectos jurídicos*, Navarra, Ed. Aranzadi, 2018, pág. 60. De forma similar, Alemania, Suecia e Italia también prohíben la gestación subrogada. *Vilar González*, *op. cit.*, pág. 168.

A diferencia de los países antes mencionados, y estableciendo un poco de contraste, en los Estados Unidos se han desarrollado una variedad de regímenes jurídicos para atender este tema, toda vez que la gestación subrogada es una materia regulada -- de manera individual -- por cada uno de sus estados. K. Trimmings & P. Beaumont, *International Surrogacy Arrangements: Legal Regulation at the International Level*, Oregon, Hart Publishing, 2013, pág. 388. **No empece a ello, la tendencia general ha sido la regulación de los acuerdos de gestación subrogada, no así su prohibición.** *Trimmings & Beaumont*, *op. cit.*, pág. 389.

Por ejemplo, el estado de California permite la modalidad altruista y comercial, al igual que la tradicional y gestacional, de la gestación subrogada. Vilar González, *op. cit.*, pág. 222; Cal. Fam. Law §§ 7960-7962 (2016). De esta forma, figura como uno de los estados con regulación más favorable a los acuerdos de gestación subrogada. *Íd.*

En contraste, New York -- un estado que históricamente ha sido renuente en adoptar la gestación subrogada -- recientemente aprobó el *Child-Parent Security Act*. Dicho estatuto viabiliza la subrogación gestacional comercial y altruista, y regula la filiación de los niños y niñas que nacen a través de dichos métodos, además de los que nacen por medio de otros tipos de asistencia reproductiva.[180] Véase, N.Y. Fam. Ct. Act §§ 581-(201-204) (McKinney). De forma similar, el Distrito de Columbia, Connecticut, Delaware, New Hampshire, entre numerosos otros estados, permiten alguna variación de gestación subrogada.[181]

B.

---

[180] De esta forma, se elimina la antigua declaración de que los acuerdos de gestación subrogada, en general, son contrarios a la política pública del estado de Nueva York y, por tanto, nulos e inexigibles. N.Y. Dom. Rel. Law § 122. En cuanto a los acuerdos comerciales, se eliminaría la imposición de una sanción civil y, en ciertas instancias, ser culpable de un delito grave. N.Y. Dom. Rel. Law § 123. Véase, *Matter of John*, 174 A.D. 3d 89, 103 N.Y. S. 3d 541, 544-546 (2nd Dep't 2019). *Íd.* Es menester aclarar que el nuevo estatuto no permite la vertiente tradicional de la gestación subrogada. Véase, N.Y. Fam. Ct. Act § 581-102 (McKinney).

[181] Véase, por ejemplo, DC Code § 16-404 (West); Conn. Gen. Stat. Ann. § 7-48a (West); Del. Code Ann. tit. 13, § 8-802 (West); N.H. Rev. Stat. Ann. § 168-B:1.

Expuesto lo anterior, consideramos útil explorar cómo otras jurisdicciones han atendido los casos de filiación dentro del contexto de la gestación subrogada. Al realizar este ejercicio, es importante aclarar que en los países donde la gestación subrogada es permitida, la filiación de los padres intencionales tiende a ser asignada antes o después del nacimiento. *Vilar González*, *op. cit.*, pág. 48. De esta forma, puede ser atribuida *ex-ante* -- a saber, desde el momento en que la criatura nace -- o, por otro lado, puede ser atribuida *ex- post facto*, es decir, después del transcurso de un periodo de tiempo y la consiguiente renuncia de la gestadora. *Íd*. Partiendo de este hecho, procedemos a analizar la normativa vigente en los distintos ordenamientos.

Así pues, en España, la nulidad de los acuerdos de gestación subrogada no significa que no se reconozca la filiación y se permita la inscripción de un menor en instancias, por ejemplo, donde se lleva a cabo el procedimiento fuera del país. *Díaz Romero*, *op. cit.*, pág. 25. No obstante, de hacerse un acuerdo en territorio español, donde el mismo acarrearía la nulidad de pleno derecho, la filiación materna sería determinada por el parto.[182] *Vilar González*, *op. cit.*, pág. 76. En ese sentido, la atribución de la filiación responde directamente a la nulidad de los contratos de gestación subrogada.

---

[182] Así pues, según la Ley 14/2006, de 26 de mayo, "[l]a filiación de los hijos nacidos por gestación de sustitución será determinada por el parto".

Francia, por su parte, de forma similar, permite en ciertas instancias -- aunque de forma más restrictiva -- la inscripción de menores nacidos por medio de la gestación subrogada, fuera del país. *Trimmings & Beaumont*, *op. cit.*, pág. 122.

Ahora bien, tal como mencionamos previamente, en los Estados Unidos se han desarrollado una multiplicidad de acercamientos a la gestación subrogada y, por lo tanto, a la filiación de los menores que se gestan como consecuencia de dichos acuerdos. Los análisis de los tribunales, en este contexto, se dan en base de las leyes estatales de filiación, adopción, técnicas de reproducción asistida y cualquier política pública estatal pertinente.

**No obstante, en cuanto al análisis aplicable a los acuerdos de gestación subrogada y la correspondiente atribución de la filiación materna, podemos colegir que, de forma general, los tribunales han adoptado una evaluación del aspecto volitivo, genético, gestacional y los intereses del menor.** Véase, A.M. Larkey, *Redefining Motherhood: Determining Legal Maternity in Gestational Surrogacy Arrangements*, 51 Drake L. Review 605 (2003); Labadie Jackson, *op. cit.*, pág. 1304. Consiguientemente, utilizan uno de estos factores o una combinación de los mismos, para determinar la filiación en instancias donde la maternidad es cuestionada. *Íd*.

IV.

A.

Ahora bien, en cuanto a la normativa local sobre la gestación subrogada, es menester señalar que Puerto Rico -- más allá de lo recientemente incorporado en el Código Civil de 2020, *infra* -- no cuenta con una ley especial sobre técnicas de reproducción asistida.[183] Tampoco existe una agrupación de estadísticas o datos fidedignos sobre la gestación subrogada en nuestro País. Es decir, existe un vacío legislativo e informativo, lo cual dificulta la evaluación de los acuerdos de gestación subrogada y su viabilidad en nuestra jurisdicción.

No obstante, en lo que respecta a nuestro ordenamiento penal, queda meridianamente claro que éste no veda la gestación subrogada. El Art. 122 del Código Penal de Puerto Rico de 2012, 33 LPRA sec. 5181, el cual codifica como delito la adopción a cambio de dinero, excluye -- expresamente -- los casos de gestación subrogada. En ese sentido, no encontramos ningún escollo penal que nos impida reconocer un acuerdo de gestación subrogada.

Habiendo concluido lo anterior sobre nuestras leyes penales, procede considerar minuciosamente nuestro ordenamiento civil, toda vez que allí yace la médula de la controversia del presente caso. En particular, nuestra

---

[183] Valga mencionar que, al momento de ser redactado el presente escrito, estaba ante la consideración de la Cámara de Representantes el Proyecto de la Cámara 577, para crear la *Ley de Acuerdos de Subrogación Gestacional*. Véase, P. de la C. 577 de 10 de marzo de 2021, 1era Ses. Ord., 19va Asam. Leg.

doctrina sobre la generación de obligaciones, el perfeccionamiento de contratos y la filiación.

B.

Y es que, como bien sabemos, en nuestra jurisdicción, las obligaciones "nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia". Art. 1042 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 2992. Cónsono con lo anterior, la contratación se basa en la autonomía de la voluntad y la habilidad de los contratantes de "establecer los pactos, cláusulas y condiciones que tengan por conveniente[s], siempre que no sean contrarios a las leyes, a la moral, ni al orden público". Art. 1207 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3372.

Dichos contratos, a la luz del principio *pacta sunt servanda*, tienen fuerza de ley entre las partes. Art. 1044 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 2994. Es decir, "[c]uando las personas contratan [,] crean normas obligatorias; tan obligatorias como la ley misma". J.R. Vélez Torres, *Curso de Derecho Civil: Derecho de Contratos*, San Juan, Ed. Revista Jurídica UIPR, 1990, Tomo IV, Vol. II, pág. 99. Tal es el caso de autos.

En la causa de epígrafe, las partes se obligaron a un proceso de subrogación gestacional por medio de cierto *Acuerdo*, y -- según lo antes expuesto -- no existía escollo alguno para la otorgación del mismo.

C.

i.

Validado lo anterior, y habiendo discutido la normativa aplicable al reconocimiento de los acuerdos de gestación subrogada, procede discutir uno de sus corolarios: la filiación. Sobre el particular, es necesario reseñar que la filiación "es el estado civil de la persona, determinado por la situación que, dentro de una familia, le asigna el haber sido engendrada en ella o el estar en ella en virtud de la adopción **o de otro hecho legalmente suficiente al efecto**". (Citas omitidas). (Énfasis suplido). *Castro v. Negrón*, 159 DPR 568, 579-580 (2003).

Como se observa, "la filiación así definida se desdobla en filiación jurídica y filiación biológica, figuras que están vinculadas entre sí, en tanto la primera presupone la segunda". *Mayol v. Torres*, 164 DPR 517, 529 (2005). **No obstante, el vínculo jurídico no siempre coincide o se deriva del hecho biológico.** R. Serrano Geyls, *Derecho de familia de Puerto Rico y legislación comparada*, San Juan, Ed. UIPR, 2002, V.II, pág. 886; *Bonilla Ramos v. Dávila Medina*, 185 DPR 667, 672 (2012).

Los procesos de filiación son de suma importancia, pues, "no se limita[n] a establecer vínculos con el propósito de identificar relaciones entre partes de la sociedad, sino que va dirigida a imponer derechos y obligaciones concretas de consecuencias permanentes". *Sánchez Rivera v. Malavé Rivera*, 192 DPR 854, 862 (2015). Por lo tanto, repercuten en diversos

aspectos de la vida de una persona, a través de la duración de la misma. Inclusive, "de la filiación depende el nombre que pueda y deba utilizar el individuo y la integración de [é]ste en el grupo familiar". (Cita omitida) R. E. Ortega-Vélez, *25 Lecciones Derecho de Familia*, 7ma ed. rev., San Juan, Ed. SITUM, 2018, pág. 217.

En esa dirección, el ahora derogado Código Civil de Puerto Rico de 1930, *supra*, incorporaba varios supuestos filiatorios y sus correspondientes presunciones, instituyendo así la filiación natural, dentro y fuera del matrimonio. Cónsono con ello, el Art. 113 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 461, establecía que se presumían hijos o hijas del marido los niños y niñas nacidos durante el matrimonio o en los trecientos (300) días después de su disolución. *Íd*. Así, también dictaba que el reconocimiento voluntario creaba una presunción de paternidad a favor del reconocedor.[184] *Íd*. En contraste, en cuanto a la maternidad,

---

[184] Ahora bien, el esquema al que hemos hecho referencia no era el originalmente contemplado por nuestro ordenamiento jurídico. No fue hasta el año 2009, por medio de la Ley Núm. 215 de 29 de diciembre de 2009, que se incorporó al antedicho inciso las presunciones según descritas, incluyendo la presunción en virtud del reconocimiento voluntario. Según pronunciado por la Asamblea Legislativa, "[e]l Código Civil de Puerto Rico se remonta a un Código Civil español más que centenario. La actual normativa que regula la filiación, se remonta a esa fecha pasando por alto los cambios sociales y científicos logrados". Exposición de Motivos, Ley Núm. 215-2009 (2009 (Parte 3) Leyes de Puerto Rico 1819).

dicho inciso establecía que el acto del parto determina la misma.[185] *Íd.*[186]

De otra parte, el Art. 125 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 504 -- el cual subsistió mayormente inalterado a pesar del transcurso del tiempo -- exponía la normativa en cuanto al reconocimiento de hijos no matrimoniales.[187]

---

[185] Ello, basado en el principio romano de *mater semper certa est*, el cual "se traduce en la certeza del hecho directo e indubitado de la gestación y el parto, de modo que la maternidad se anuncia por el embarazo y se manifiesta por el alumbramiento". A. Vela Sánchez, *La maternidad subrogada: estudio ante un reto normativo*, Granada, Ed. Comares, 2012, pág. 31-32. Empero, ésta ha tenido sus críticas. Por ejemplo:

> Con todo ello se añade una mayor complejidad a la cuestión pacífica de la certeza asociada a la maternidad natural, derivada de la gestación y el parto, que se asentaba tradicionalmente en la máxima pauliana «*mater semper certa est*», y que **da paso a un nuevo principio que podríamos denominar «*mater non semper certa est*», el cual plantea grandes retos, tanto al legislador, como al intérprete del Derecho**. (Cita omitida). (Énfasis suplido). Vilar González, *op. cit.*, pág. 26.

[186] Sobre el nexo entre la filiación, el acto del parto y la visión tradicional de éstos, es importante recalcar que:

> Hasta hace muy poco tiempo, resultaba impensable que la mujer que daba a luz, no fuera la misma persona que hubiera aportado el óvulo para la fecundación, por lo que las normas existentes para determinar la filiación por naturaleza tenían su fundamento, única y exclusivamente, en la verdad biológica con respecto a la madre, estableciéndose, con respecto al padre, diversos mecanismos jurídicos dirigidos a propiciar la adecuación entre la filiación jurídica y la biológica, que hacían posible investigar la paternidad. **Sin embargo, con las TRA [técnicas de reproducción asistida] se genera la necesidad de establecer también acciones que permitan investigar la maternidad, ya que, con ellas, surge la posibilidad de disociar o deconstruir dicha maternidad en tres elementos: el genético, el gestacional y el volitivo, que podrán o no coincidir en una misma mujer**. (Énfasis suplido). Vilar González, *op. cit.*, pág. 25 – 26.

[187] No obstante, es imperativo recalcar que dicho artículo debe ser evaluado a la luz de lo dispuesto en *Ocasio v. Díaz*, 88 DPR 676 (1963) y su progenie.

En lo pertinente, el artículo de referencia rezaba:

En cuanto al reconocimiento voluntario, en específico, hemos sentenciado que es "aquella declaración hecha por ambos padres (o por uno de ellos aisladamente), por cuya virtud acreditan que una persona es hija suya, siempre que ello se haga en las condiciones y mediante las formas prescritas por las leyes". (Citas omitidas). *González Rosado v. Echevarría Muñiz*, 169 DPR 554, 563 (2006). Por su naturaleza y sus correspondientes consecuencias, dicho acto jurídico es personal, unilateral e irrevocable. Ortega-Vélez, *op. cit.*, pág. 229. De lo anterior se desprende que el antiguo Código Civil de 1930, *supra*, no hacía ninguna referencia explícita a los procesos de gestación subrogada.

Ahora bien, a diferencia de su predecesor, el nuevo Código Civil de 2020, *supra*, contempla, de forma expresa, la maternidad y paternidad que surge como consecuencia de un proceso de gestación subrogada. Aunque en limitadas

---

Son hijos naturales los nacidos, fuera de matrimonio, de padres que al tiempo de la concepción de aquéllos hubieran podido casarse, sin dispensa o con ella.

El hijo natural puede ser reconocido por el padre o la madre conjuntamente, o por uno solo de ellos, en el acta de nacimiento, o en otro documento público.

…

La madre estará obligada al reconocimiento del hijo natural, en los mismos casos que el padre, y además cuando se pruebe cumplidamente el hecho del parto y la identidad del hijo.

El hijo mayor de edad no podrá ser reconocido sin su consentimiento. Cuando el reconocimiento del menor de edad no se realiza en el acta de nacimiento o en testamento, será necesaria la aprobación del juez de la sala del Tribunal de Primera Instancia en que resida el menor, con intervención del fiscal. Art. 25, Código Civil de 1930, 31 LPRA sec. 504.

instancias, se hace alusión a la filiación y los padres intencionales.

En particular, en su Art. 556, el Código Civil de 2020 dispone expresamente que "**[l]a filiación tiene lugar por vínculo genético, por métodos de procreación asistida o por adopción**". (Énfasis suplido). Art. 556, Código Civil de 2020, 31 LPRA sec. 7102. Consecuentemente, el referido cuerpo reglamentario divide la regulación de la filiación materna y paterna en dos incisos distintos.

En lo pertinente, y como ya mencionamos, el nuevo **Art. 567, 31 LPRA sec. 7121, dispone la presunción que el parto determina la maternidad "excepto en casos de maternidad subrogada en los cuales la mujer gestante no tiene vínculo genético alguno con el hijo que se desprende de su vientre y desde un principio su intención original fue llevar el embarazo a término para otra persona".** (Énfasis suplido).

Así las cosas, y cónsono con éstos, se enmendó la lista de personas legitimadas para impugnar la filiación materna. Véase, Art. 570, Código Civil de 2020, 31 LPRA sec. 7124. **En particular, en el Art. 570 del Código Civil de 2020, se dispone que "[l]a maternidad de un hijo puede impugnarse únicamente si se prueba que hubo simulación del parto, sustitución del hijo durante el alumbramiento o después de él, o por acuerdo de maternidad subrogada".** (Énfasis suplido). *Íd*. En estos últimos casos, la "madre intencional subrogada" está legitimada para impugnar la maternidad. *Íd*.

Como se puede apreciar, si bien el legislador ha dado importantes pasos para contemplar las distintas controversias que genera el tema bajo estudio, -- a pesar de dichos esfuerzos -- han quedado amplias lagunas por atender.

ii.

Asimismo, al tratar el tema de la filiación en el contexto de las controversias bajo estudio, conviene repasar -- principalmente para descartar su aplicación en escenarios como los de autos -- la doctrina aplicable a la filiación adoptiva. Recordemos que la adopción es un "acto jurídico solemne mediante el cual se sustituye totalmente el parentesco familiar biológico o natural de una persona por otro en un procedimiento judicial rigurosamente reglamentado". *Ex parte Feliciano Suárez*, 117 DPR 402, 406 (1986). Véase, Serrano Geyls, *op. cit.*, págs. 1085-1086. En ese sentido, "se reconoce una integración plena y total del hijo adoptivo con la familia del adoptante". *Ex parte Feliciano Suárez*, *supra*, pág. 407. Es decir, como consecuencia de la nueva filiación, la persona adoptada adquiere todas las obligaciones y derechos del hijo con vínculo biológico.

En nuestra jurisdicción, parte de la reglamentación instaurada para regir los procedimientos de adopción, incluye la Ley de Adopción de Puerto Rico, Ley Núm. 61-2018, 8 LPRA sec. 1081 *et seq.* (en adelante, "Ley de Adopción"). El precitado estatuto fue aprobado en aras de agilizar los procedimientos de adopción en Puerto Rico, ya que "[l]a

adopción es una alternativa real y una opción de amor en beneficio de todos, cuando por diversas circunstancias nuestros niños no encuentran en sus padres biológicos el amor y afecto que por derecho natural deben recibir". Exposición de Motivos, Ley de Adopción.

Para viabilizar la intención legislativa, y proteger el bienestar de los menores que atraviesan un proceso de adopción -- al igual que los padres biológicos y adoptantes --, la Ley de Adopción enumera una estricta lista de requisitos sustantivos y procesales, los cuales varían dependiendo las circunstancias de la adopción. Así, por ejemplo, en cuanto a la figura del acuerdo de adopción -- según surge de la entrega voluntaria de menores -- se establece que es:

> [E]l acto jurídico solemne mediante el cual la mujer gestante pacta, sin mediar compensación de clase alguna, salvo el pago de los gastos del embarazo[…] en documento juramentado ante notario público autorizado a ejercer en Puerto Rico, llevar a término el embarazo y renunciar al derecho de patria potestad para entregar al recién nacido en adopción; y la persona, pareja o matrimonio adoptante futuro se obligan a sufragar los gastos del embarazo y a adoptar al recién nacido, independientemente de cualquier condición de salud con la cual haya nacido […]". Art. 3(a), Ley de Adopción, 8 LPRA sec. 1081b(a).

Sobre los requisitos de los acuerdos de adopción durante el embarazo, se incluye como condición que la parte adoptante exprese que reconoce que la madre biológica del menor puede dejar sin efecto el acuerdo de adopción -- es decir, retractarse -- dentro de los siete (7) días siguientes al nacimiento de la criatura. Art. 5(5), Ley de Adopción, 8 LPRA sec. 1082a (5). De modo que, cualquier acuerdo que

"[l]imite o pretenda limitar el derecho que tiene la madre biológica para retractarse de la entrega en adopción", sería nulo. Art. 7(3), Ley de Adopción, 8 LPRA sec. 1082c (3).

D.

Por otro lado, es oportuno señalar aquí que el Registro Demográfico -- habilitado por la Ley del Registro General Demográfico de Puerto Rico, Ley Núm. 24 de 22 de abril de 1931, 24 LPRA sec. 1041 *et seq.*, según enmendada (en adelante, "Ley del Registro Demográfico") -- es la entidad que tiene a su cargo "el registro, colección, custodia, preservación, enmiendas y certificación de récords vitales; la colección de otros informes requeridos por esta parte; actividades relacionadas a ella, incluyendo la tabulación, análisis y publicación de estadísticas vitales". Art. 2(1), Ley del Registro Demográfico, 24 LPRA sec. 1042(1). Por récords vitales nos referimos a los nacimientos, defunciones, casamientos, divorcios, disoluciones o anulaciones de casamientos y los informes relacionados a éstos. Art. 2(10), Ley del Registro Demográfico, 24 LPRA sec. 1042(10).

Como mencionáramos, por medio de dicho estatuto se regula la inscripción y notificación de todo nacimiento y, como corolario, el reconocimiento voluntario. Así, por ejemplo, el Art. 19-A de la Ley del Registro Demográfico, 24 LPRA sec. 1133a, establece, en lo pertinente, que:

> Si el nacimiento es reconocido por uno solo de los padres será obligación del Registro Demográfico, cuando así lo requiera dicho padre o madre al momento de la inscripción, realizar la inscripción

haciendo constar los dos apellidos del único que lo reconoce.

**Si con posterioridad a la inscripción surgiera la intención de un reconocimiento voluntario, el Registro Demográfico viene en la obligación de sustituir el apellido del padre o la madre de acuerdo a la documentación evidenciada.** (Énfasis suplido).

Como se puede colegir, existe un mecanismo procesal para el reconocimiento voluntario y su correspondiente inscripción.

E.

Por último, corresponde recalcar que el Art. II, Sec. 1, comprendido dentro de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico, establece -- de forma expresa -- que:

**La dignidad del ser humano es inviolable. Todos los hombres [y mujeres] son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas.** Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.[188] (Énfasis suplido). Art. II, Sec. 1, Const. ELA LPRA, Tomo 1.

---

[188] Como parte del proceso de la Convención Constituyente, el Informe de la Comisión de Carta de Derecho expresó que:

La igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en la naturaleza o en la cultura. **Todo discrimen o privilegio contrario a esta esencial igualdad repugna al sistema jurídico puertorriqueño. En cuanto fuera menester nuestra**

De este modo, se codificó en nuestra Carta Magna el principio fundamental de la igualdad y, en lo pertinente, el rechazo al discrimen por motivo de sexo. Asimismo, enlazado con dicho principio, nuestra Constitución, en su Art. II, Sec. 7, dispone que no "se negará a persona alguna en Puerto Rico la igual protección de las leyes". Art. II, Sec. 7, Const. ELA, LPRA, Tomo 1.

La precitada disposición constitucional se activa "cuando nos enfrentamos a una legislación o a una acción estadual que crea clasificaciones entre grupos, discriminando a unos frente a otros". *Garib Bazaín v. Hospital Español Auxilio Mutuo de Puerto Rico*, 204 DPR 601 (2020) (Colón Pérez, opinión disidente); *San Miguel Lorenzana v. E.L.A.*, 134 DPR 405, 424 (1993); *Berberena v. Echegoyen*, 128 DPR 864, 878 (1991). Pese a esto, no se exige un trato igual para todo ciudadano y ciudadana, más bien se prohíbe el trato desigual injustificado. *Garib Bazaín v. Hospital Español Auxilio Mutuo de Puerto Rico*, *supra*; *Berberena v. Echegoyen*, *supra*; *Zachry International v. Tribunal Superior*, 104 DPR 267, 277 (1975).

Siendo ello así, al emplear un análisis sobre la igual protección de las leyes en determinado contexto, debemos examinar la correlación entre la clasificación y el propósito que se pretende obtener mediante ésta. *Garib*

---

**organización legal queda robustecida por la presente disposición constitucional, a la vez que obligada a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto.** (Énfasis suplido). 4 Diario de Sesiones de la Convención Constituyente 2561 (1951).

*Bazaín v. Hospital Español Auxilio Mutuo de Puerto Rico*, *supra*; *Domínguez Castro v. ELA*, 178 DPR 1 (2010); *Berberena v. Echegoyen*, *supra*. Además, se debe considerar la importancia del derecho o interés afectado por la actuación del Gobierno. *Íd.*

Es, pues, a la luz de la normativa antes expuesta que corresponde analizar la totalidad de la causa ante nuestra consideración.

V.

A.

Tal como esbozamos en la exposición del tracto procesal del presente caso, el matrimonio RPR-BJJ nos invita a que revoquemos la *Sentencia* emitida por el foro apelativo intermedio y que, como consecuencia, confirmemos la determinación del Tribunal de Primera Instancia en su totalidad. A nuestro juicio, y como correctamente lo decidió una mayoría de este Tribunal, les asiste la razón.

En primer plano, es menester señalar que no existe nada en nuestro ordenamiento -- tanto bajo la vigencia del Código Civil de 1930, *supra*, como el Código Civil de 2020, *supra* -- que prohíba los acuerdos de gestación subrogada. Este tipo de contrato es plenamente válido, por no ser contrario a la ley, la moral o el orden público. Siendo ello así, se debe respetar el aspecto volitivo envuelto en estas relaciones, lo cual da paso a acuerdos vinculantes y exigibles, tal como el válidamente otorgado entre el matrimonio RPR-BJJ y CTR.

Sobre los hechos del presente caso, precisa aquí señalar que el matrimonio RPR-BJJ ha criado al menor MVJP desde su nacimiento, cuidándolo y asumiendo así el rol de padre y madre. Esto, por causa del acuerdo establecido entre las partes y el estado de derecho creado por sus voluntades.

**Acuerdo que, según surge de las determinaciones de hecho del Tribunal de Primera Instancia y las conclusiones del Tribunal de Apelaciones, ni siquiera está siendo impugnado.** El hecho de que, a pesar de esto, no se le quiera reconocer ningún derecho a RPR sobre el menor MVJP -- a menos que se sujete a un proceso de adopción -- es inconcebible y desatinado.

B.

Dejando claro lo anterior, y en lo relacionado a la filiación como consecuencia de los acuerdos de gestación subrogada, entendemos que, tal y como lo sentencia una mayoría de mis compañeros de estrado, -- en nuestra jurisdicción -- la misma puede proceder por vía del reconocimiento voluntario, como el que hizo RPR del menor MVJP. A todas luces, estamos ante un escenario donde existe una declaración efectuada por una progenitora, por cuya virtud se acredita que un menor es hija o hijo suyo, habiéndolo hecho bajo las condiciones y mediante la forma prescrita por ley.

Aducir lo contrario, obligando así a una madre intencional a tener que recurrir a un proceso de adopción mientras que el padre intencional -- sea biológico o no --

puede reconocer al menor voluntariamente, sería un proceder patentemente discriminatorio y, en consecuencia, improcedente. Así lo concluyó el foro primario, al acertadamente hacer una evaluación abarcadora de las leyes aplicables y armonizando sus preceptos, a través de un lente de equidad.

No cabe hablar aquí, pues, de un proceso de adopción, como nos solicita el Procurador General. Esto, ya que la adopción contempla un crío ya concebido, el cual -- por una heterogeneidad de razones -- no puede ser sustentado por sus progenitores y se busca posicionarlo en un hogar donde sea cuidado. Queda claro, entonces, que es una situación distinta a las instancias de gestación subrogada, donde una o varias personas acuerdan gestar un crío, **como consecuencia directa de su voluntad**. En ese sentido, si bien se podrían trazar ciertos aspectos paralelos entre la adopción y la gestación subrogada, las dos (2) resultan de circunstancias -- y en virtud de intereses -- distintos.

C.

**En definitiva, y conforme a lo antes expuesto, no podemos adscribirnos a una visión que considera que el parto o una conexión genética define exclusivamente la maternidad. De esa forma, se excluyen los aspectos volitivos que están involucrados en los acuerdos de gestación subrogada y nos abstraemos de las realidades de los avances científicos en**

**las tecnologías de reproducción asistida.**[189] Análogamente, nos aislaríamos de las vías legales existentes que permiten la inscripción de un menor -- producto de un proceso de subrogación gestacional -- con su madre intencional como progenitora.

VI.

En fin, y a modo de epílogo, según surge de los hechos y la normativa antes expuesta, en el caso de epígrafe se formuló un acuerdo vinculante de subrogación gestacional, la madre intencional del menor lo reconoció como hijo y, desde ese momento, advino madre. <u>Más allá del aspecto genético o el acto del parto: se le debe reconocer como tal</u>.

VII.

Es, pues, por todo lo anterior que estamos conformes con el proceder de este Tribunal en el día de hoy.


Ángel Colón Pérez
Juez Asociado

---

[189] Es indispensable enfatizar la importancia del aspecto volitivo en los acuerdos de gestación subrogada. Por tanto:

> **La necesidad de proteger la prevalencia del elemento volitivo o voluntad procreacional de las partes, frente a una búsqueda de la realidad biológica que la contradiga, se hace todavía más patente en el caso de la gestación subrogada, que <u>no tiene cabida en las modalidades tradicionales de filiación, por naturaleza y adoptiva, contempladas en nuestro Código Civil</u>.** Y más, si ésta se llevase a cabo por parte de parejas homosexuales masculinas o padres intencionales que deseasen acceder a la paternidad de forma individual, ya que ello obligaría a replantearse la determinación legal de la filiación al no poder asociarla, indisolublemente, al hecho biológico del parto. (Énfasis suplido). Vilar González, *op. cit.*, pág. 27.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

RPR & BJJ

　　Peticionarios

　　　　　　　　　　　　　　　CC-2020-0653

*Ex parte*


Opinión disidente emitida por el Juez Asociado señor MARTÍNEZ TORRES.


En San Juan, Puerto Rico, a 17 de junio de 2021.

　　　Disiento muy respetuosamente de la Opinión que suscribe este Tribunal. No tengo dudas de que el Tribunal busca hacer justicia para el menor y su familia. Sin embargo, entiendo que se ignoraron asuntos jurisdiccionales y las salvaguardas que proveen los procedimientos judiciales. Debido a que el menor M.J. nació mientras estaba vigente el Código Civil de 1930, y que según esa legislación la filiación jurídica materna emana del hecho del parto, no es posible inscribir en el Registro Demográfico una maternidad que surge por un contrato de maternidad subrogada.

El Código Civil de 1930 se basa en el Código Napoleónico y recoge el conocimiento científico limitado de esa época. El legislador -como todos- desconocía entonces los detalles biológicos de la gestación por el lado materno. Mucho menos existían los métodos de maternidad subrogada que la ciencia trajo décadas después. Por eso, su criterio fue objetivo: Madre es la que pare la criatura.

Con el Código Civil de 2020, la ley por fin alcanzó a la ciencia. Aunque se sigue reconociendo que se inscriba como madre a la mujer que da a luz al bebé, se creó una excepción para la maternidad subrogada sin vínculo genético con la madre gestante.

Con una intención muy loable, la Opinión del Tribunal hace que esa nueva legislación aplique retroactivamente a las partes en este caso y al menor. No obstante, el legislador dispuso expresamente lo contrario: la nueva norma no es retroactiva.

Tras un estudio de las disposiciones y figuras en controversia, por tratarse de un asunto sustantivo, entiendo que el advenir de un cambio normativo en materia de filiación no es suficiente para que se aplique la nueva ley retroactivamente, si no se cumple con los requisitos para que se configure una excepción a la norma de irretroactividad.

Lamentablemente, este Tribunal -sin mucha explicación- trastoca la figura de la irretroactividad de la ley en asuntos sustantivos. De igual manera, cambia la norma de que en el Registro Demográfico se inscriben datos vitales y no

los deseos de quienes solicitan la inscripción. Además, el Tribunal le atribuye a los empleados del Registro Demográfico una función calificadora que no tienen por virtud de ley. Eso podría tener consecuencias en otros escenarios en el futuro.

Ahora bien, la irretroactividad de la norma no deja sin remedios a los solicitantes para hacer que se les inscriba eventualmente como los progenitores del menor. La mujer que carece de vínculo biológico con un menor tiene disponible la presentación de una petición de adopción para que se le reconozca como madre para todos los fines legales. En casos como este, ese procedimiento es expedito, por no haber oposición de la madre biológica incidental. Además, la Opinión mayoritaria hace una interpretación aislada y contraria al claro lenguaje del Código Civil de 1930 para justificar su resultado.

La situación fáctica que origina este caso se encuentra detallada en la Opinión mayoritaria, por lo que procedo directamente a exponer mi postura.

I

La filiación es el estado civil que se atribuye a una persona por el hecho de tener a otra u otras por progenitores. Rivera Marrero v. Santiago Martínez, 203 DPR 462, 476 (2019). Se trata de una relación jurídica procedente del vínculo natural entre padres e hijos. Íd. Véase, J. Puig Brutau, Fundamentos de derecho civil, 2da ed., Barcelona, Ed. Bosch, 1985, T. IV, pág. 187. No obstante, debido a que la relación biológica no siempre coincide con la relación jurídica, la

filiación en su concepto más amplio denota el estado que se le asigna a una persona dentro de una familia por haber sido engendrada en ella o ser parte como resultado de una adopción o de otro hecho legalmente suficiente en derecho. Castro v. Negrón, 159 DPR 568, 579-580 (2003). Véase, Peña Bernaldo de Quirós, Derecho de familia, Madrid, Sección de Publicaciones, Facultad de Derecho, Universidad Complutense, 1989, págs. 402-403.

A estos fines, hemos reconocido que existen dos tipos de filiaciones: la natural y la adoptiva. A.A.R. Ex parte, 187DPR 835, 856 (2013); Beníquez v. Vargas, 184 DPR 210, 228 (2012). Por su parte, la filiación natural recoge y regula la realidad biológica con el fin de distribuir derechos y obligaciones específicas entre padres e hijos. Rivera Marrero v. Santiago Martínez, supra, pág. 476; Sánchez v. Sánchez, 154 DPR 645, 660 (2001). En virtud de esta, el Art. 113 del Código Civil de 1930, entonces vigente, 31 LPRA sec. 461, establecía las presunciones de paternidad y maternidad:

> Se presumen hijos del marido de la mujer casada los nacidos durante el matrimonio y los nacidos antes de los trescientos días siguientes a su disolución. El reconocimiento voluntario crea una presunción de paternidad a favor del reconocedor. **El parto determina la maternidad.** (Énfasis suplido).

Conforme hemos expresado, la filiación es la declaración del estado jurídico de una persona como hijo. A pesar de que en materia de filiación el elemento biológico no es el único a considerarse, nuestra jurisprudencia reafirma la política pública de lograr que la realidad biológica coincida con la

jurídica. <u>Rivera Marrero v. Santiago Martínez</u>, <u>supra</u>, pág. 475; <u>Sánchez Rivera v. Malavé Rivera</u>, <u>supra</u>, pág. 863. Esto sostiene un balance en la búsqueda de la estabilidad de los derechos y obligaciones nacidos de la filiación. <u>Íd</u>., pág. 867. De hecho, el vínculo biológico es insuficiente por sí mismo para que nazca el vínculo jurídico. <u>Alvareztorre Muñiz v. Sorani Jiménez</u>, 175 DPR 398, 411 (2009). Por eso, cuando no conste quiénes son los padres de una persona puede darse una filiación biológica pero no jurídica. También puede darse el caso de que quien figura como padre jurídico no lo sea biológicamente.

Así, las tres acciones judiciales que reconoce nuestro ordenamiento en cuanto a la filiación natural son: (1) la afirmación de filiación, (2) la acción de impugnación y (3) la mixta. <u>Rivera Marrero v. Santiago Martínez</u>, <u>supra</u>, pág. 477. Además, existen varias maneras en que se adquiere el estado o condición de hijo, desde el nacimiento -por cobijarle alguna presunción- o desde el momento del reconocimiento, o en la alternativa, por decreto judicial. <u>Castro v. Negrón</u>, <u>supra</u>; <u>Almodóvar v. Méndez Román</u>, 125 DPR 218, 251 (1990).

Primero, dentro de las acciones de afirmación de filiación o de reclamación de filiación, se encuentra el reconocimiento voluntario -que no esté en conflicto con alguna presunción-. Estas acciones pretenden un pronunciamiento judicial que determine la filiación **de una persona que carecía de ella**. <u>Alvareztorre Muñiz v. Sorani Jiménez</u>, <u>supra</u>. En <u>Almodóvar v. Mendez Román</u>, <u>supra</u>, pág. 236 (citando a Albaladejo, <u>Curso de derecho civil</u>, 2da ed.,

Barcelona, Ed. Bosch, 1984, T. IV, pág. 226), reconocimos que se ha señalado que **"[l]as personas que carecen de filiación conocida** paterna o materna o de ambas, pasan a ostentar una u otra o las dos cuando los reconoce un varón, una mujer o una pareja". (Énfasis suplido).

En segundo lugar, se encuentran las acciones de impugnación, ya sea de impugnación de paternidad o maternidad o de impugnación de reconocimiento voluntario. Ambas están dirigidas a negar una filiación ya establecida. Íd., pág. 414. Además, en un pleito de impugnación de filiación presunta el menor es parte interesada. Bonilla Ramos v. Dávila Medina, 185 DPR 667, 679 (2012).

En particular, al momento del nacimiento del menor M.J. nuestro ordenamiento jurídico contenía la premisa de que el parto determina la filiación jurídica materna. Por virtud del principio de *mater semper certa est*, cuando se comprueba el hecho del parto y la identidad del hijo se atribuye *ipso iure* la maternidad. R. Ortega Vélez, La filiación: apuntes y jurisprudencia, 1ra ed., San Juan, Ed. Scisco, 1997, pág. 6. Esto se debe a que el Código Civil de 1930 parte de la premisa de que la maternidad es un hecho de fácil verificación porque el parto y el embarazo son realidades físicas externas, verificables con relativa sencillez. Ramos v. Marrero, 116 DPR 357, 360 (1985).

Por esto, el Art. 115 del Código Civil de 1930, 31 LPRA sec. 463, establece que la presunción de maternidad puede impugnarse en dos instancias: por simulación del parto o por sustitución inadvertida del hijo durante el alumbramiento o

luego de este. En esos casos tiene legitimación para instar una acción de impugnación: la presunta madre, la madre biológica, el hijo o el presunto padre. Íd. Distíngase que el concepto de madre biológica no es igual al de madre genética. J. Castán Tobeñas, Derecho civil español, común y foral, 10 ma ed. rev., Madrid, Ed. Reus, 1995, T. V, Vol. II, págs. 232-238.

El término "madre biológica" se emplea con relación a la mujer que da a luz al menor, mientras que "madre genética" es quien aporta el óvulo. A estos efectos, la mujer que gesta al hijo (madre gestante) es siempre la madre biológica, aunque el óvulo provenga de otra mujer (madre genética). R. Serrano Geyls, Derecho de familia de Puerto Rico y legislación comparada, 1ra ed., San Juan, [s. Ed.], 2002, Vol. II, pág. 1240. En consecuencia, el vínculo maternofilial se da con la mujer que alumbra al menor. Ortega Vélez, op. cit., pág. 223.

En el marco jurídico de la ley española, similar al Art. 113 del Código Civil de Puerto Rico de 1930, supra, algunos tratadistas mencionan que la maternidad queda determinada por el hecho del parto y la identidad del hijo y así determinada no es impugnable. J. Santos Briz y otros, Tratado de derecho civil: teoría y práctica, 1ra ed., Barcelona, Ed. Bosch, 2003, T. V, pág. 300.

Lo anterior significa que el vínculo biológico materno se da por virtud del evento del alumbramiento. Visto esto, la presunción de maternidad puede impugnarse efectivamente con prueba de que quien se cree que dio a luz no fue quien en realidad lo hizo, pues lo determinante es el alumbramiento.

Como los conceptos de filiación y maternidad existentes al momento del nacimiento del menor M.J. no contemplaban la procreación asexual ni la extracorporal, **"[l]os tribunales no pueden dar a esta extensa y complicada materia la clara orientación y la reglamentación centralizada y de larga duración que se requiere"**. (Énfasis suplido) Serrano Geyls, op. cit., pág. 1246. Las disposiciones contenidas en el Art. 115 del Código Civil de 1930, supra, muestran un lenguaje claro de cuándo procede impugnar la presunción de maternidad. Así, si el texto de la ley no crea dudas ni ambigüedades en cuanto a los criterios restringidos para impugnar la maternidad, se debe interpretar según el texto de la ley. Art. 138 del Código Civil de 1930, supra; A.A.R. Ex parte, supra, pág. 884. Estos requisitos limitados responden principalmente a ofrecer un grado de certeza entre la filiación jurídica y la biológica.

A su vez, en el tercer tipo de acciones, las mixtas, se procura la declaración de determinada filiación mientras que se niega otra contradictoria, ambas interdependientes entre sí. Rivera Marrero v. Santiago Martínez, supra, pág. 477. En esta categoría se encuentran las acciones en las que se impugna una presunta filiación buscando otra. Se trata de una acción de carácter accesorio pues la impugnación no tiene carácter independiente de la acción de filiación. Sánchez v. Sánchez, supra; Robles López v. Guevárez Santos, 109 DPR 563 (1980).

Asimismo, en nuestro ordenamiento legal rige la norma de la incompatibilidad de filiaciones contradictorias, que

dispone que no es posible determinar una nueva filiación en tanto exista una contradictoria. Beníquez v. Vargas, supra, pág. 249. En lo pertinente, el reconocimiento voluntario es un acto jurídico que consiste en una admisión del progenitor sobre el hecho de la paternidad o maternidad biológica, que permite establecer el estado civil del hijo. Íd., pág. 231; Castro v. Negrón, supra, pág. 585.

A diferencia de la filiación adoptiva, el reconocimiento voluntario no puede ser eficaz mientras haya otra filiación natural contradictoria. Es decir, "[q]uien alega la nueva filiación está obligado a impugnar la filiación existente a través de una acción de impugnación, o a ejercitar simultáneamente la de reclamación e impugnación [...] pues **sólo cuando la filiación oficial se destruye puede procederse a la determinación de la nueva**". (Énfasis suplido) Beníquez v. Vargas, supra, pág. 249, citando a E. Toral Lara, Novedades en materia de determinación y prueba de filiación, en E. Llamas Pombo, Nuevos conflictos del derecho de familia, Madrid, Ed. La Ley, 2009, pág. 323. "**[S]erá ineficaz el reconocimiento si está en oposición con un título de legitimación anterior que acredite una filiación contradictoria**". (Énfasis suplido) Castro v. Negrón, supra, pág. 288.

La declaración de nacimiento es un ejemplo de este tipo de título que consta en el Registro Demográfico. La Ley del Registro Demográfico de Puerto Rico, Ley Núm. 24 de 1931, según enmendada, 24 LPRA sec. 1131, establece que las instituciones hospitalarias tienen la obligación de someter

una declaración de nacimiento dentro del término de treinta días desde el parto. Entre los datos que contiene la declaración se encuentra el nombre de la mujer que dio a luz al menor -la madre biológica-. Recordemos que la información que consta en el Registro Demográfico constituye evidencia *prima facie* del hecho que se pretende constatar. Delgado Ex parte, 165 DPR 170, 187 (2005).

El Registro Demográfico da publicidad de datos vitales de la persona y de hechos que afectan su estado civil cuando entran en relación con el Estado o con terceros. Íd., pág. 191. Su función consiste en registrar, coleccionar, custodiar, preservar, enmendar y certificar hechos vitales de las personas nacidas en Puerto Rico. Art. 7 de la Ley del Registro Demográfico de Puerto Rico, 8 LPRA sec. 1042. En específico, el certificado de nacimiento constituye "un documento que recoge información histórica sobre hechos vitales de la persona al momento de su nacimiento". Íd. Debemos ser cuidadosos de no abrir el Registro Demográfico para que en él se coloquen deseos en vez de datos. **Nuestra jurisprudencia es clara en que la Ley del Registro Demográfico y las disposiciones que permiten registrar información en este o enmendar sus asientos deben interpretarse restrictivamente.** Íd., pág. 189. **Para que se cambien sus constancias, el cambio tiene que estar previamente autorizado por la ley.** Íd. **Igualmente, una orden de nuestra parte para algún cambio o inscripción en el Registro solo procederá si hay legislación a esos efectos.**

Contario a lo que aduce la Opinión mayoritaria, el caso ante nuestra consideración no trata de una inscripción registral por reconocimiento al amparo del Art. 125 del Código Civil de 1930. El claro lenguaje de este artículo revela que sus disposiciones no cobijaban a la señora R.P.R. El Art. 125 del Código Civil de 1930, 31 LPRA sec. 504, se refiere a la filiación extramatrimonial. Para ello, define que los hijos naturales son "los nacidos, fuera del matrimonio, de padres que al tiempo de la concepción de aquéllos hubieran podido casarse, sin dispensa o con ella". Íd. Este artículo establece que el hijo natural puede ser reconocido por el padre o la madre conjuntamente, o por solo uno de ellos, en el acta de nacimiento, o en otro documento público. Íd. Específicamente, la madre estará obligada al reconocimiento del hijo natural, cuando se pruebe el hecho del parto y la identidad del hijo. Íd.

Cabe destacar que la madre a la que se hace referencia en este artículo es la que establece todo el ordenamiento jurídico vigente al momento del nacimiento del menor: la que le dio a luz, porque el alumbramiento determina la maternidad. Véase Art. 113 del Código Civil de 1930, supra. Incluso, una lectura completa e integral nos revela que ya que en este caso quedo evidenciado el hecho del parto y la identidad del menor, la señora C.T.R. debía reconocer al menor M.J. El menor no es el hijo natural de la señora R.P.R. El Art. 125 del Código Civil de 1930, supra, no la facultaba para reconocerlo. De igual modo, ya que el Art. 31 de la Ley del Registro Demográfico, 24 LPRA sec. 1231, se refiere al reconocimiento

de un hijo natural, no debemos forzar su aplicación a este caso.

Adviértase que la Opinión Mayoritaria razona la señora R.P.R. puede reconocer voluntariamente al menor M.J., ya que la madre biológica renunció válidamente a cualquier derecho sobre este. Ahora bien, decir que la señora C.T.R. renunció a los derechos que tenía sobre el menor M.J., es reconocer que estos derechos le asistían por razón del parto. Además, una vez se configura una renuncia válida a la patria potestad de un menor, para que otra persona pase a ser el padre o madre legal del menor lo que procede es la filiación adoptiva. La figura del reconocimiento voluntario no es intercambiable con la adopción. Lo contrario laceraría las salvaguardas que provee el mecanismo de adopción. Establecer un vínculo filiatorio mediante el proceso de adopción no imprime un sello de desigualdad filiatoria al menor ni a la madre intencional. La filiación adoptiva no es una filiación de segunda categoría.

Aunque los peticionarios instaron una acción *ex parte* sobre *Inscripción del certificado de nacimiento y subrogacia gestacional*, queda claro que lo que buscaban era impugnar la presunción de maternidad que establece el parto para que entonces se declarara judicialmente la filiación a través del reconocimiento voluntario.[190] Una sentencia emitida en virtud

---

[190] En la Petición ex parte se desprende la súplica siguiente:

Los peticionarios [R.P.R y B.J.J.] solicitan en primer lugar, que se acepte la renuncia voluntaria de la parte con interés [C.T.R.] a la patria potestad y maternidad del menor […] derechos y responsabilidades que se le imponen por razón del parto. En segundo lugar, los peticionarios solicitan que se les adjudique la patria

de una solicitud de reconocimiento voluntario con autorización judicial es un documento público autentico suficiente para que se inscriba a un menor. Sin embargo, al momento de instar la acción *ex parte* el tribunal tenía ante sí prueba fehaciente de los datos del parto -entre ellos la declaración de nacimiento-, de la que surgía que la señora C.T.R. fue quien dio a luz al menor M.J., por lo que el tribunal se veía impedido de validar el reconocimiento de la señora R.P.R., sin que con ello se impugnara eficazmente el vínculo natural del parto mediante el proceso adecuado.

La prueba presentada no podía estar dirigida solo a rebatir el vínculo genético ya que este no es determinante para establecer la relación maternofilial. A estos fines y a la luz del derecho entonces vigente, la presunción de maternidad se debía impugnar con prueba de que C.T.R. no fue quien dio a luz al menor, ya sea por sustitución inadvertida o por simulación del parto. Puesto que ninguna de las circunstancias reconocidas por la ley aplica a los hechos del caso, la presunción de maternidad no fue válidamente

---

potestad, maternidad y paternidad a su favor, por entender que ello conviene a los mejores intereses, a la salud, al bienestar del menor y para atemperar la realidad fáctica de la intención original de los peticionarios y la parte con interés a la realidad jurídia.

Los peticionarios suplican que se decrete y ordene al Hospital […] que emita la documentación requerida para que el certificado de nacimiento original del menor […] incluya a la peticionaria como su madre y el peticionario como su padre para todos los efectos legales y con todos los derechos inherentes a la condición de hijo legítimo.

Los peticionarios solicitan, además, que este Honorable Tribunal autorice y ordene inscribir al menor […] con los nombres de los peticionarios como su madre y padre, respectivamente, en el certificado de nacimiento original del menor.

Apéndice de los peticionarios, Petición, pág. 46.

impugnada. Existe el hecho biológico fehaciente de que la señora C.T.R. alumbró al menor M.J. y por tanto, es su madre biológica. Por eso, al momento en que se presentó la Petición ex parte nuestro ordenamiento impedía que se reconociera una relación maternofilial mediante un Acuerdo de Subrogación.

Nuestra capacidad de intervención judicial no equivale a que suplantemos y nos adjudiquemos la función legislativa. Este caso no trata sobre mecanismos intercambiables entre los que se puede escoger el "menos oneroso". Al momento del nacimiento del menor no había autorización legislativa alguna para que validáramos un reconocimiento voluntario sin que se rebatiera adecuadamente una presunción en contrario.

II

Más aún, el proceso seguido fue fatalmente defectuoso. Hemos reiterado que en una acción de filiación tanto la persona que la reclama, como la persona cuyo estado filiatorio quedaría afectado por el dictamen judicial, son partes indispensables. Bonilla Ramos v. Dávila Medina, supra, pág. 680. Esto responde a que el cambio de estado civil provoca un impacto en los derechos y las obligaciones que provienen de la filiación. Por ende, no cabe duda de que aquella persona que puede verse perjudicada por el cambio de estatus filiatorio es parte indispensable, aun cuando sea un menor de edad. Íd.

Cuando en algún asunto el interés del menor es opuesto al de su padre o madre con patria potestad, se le debe nombrar un defensor judicial que lo represente en virtud del poder de parens patriae que tiene el Estado. Rivera Marrero v. Santiago

Martínez, supra, pág. 486. Su norte consiste en proteger los intereses y el bienestar del menor, de modo que exista una garantía y protección para su beneficio. Íd., pág. 487. Rivera Marrero v. Santiago Martínez, supra, pág. 486. Esta designación dependerá de las circunstancias del caso, pero siguiendo un criterio de amplitud a favor de la designación de un defensor judicial. Íd., pág. 488. La Regla 15.2 de Procedimiento Civil, 32 LPRA Ap. V, provee que el tribunal tiene discreción para nombrar un defensor judicial por razón de minoría de edad o cuando exista incompatibilidad entre los intereses de la madre o del padre con los del hijo. Íd., págs. 487-488.

Entretanto, cuando la ley no dispone un procedimiento específico para cierto asunto el tribunal tiene la facultad de reglamentar su tramitación, siempre que ello no esté en conflicto con esta u otras leyes aplicables. Regla 72 de Procedimiento Civil, 32 LPRA Ap. V. Pero cuando la ley establece el procedimiento a seguir, este no puede eludirse bajo un proceso análogo de jurisdicción voluntaria.

Nuestro ordenamiento contiene normas que delinean los procesos y formalidades a seguir para establecer la filiación jurídica de un menor de edad. Según los hechos del caso, el mecanismo correcto para viabilizar la solicitud de la parte peticionaria era una acción de adopción. De hecho, en este caso no era posible rebatir la presunción de maternidad, pues la prueba presentada establece que no hubo simulación del parto ni sustitución inadvertida del menor. Quedo demostrado

que la señora C.T.R. alumbró al menor M.J. Eso era lo único relevante, según el Código Civil de 1930.

Es conocido que la filiación adoptiva surge de un acto jurídico solemne, en el cual luego de una ruptura del vínculo jurídico existente entre un individuo y sus progenitores, se forma una nueva filiación. A.A.R. Ex parte, supra, pág. 856. Una vez se decreta la adopción "el adoptado será considerado para todos los efectos legales como hijo del adoptante con todos los derechos, deberes y obligaciones que le corresponden por ley". Art. 137 del Código Civil de 1930, 31 LPRA sec. 538. Del expediente se desprende que en ningún momento se imposibilitó una acción de adopción; todo lo contrario, se realizaron los estudios correspondientes a tales fines.

La Ley de Adopción de Puerto Rico, Ley Núm. 61-2018, 8 LPRA sec. 1081 et seq., declara la política pública de que el procedimiento de adopción sea expedito, flexible y confidencial. Para que este proceso se facilite se proveyó un procedimiento expedito cuyo tramite total no excederá de sesenta días desde su inicio hasta su resolución final. Art. 2 de la Ley de Adopción de Puerto Rico, 8 LPRA sec. 1086. En lo pertinente, este incluye la entrega voluntaria de los menores por su madre biológica previa renuncia a la patria potestad. Art. 3 de la Ley de Adopción de Puerto Rico, 8 LPRA sec. 1081b(k). Esta renuncia se debe hacer mediante documento juramentado ante notario público, en la presencia de un testigo y puede dejarse sin efecto dentro de los quince

días siguientes. Art. 21 de la Ley de Adopción de Puerto Rico, 8 LPRA sec. 1084.

A su vez, el trámite procesal establece que si consta en autos el estudio social y el consentimiento bajo juramento, por escrito o dado en corte abierta por las personas llamadas a consentir, el tribunal puede autorizar la adopción en la primera comparecencia o en la vista en su fondo. Arts. 30-31 de la Ley de Adopción de Puerto Rico, 8 LPRA secs. 1086f-1086g. Cuando el tribunal emite el decreto autorizando la adopción dispone todo lo necesario para establecer la nueva filiación del adoptado, que incluye el contenido del nuevo certificado de nacimiento que será enviado al Registro Demográfico. Art. 33 de la Ley de Adopción de Puerto Rico, 8 LPRA sec. 1086i.

Queda claro, entonces que la señora R.P.R. no se encuentra desprovista de remedio. Por el contrario, con el procedimiento expedito de la ley, probablemente ya sería la madre legal del menor si hubiera instado una petición de adopción. Ante el foro primario testificó la trabajadora social de la Unidad de Adopción del Departamento de la Familia que realizó el estudio social para que se pudiera adoptar al menor. El hecho de que la peticionaria prefiere un procedimiento distinto al de adopción no es suficiente para prescindir del proceso requerido por ley. Bajo el Código Civil de 2020 la solución es otra, pero esa no es la ley aplicable.

La Opinión mayoritaria evita aludir expresamente al concepto de aplicación retroactiva de la ley, pero su análisis

tiene el efecto erróneo de aplicar la ley de forma retroactiva. Por esto es necesario entonces examinar el asunto de temporalidad y aplicar las disposiciones correspondientes sobre Derecho transitorio.

III

**A. Contornos contemporáneos y la maternidad subrogada**

A través de un contrato de maternidad subrogada o maternidad sustituta una persona (el padre o madre intencional) y una mujer (madre subrogada) acuerdan que esta última gestará a la criatura para los padres intencionales y que renuncia a todo derecho que pudiera tener sobre el nacido. (Traducción nuestra) Surrogate-parenting agreement, Black's Law Dictionary, 9th ed., [s.l]; Ed. Bryan A. Garner, 2009, pág. 1583. La literatura académica distingue entre la subrogación tradicional y la subrogación gestacional. En la subrogación tradicional la mujer gestante está vinculada genéticamente al crio ya que se fertiliza su propio óvulo. Traditional surrogacy, Black's Law Dictionary, op. cit., pág. 1582. En cambio, en la subrogación gestacional se utiliza el óvulo de una mujer distinta a la portadora, quien carece de vínculo genético con la criatura. Gestational surrogacy, Black's Law Dictionary, op. cit., pág. 1582. En el caso de autos el menor M.J. es producto de subrogación gestacional y no posee vínculo genético alguno con la madre intencional ni con la madre gestante, pero posee vínculo biológico con esta última.

El menor M.J. nació mientras se encontraba vigente el Código Civil de 1930. Por ello, aplica la norma sustantiva

de que su presunta madre es quien le dio a luz. A pesar de que sostengo que el Código Civil de 2020, no aplica al caso ante nosotros, ello no significa que ignore que este contiene disposiciones sobre la reproducción asistida. En efecto, el tipo de maternidad subrogada que contempla el Código Civil de 2020 es aquel en el que la mujer que da a luz no tiene vínculo genético con la criatura, es decir, la maternidad subrogada gestacional. Nótese, que el legislador no estableció una presunción de maternidad a favor de la madre intencional, sino que se limitó a reconocer que cuando haya un acuerdo de maternidad subrogada gestacional no rige la norma de que el parto determina la maternidad. Incluso, el cambio en la norma pretende que la mujer pueda reconocer su maternidad cuando tiene vínculo genético con el menor, a pesar de que este fue gestado por otra mujer. Memorial Explicativo del Código Civil 2020, págs. 522-523; M. Garay Aubán, Código Civil de Puerto Rico 2020 y su historial legislativo, 1ra ed., San Juan, Ed. Situm, T. I, 2020, pág. 397.

**B. Irretroactividad de la ley**

Puede percibirse que el Código Civil de 2020 dio un paso enorme de avance en esta área del Derecho al establecer que la filiación materna en los casos de maternidad subrogada gestacional no se rige por la norma legal de que el parto determina la maternidad. Sin embargo, eso no nos autoriza a hacer retroactiva esa norma sustantiva de Derecho, en ausencia de la voluntad expresa del legislador.

En lo aquí concerniente, tanto el Código Civil de 1930, Art. 3, 31 LPRA sec. 3, como el Código Civil de 2020, Art. 9, 31 LPRA sec. 5323, contienen la norma general de que las leyes no tendrán efecto retroactivo, excepto cuando se dispone expresamente lo contrario. De igual modo, ambos cuerpos normativos establecen que en ningún momento se impondrá el efecto retroactivo de una ley para perjudicar los derechos adquiridos al amparo de legislación anterior. Íd.

El principio de irretroactividad de las leyes sirve como fundamento de interpretación estatutaria. Asoc. Maestros v. Depto. Educación, 171 DPR 640 (2007). Este principio brinda seguridad jurídica a fin de que los sujetos actúen amparados por una legislación determinada. Díaz Ramos v. Matta Irizarry, 198 DPR 916, 929 (2017). Sin embargo, una ley puede tener efectos retroactivos cuando así surja de la intención legislativa, ya sea de forma expresa o tácita. Rivera Padilla v. OAT, 189 DPR 315, 340 (2013); Clases A, B y C, 183 DPR 666, 679 (2011). De lo contrario, "la ley aplicable al asunto es la que estaba vigente cuando ocurrieron los hechos que dan lugar a la causa de acción". Nieves Cruz v. U.P.R., 151 DPR 150, 158 (2000). Por eso, debido a que la retroactividad es un acto excepcional, la intención del legislador sobre tal efecto debe relucir del propio cuerpo normativo. Díaz Ramos v. Matta Irizarry, supra. En caso de duda, los tribunales deben decidir por la no retroactividad de la ley y en los casos en que se la ley disponga que se aplique retroactivamente, ha de hacerlo el juzgador prudentemente y con sentido retroactivo. Nieves

Cruz v. U.P.R., supra, págs. 158-159; J. Puig Brutau, Introducción al Derecho Civil, Ed. Bosch. Barcelona, 1981, pág. 181.

La norma de irretroactividad de las leyes es especialmente pertinente a estatutos de carácter sustantivo. Cortés Córdova v. Cortés Rosario, 86 DPR 117, 123 (1962). En contrario, las normas procesales pueden aplicarse a casos pendientes. R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed. rev., San Juan, Pubs. JTS, 1987, pág. 400.

En lo concerniente, tiene aplicación la norma reiterada de que los derechos filiatorios se rigen por la ley sustantiva vigente al momento del nacimiento del menor. Véase: Beníquez v. Vargas, supra; Silva v. Doe, 75 DPR 209, 218 (1953); Torres v. Sucn. Cautiño, 70 DPR 646, 652 (1949); Toro v. Ríos, 68 DPR 760, 761 (1948); Mercado v. Sucn. Mangual, 35 DPR 422, 423 (1926); Morales v. Sucn. Cerame, 30 DPR 843 (1922); Méndez v. Martínez, 21 DPR 252, 266 (1914); Charres v. Arroyo, 16 DPR 816, 821 (1910). Esto es así a menos que la nueva ley expresamente disponga su aplicación retroactiva o que esa sea la intención legislativa. Martínez et al. v. Vda. de Martínez, 88 DPR 443, 453 (1963).

Ahora bien, la doctrina de irretroactividad no es una limitación insuperable para que el poder legislativo modifique legislación anterior en materia filiatoria. Nuestro pronunciamiento en Ocasio v. Díaz, 88 DPR 676 (1963), es un ejemplo de esto. En aquel momento, determinamos que, por imperativo constitucional, sin importar la fecha ni demás

circunstancias del nacimiento, no puede haber distinción entre los entonces llamados hijos naturales, adulterinos o legítimos.

No podemos perder de vista que el tema central de aquel caso era la disponibilidad de igual trato jurídico para toda declaración judicial de estado filiatorio. Asimismo, quedó evidenciado que hacer distinciones judiciales entre tipos de hijos es incongruente con el principio de igual trato jurídico consagrado en nuestra Constitución. Por ello, la aplicación retroactiva estuvo dirigida a eliminar un grave mal social: la clasificación de hijos legítimos vis a vis los ilegítimos. Ocasio v. Díaz, supra.

En el caso de autos no nos encontramos ante una situación de contravención a los principios constitucionales de igualdad ni se elimina un tipo de filiación. No se implica un trato distinto con relación al menor M.J. y los derechos y obligaciones en función de sus padres y familia. Tampoco hay algún precepto constitucional que se vea afectado y amerite la aplicación retroactiva de una norma filiatoria.

En múltiples ocasiones hemos tenido la oportunidad de sopesar el principio de irretroactividad de las leyes en asuntos de filiación. En Vázquez Vélez v. Caro Moreno, 182 DPR 803 (2011), nos expresamos sobre algunas de las enmiendas que realizó la Ley Núm. 215-2009 al Código Civil de 1930, entre ellas el cambio en los términos y forma para impugnar la presunción de paternidad y de maternidad. Allí la controversia giraba en torno a si los nuevos términos aplicaban a pleitos pendientes de adjudicación ante los

tribunales al momento de entrar en vigor la Ley Núm. 215-2009. Nuestra decisión se asentó en que la ley objeto de la controversia **contenía una medida de derecho transitorio que instauraba expresamente la aplicación retroactiva de las enmiendas a los casos pendientes de adjudicación, en unión a la intención del legislador. Como consecuencia, determinamos que resultaba evidente que las enmiendas aplicaban retroactivamente a pleitos pendientes de adjudicación.** Nótese que para ese pronunciamiento **fue fundamental la cláusula de derecho transitorio que autorizaba la aplicación retroactiva a pleitos pendientes.** Eso es acorde con la jurisprudencia relativa a la irretroactividad de las leyes.

Tomando en cuenta que las relaciones filiales se rigen por la ley vigente al momento del nacimiento del menor, es menester que contestemos las siguientes preguntas: ¿El Código Civil de 2020 contiene una disposición transitoria que expresamente establezca su aplicación retroactiva a asuntos de derecho filiatorio? De no ser así ¿podemos afirmar que la intención legislativa fue la aplicación retroactiva de la ley? Ambas preguntas son consistentes con el análisis que reiteradamente hemos llevado a cabo al momento de decidir sobre los derechos filiatorios de los menores. Véase, Vázquez Vélez v. Caro Moreno, supra.

Debemos contestar las preguntas anteriores en la negativa. El Código Civil de 2020 no contiene una disposición transitoria que expresamente establezca su aplicación retroactiva a asuntos de derecho filiatorio.

Tampoco podemos afirmar que la intención legislativa fue su aplicación retroactiva. De un análisis integrado y ponderado de la figura de la filiación y el principio de irretroactividad, resulta que no estamos ante un estatuto de naturaleza meramente procesal. El Código Civil es un cuerpo de leyes sustantivas. MacCormick et al. v. Molinari et al., 16 DPR, 409 (1910). Este establece lo referente a los derechos filiatorios. Y es que la norma principal de que el parto determina la maternidad es un asunto de Derecho sustantivo. En cambio, cómo se prueba eso y mediante qué procedimiento legal son cuestiones secundarias y dependientes de esta norma sustantiva.

Indudablemente el estado filiatorio de un menor podría implicar asuntos procesales y probatorios, pero no por ello debemos -por *fiat* judicial- soslayar que principalmente se trata de un asunto sustantivo y de cómo adquirir derechos. Recalco que el Código Civil de 2020 es un cuerpo normativo de carácter sustantivo. Considero que no es suficiente señalar que las presunciones son instituciones probatorias de carácter procesal para, sin más, imponer por conducto judicial la aplicación retroactiva de una ley a un asunto sustantivo. En el afán de llegar a una solución que parezca simpática no podemos lacerar un derecho tan prominente como lo es el estado o la condición de hijo. La determinación de la filiación es un asunto de Derecho sustantivo y ello no cambia por los métodos probatorios -incluyendo presunciones- que se usen para establecerla.

El menor M.J. nació en el año 2019 por lo que el Código Civil de 1930 rige lo relacionado a su estado filiatorio. Aunque el Código Civil de 2020 incluye expresamente el concepto de maternidad subrogada este no es aplicable a la controversia debido a que: (1) no contiene expresamente que sus disposiciones serán aplicables a casos filiatorios pendientes de adjudicación; (2) no se denota la intención legislativa de su aplicación retroactiva, tampoco su necesidad; (3) es un cuerpo normativo de carácter sustantivo y no de meras normas procesales; (4) no contiene una disposición transitoria que configure una excepción a la retroactividad en materia de filiación y (5) la aplicación del Código Civil de 1930 no vulnera preceptos constitucionales.

Es correcto que el Art. 1808 del Código Civil de 2020, 31 LPRA sec. 11713, dispone:

> Las acciones y los derechos nacidos y no ejercitados antes de la entrada en vigor de este Código, subsisten con la extensión y en los términos que le reconoce la legislación precedente; pero sujetándose, en cuanto a su ejercicio y procedimientos para hacerlos valer, a lo dispuesto en este Código. Si el ejercicio del derecho o de la acción se halla pendiente de procedimientos comenzados bajo la legislación anterior, y estos son diferentes de los establecidos en este Código, pueden optar los interesados por unos o por otros.

Sin embargo, esta disposición procesal no es aplicable a esta controversia ya que rige la norma sustantiva de que el parto determina la maternidad. Esto es una norma de derecho sustantivo y no una regla de derecho probatorio. "Cualquier regla de derecho sustantivo de la forma **A es B** podría

expresarse como una presunción incontrovertible con hecho básico **A** y hecho presumido **B. Pero sigue siendo una norma de derecho sustantivo, no una regla de evidencia"**. (Énfasis en el original) E. Chiesa Aponte, Reglas de evidencia comentadas, 1ra ed., San Juan, Ed. Situm, 2016, pág. 63.

### C. Autolimitación judicial

Nuestro ordenamiento jurídico permite el reconocimiento voluntario materno. Sin embargo, el reconocimiento voluntario, ya sea paterno o materno, no es inscribible si es contrario a un título contradictorio de filiación. No estamos ante un trato discriminatorio. No es necesario discutir el aspecto constitucional de este asunto. La norma de autolimitación judicial requiere que si un asunto se puede resolver utilizando un análisis estatutario es innecesario considerar el aspecto constitucional. Com. CNP v. CEE, 197 DPR 914, 926 (2017).

Cuando se cuestiona la validez de una ley, el Tribunal decidirá si alguna interpretación razonable permite soslayar la cuestión constitucional. AMPR v. Sist. Retiro de Maestros IV, 190 DPR 854, 878 (2014). Esto responde a consideraciones constitucionales y prudenciales que requieren que los tribunales se esfuercen por lograr interpretaciones congruentes y compatibles que adelanten la constitucionalidad de las leyes. Brau, Linares v. ELA, 190 DPR 315, 337 (2014). "La norma de autolimitación judicial que se ha impuesto este Tribunal requiere que decidamos sobre la constitucionalidad de una ley sólo cuando no haya otra manera de adjudicar la controversia ante nuestra consideración". A.A.R., Ex parte,

supra, pág. 994. Por todo lo anterior, no es necesario adentrarnos en un análisis de una impugnación constitucional que nadie ha hecho y que no es correcta.

IV

Como expliqué, aunque se puede presentar evidencia para impugnar la presunción de maternidad, esta prueba no va dirigida a rebatir que la madre biológica de un menor es quien lo alumbró, sino a probar que quien en realidad dio a luz -madre biológica- es alguien diferente a quien se cree que lo hizo. La excepción que introduce el Código Civil de 2020 en los casos de maternidad subrogada gestacional no representa un cambio en los procedimientos para determinar la maternidad. Más bien es una modificación de la norma sustantiva. Mantuvo el parto como factor que determina la maternidad, pero sustrajo de esa regla -como excepción- la maternidad subrogada en la que la persona que alumbró al bebé no tiene vínculo genético con él. Por tratarse de un asunto de derecho sustantivo la nueva normativa no tiene aplicación retroactiva.

Los señalamientos de error que son eje de esta controversia residen en cuál es el procedimiento legal para que se inscriba a la madre intencional como madre legal del menor M.J. -nacido por subrogación gestacional-. Queda claro que el proceso no podía basarse en una mera petición *ex parte* de reconocimiento voluntario ya que al momento de instarse había prueba fehaciente de una filiación contradictoria por la presunción de maternidad que se deriva del parto. En otras palabras, una vez el menor M.J. fue dado

a luz por la señora C.T.R. estaba presente la presunción de que esta era su madre. De ese modo, el reconocimiento voluntario hecho por la señora R.P.R. no podía ser eficaz hasta tanto se rebatiera la presunción de maternidad de la señora C.T.R. Ante la falta de vínculo biológico entre la peticionaria y el menor, el mecanismo disponible por ley para viabilizar que esta pase a ser la madre legal es la adopción.

Aun cuando se trató de impugnar la filiación materna del menor, no se instó la acción adecuada ni se acumuló al menor como parte. Por más atractivo que nos parezca, nuestro ordenamiento no dispone para que se rebata la presunción de maternidad o paternidad en una acción inadecuada y en la que falten partes indispensables.

Así pues, si de los datos disponibles en el Registro Demográfico surge que otra mujer fue quien dio a luz al menor, el Registro se encuentra impedido de inscribir automáticamente a la reconocedora o madre intencional como madre legal. Además, el proceso judicial en el que ceda la filiación presunta no solo debe ser oportuno, sino también adecuado. Solo en un proceso judicial oportuno y correcto que impugne el hecho del parto se puede rebatir eficazmente la presunción de maternidad. Aunque se presente prueba pertinente, si hay ausencia de partes indispensables el dictamen judicial sería nulo. Por lo tanto, contrario a lo que plantea la Opinión mayoritaria, el proceso *ex parte* no tuvo el efecto de derrotar la determinación legal de que la señora C.T.R. es la madre del menor, por razón del parto.

El parto determina la maternidad y el Código Civil de 1930 no eximía la maternidad subrogada gestacional de esa norma, a diferencia del Código Civil de 2020.

Es por esa razón que disiento respetuosamente del curso de acción seguido por este Tribunal. "Cuando se fuerza el Derecho en busca de una solución preferida el fantasma del mal precedente reaparecerá a atormentarnos". Caraballo Ramírez v. Acosta, 104 DPR 474, 489 (1975) (Opinión Disidente del Juez Asociado señor Díaz Cruz).


                              RAFAEL L. MARTÍNEZ TORRES
                              Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| RPR & BJJ<br><br>Peticionarios<br><br><br>*Ex parte* | CC-2020-0653 |  |

Opinión disidente emitida por la Jueza Asociada señora Pabón Charneco.

En San Juan, Puerto Rico, a 17 de junio de 2021.

Luego de analizar los asuntos sensitivos que contiene el caso de epígrafe, respetuosamente disiento de la Opinión Mayoritaria.

Es un hecho innegable que el Código Civil de 2020 incorporó avances científicos en el campo jurídico. En particular, reconoció la filiación maternofilial en los casos de maternidad subrogada gestacional. Así, viabilizó en nuestro ordenamiento nuevas y diversas formas para reconocer uno de los vínculos más íntimos y trascendentales entre los seres humanos: la maternidad. De igual forma, dejó atrás nociones tajantes y anticuadas que no tienen igual aplicación hoy día.

A pesar de que reconozco el progreso jurídico que el nuevo Código Civil trajo en el tema de reproducción asistida, es mi postura que la Asamblea Legislativa no dispuso expresa ni tácitamente la aplicación retroactiva de las disposiciones contenidas en el Código Civil de 2020. Ante ello, procedía resolver al amparo del Código Civil de 1930, cuyo cuerpo normativo estaba vigente al momento de los hechos.

Esto no quiere decir que por aplicar el Código Civil de 1930 el menor M.J. queda desprovisto de un vínculo filial con la señora R.P.R. Ello es posible mediante la filiación adoptiva. De esta forma es que se puede reconocer como hijo ante la incapacidad de rebatir la presunción *iuris tantum* establecida por la normativa aplicable de que la señora C.T.R. -en calidad de madre subrogada- alumbró al menor M.J. Esta filiación adoptiva concede los mismos derechos y obligaciones que otorga la filiación natural.

Sin embargo, este Tribunal se adjudicó facultades legislativas al desviarse del principio de irretroactividad. Por ello, disiento.

A continuación, reseño brevemente el tracto procesal del caso de autos en ánimo de ilustrar en justa perspectiva los fundamentos que me motivan a emitir el presente disenso.

**I**

Los hechos del presente caso se remontan en el profundo deseo del matrimonio compuesto por R.P.R. y B.J.J. (peticionarios) en procrear un hijo. Tras múltiples intentos

fallidos, optaron por utilizar el procedimiento de reproducción asistida mediante tercero para convertirse en padres. Los peticionarios pactaron con la señora C.T.R. un Acuerdo de Subrogación. Mediante este, consignaron que la señora C.T.R. sería la madre subrogada gestacional. Ello implica que sería la portadora del menor, sin vínculo genético con la criatura toda vez que se utilizó el óvulo de una mujer donante. En este proceso de fertilización *in vitro* se utilizaron los espermatozoides del señor B.J.J. En el Acuerdo de Subrogación, pactaron que luego del alumbramiento del menor, la señora C.T.R. renunciaría a todos los derechos y las obligaciones que le revisten con el menor a consecuencia del parto.

Tras el nacimiento del menor, los peticionarios presentaron el **13 de marzo de 2019** una *Petición* ex parte ante el Tribunal de Primera Instancia. En su petitorio, le solicitaron al foro primario tres (3) asuntos previo a ordenar la inscripción del menor con sus apellidos, a saber: (1) aceptar la renuncia voluntaria de la señora C.T.R. a la patria potestad y maternidad del menor, así como los derechos y responsabilidades que se le impone por razón de parto; (2) adjudicar la patria potestad, maternidad y paternidad a su favor, ya que esa fue la intención original en el acuerdo suscrito entre las partes, y (3) ordenar a la institución hospitalaria donde nació el menor a que "emita la documentación requerida para que el certificado de nacimiento original del menor [M.J.] incluya a [los peticionarios] como

sus padres para todos los efectos legales y con todos los derechos inherentes a la condición de hijo legítimo".[191] De modo que los peticionarios no deseaban que se consignara en los documentos registrales que la señora C.T.R. alumbró al menor M.J. Nótese que la naturaleza de esta *Petición* no se circunscribe únicamente a la inscripción del menor, sino a la impugnación de relaciones filiales y al reconocimiento voluntario mediante un Acuerdo de Subrogación.

Posteriormente, el Tribunal de Primera Instancia le notificó la *Petición* a la Procuradora de Asuntos de Familia (Procuradora) y al Departamento de la Familia. Asimismo, le ordenó a este último a preparar un estudio social sobre el núcleo familiar de los peticionarios. Tras emitirse la Orden, la Procuradora presentó un *Urgente Informe Fiscal*. En este sostuvo que, dado a unas complicaciones de salud del menor, los peticionarios le solicitaron el certificado de nacimiento para que el menor obtuviera un plan médico. Ante tal escenario, esbozó la Procuradora que nuestro ordenamiento permite que el padre biológico –el señor B.J.J.- reconozca voluntariamente al menor con sus dos apellidos al amparo del Artículo 19-A de la Ley Núm. 24 de 22 de abril de 1931, según enmendada, conocida como la Ley del Registro Demográfico de Puerto Rico, 24 LPRA sec. 1133a. Indicó que, posteriormente, la señora R.P.R. deberá presentar una petición de adopción dado que no alumbró al menor M.J. Así las cosas, el tribunal

---

[191] Apéndice de los peticionarios, *Petición*, pág. 46.

de instancia ordenó al Registro Demográfico a inscribir al menor con los dos apellidos del señor B.J.J.

Luego de varios trámites procesales, el foro primario celebró dos (2) vistas para dilucidar si la señora R.P.R. podía inscribir al menor como su hijo. En estas vistas las partes tuvieron la oportunidad de presentar evidencia y sus argumentos.[192] Los peticionarios, por un lado, argumentaron que, a raíz del vacío legislativo, procedía utilizar el reconocimiento voluntario establecido en la Ley del Registro Demográfico, *supra*, para que la señora R.P.R. obtenga la filiación natural del menor y este sea inscrito en el Registro Demográfico como su hijo biológico. La Procuradora, por otro lado, arguyó que "en nuestro ordenamiento jurídico no se ha legislado para lo que solicitan los peticionarios que es que se ordene al Registro Demográfico la inscripción del menor como hijo de [R.P.R.] por filiación natural, a pesar de que no es biológicamente su madre".[193] Adujo que, ante la laguna legislativa, procedía la filiación adoptiva de conformidad con la Ley Núm. 61-2018, conocida como la Ley de Adopción de Puerto Rico, 8 LPRA sec. 1081 *et seq.* Luego de escuchar los argumentos de las partes, el Tribunal de Primera Instancia, emitió una *Sentencia* en la cual resolvió —mediante equidad— que la Ley del Registro Demográfico, *supra*, permite la inscripción de un hijo por reconocimiento voluntario de un

---

[192] En las vistas celebradas comparecieron los peticionarios; la Procuradora en representación del Ministerio Público; el Departamento de la Familia mediante su representación legal; la Trabajadora Social del Departamento de la Familia; la Unidad de Adopción representada por la Sra. Yolanda Navedo, y la madre subrogada, la señora C.T.R.

[193] Apéndice de los peticionarios, *Sentencia*, pág. 93.

padre o madre. Por ello, ordenó la inscripción del menor con el nombre de R.P.R. como su madre natural. Cabe mencionar que previo a su dictamen, el foro primario obtuvo un Informe Positivo de la Unidad de Adopción para la filiación adoptiva entre la señora R.P.R. y el menor M.J.

En desacuerdo con la determinación, la Oficina del Procurador General presentó una *Moción de Reconsideración* en la cual reiteró sus argumentos. Sin embargo, el foro primario denegó su solicitud.

Inconforme aún, el Procurador General recurrió al Tribunal de Apelaciones. Allí sostuvo que el tribunal de instancia abusó de su discreción al ordenar la inscripción del menor como hijo biológico de R.P.R. Reiteró que previo a inscribir el menor, procedía el procedimiento de adopción. Oportunamente, los peticionarios se opusieron y alegaron que la *Sentencia* recurrida estaba correcta en derecho.

Así las cosas, el foro apelativo intermedio emitió una *Sentencia*. Mediante esta, revocó el dictamen del Tribunal de Primera Instancia al concluir que la señora C.T.R. y su entonces pareja consensual son partes indispensables, por lo cual resolvió que el foro primario estaba impedido de adjudicar la controversia sin la presencia de estos. Los peticionarios solicitaron reconsideración, la cual fue denegada.

Inconformes con lo resuelto, los peticionarios recurren ante nos mediante un Recurso de *Certiorari*. En esencia,

señalan que el Tribunal de Apelaciones erró en las dos (2) determinaciones siguientes: (1) al revocar la sentencia del foro primario por falta de partes indispensables, y (2) al convertir el proceso ex parte en una controversia ficticia respecto al Acuerdo de Subrogación.

## II

## A.

Al momento en que ocurrieron los hechos del caso de epígrafe estaba vigente el Código Civil del 1930. El entonces cuerpo normativo regulaba la doctrina de filiación. Esta doctrina constituye uno de los pilares fundamentales en el Derecho de Familia ya que responde a imperativos de política pública. *González Rosado v. Echevarría Muñiz*, 169 DPR 554, 561 (2006). La filiación concede derechos y obligaciones a las madres y a los padres en relación con sus hijos, y viceversa. *Rivera Marrero v. Santiago Martínez*, 203 DPR 462, 476 (2019). La filiación es "el estado civil de una persona, determinado por la situación que, dentro de una familia, le asigna el haber sido engendrada en ella o el estar en ella en virtud de la adopción o de otro hecho legalmente suficiente al efecto". *Castro v. Negrón*, 159 DPR 568, 579-580 (2003). Por ello, nuestro ordenamiento reconocía dos (2) tipos de filiación: la natural y la adoptiva. *Rivera Marrero v. Santiago Martínez,* supra*; A.A.R., Ex parte*, 187 DPR 835, 856 (2013). La filiación natural refleja la realidad biológica entre los padres con el menor. *A.A.R., Ex parte*, supra.

Mientras, la filiación adoptiva nace mediante una ruptura total del vínculo jurídico con parentela biológica, de modo que se crea una nueva filiación entre el menor con la persona adoptante. *Beníquez et al. v. Vargas et al.*, 184 DPR 210, 233 (2012). La filiación adoptiva constata una "ficción jurídica **cuyo fin es crear los mismos derechos y obligaciones que existen entre padres e hijos que ostenten filiación natural**". (Énfasis suplido). *A.R.R., Ex parte*, supra, pág. 857; *Zapata et al. v. Zapata et al.*, 156 DPR 278, 286 (2002). De modo que la relación filial se enmarca en una realidad dual: la biológica y la jurídica. Sin embargo, la realidad biológica y la jurídica podrían no coincidir. *Beníquez et al. v. Vargas et al.*, supra, pág. 227.

En vista de lo anterior y en lo aquí pertinente, la filiación natural establece unas presunciones controvertibles. Particularmente, en el Art. 113 del entonces Código Civil, 31 LPRA ant. sec. 461, dispone:

> Se presumen hijos del marido de la mujer casada los nacidos durante el matrimonio y los nacidos antes de los trecientos días siguientes a su disolución. El reconocimiento voluntario crea una presunción de paternidad a favor de reconocedor. **El parto determina la maternidad.** (Énfasis suplido).

El precitado artículo dispone expresamente que la presunción maternofilial está inexorablemente atada al hecho del parto, sin distinción alguna sobre el estado marital de la mujer. Esta norma proviene del Derecho Romano *mater semper certa est* ("la madre siempre es conocida"), por lo que fue

codificada mucho antes que la ciencia reconociera la reproducción asistida mediante terceros. R. Serrano Geyls, *Derecho de Familia de Puerto Rico y Legislación Comparada*, San Juan, P.R., 1ra ed., 2002, Vol. II, pág. 957. A diferencia de la filiación paterna, el ordenamiento otorgaba certeza sobre la filiación materna ya que el alumbramiento ofrecía una garantía en cuanto al vínculo entre la mujer y el recién nacido. *Almodóvar v. Méndez Román*, 125 DPR 218, 235 (1990). Ahora bien, el Código Civil de 1930 admitía en ciertas instancias controvertir esta presunción respecto a la filiación materna.

La impugnación maternofilial únicamente procedía al probarse que hubo simulación de parto o sustitución inadvertida del hijo. Art. 115 del Código Civil de 1930, *supra*. Quien tenía legitimación activa para instar este tipo de impugnación era la presunta madre y la madre biológica, así como el hijo y el presunto padre. *Íd.* De probarse cualquiera de los dos (2) escenarios o mediante decreto judicial autorizando la adopción, la madre podía reconocer voluntariamente al menor e inscribirlo con su apellido de conformidad con el Art. 19-A de la Ley del Registro Demográfico, *supra*.[194]

---

[194] Este artículo dispone lo siguiente:

  Si el nacimiento es reconocido por uno solo de los padres será obligación del Registro Demográfico, cuando así lo requiera dicho padre o madre al momento de la inscripción, realizar la inscripción haciendo constar los dos apellidos del único que lo reconoce. Si con posterioridad a la inscripción surgiera la intención de un reconocimiento voluntario, el Registro Demográfico viene en la obligación de sustituir el apellido del padre o **la madre de acuerdo**

No se puede perder de perspectiva que ambas legislaciones -tanto la Ley del Registro Demográfico, *supra*, como el Código Civil de 1930- se deben interpretar en conjunto, y no de manera aislada y separada. Más aún cuando el Código Civil consigna derechos sustantivos sobre la filiación, que luego tienen efectos procesales mediante la Ley del Registro Demográfico, *supra*. La Ley del Registro Demográfico, *supra*, no concede derechos sustantivos relativos la doctrina de filiación, sino da publicidad de datos vitales de la persona, así como su estado civil. *Delgado, Ex parte*, 165 DPR 170, 187 (2005). Esta legislación tiene como norte registrar, coleccionar, custodiar, preservar, enmendar y certificar hechos vitales de las personas nacidas en Puerto Rico. Art. 7 de la Ley del Registro Demográfico, *supra*. En ese sentido, de no impugnarse la relación maternofilial mediante simulación de parte o sustitución inadvertida, la madre que alumbró al menor estaba obligada a reconocer a su hijo, "cuando se pruebe cumplidamente el hecho del parto y la identidad del hijo". Art. 125 del Código Civil de 1930, *supra*.

No obstante lo anterior, el campo jurídico logró alcanzar los cambios sociales y científicos del Siglo XXI al reconocer -como excepción- el derecho filiatorio mediante la figura de madre subrogada gestacional. Ello ocurrió luego de la aprobación del nuevo Código Civil en el verano de 2020,

---

**a la documentación evidenciada**. (Énfasis suplido). Art. 19-A de la Ley Núm. 24 de 22 de abril de 1931, según enmendada, mejor conocida como la Ley del Registro Demográfico de Puerto Rico, 24 LPRA sec. 1133a.

mientras el caso de autos estaba pendiente en el Tribunal de Apelaciones. Este Código Civil trajo cambios significativos en el Derecho de Familia. Particularmente, reconoce el reconocimiento voluntario maternofilial en casos de maternidad subrogada sin vínculo genético con el hijo que se desprende de su vientre. Art. 567 del Código Civil de 2020, 31 LPRA sec. 7121. Así pues, se permite la reproducción humana asistida con la intervención de terceros donantes de material genético o mujeres gestantes sin vínculo genético. *Memorial Explicativo del Código Civil 2020*, pág. 522. Ahora bien, cabe preguntarse si la Asamblea Legislativa dispuso que esta nueva norma aplica de manera retroactivamente.

**B.**

El principio de irretroactividad es una norma estatutaria consignada en el Código Civil de 1930, así como en el Código Civil de 2020, la cual establece que la ley no tendrá efecto retroactivo a menos que así lo dispusiera expresamente. Art. 9 del Código Civil de 2020, 31 LPRA sec. 9; Art. 3 del Código Civil de 1930, *supra*. En consecuencia, únicamente procede la retroactividad cuando así se desprenda de la norma estatutaria. *Díaz Ramos v. Matta Irizarry*, 198 DPR 916, 929 (2017); *Asoc. Maestros v. Depto. Educación*, 171 DPR 640, 648 (2007). De no ser así, la ley aplicable a la causa de acción es la vigente al momento de los hechos. *Nieves Cruz ex rel. Hernández Nieves v. UPR*, 151 DPR 150, 158 (2000). El propósito primordial de este principio es proveer estabilidad jurídica en las causas de acción. *Díaz Ramos v.*

*Matta Irizarry*, supra. Por consiguiente, el principio de irretroactividad cobra mayor fuerza ante una norma que atiende asuntos sustantivos. *Cortés Córdova v. Cortés Rosario*, 86 DPR 117, 123-124 (1962). Empero, cuando se trata de normas procesales pueden aplicarse a casos pendientes ante el foro judicial. R.E. Bernier & J.A. Cuevas Segarra, *Aprobación e Interpretación de las Leyes en Puerto Rico*, 2da. ed., San Juan, P.R., 1987, Publicaciones JTS Inc., pág. 400.; J. Puig Brutau, *Introducción al Derecho Civil*, Barcelona, Bosh, 1981, pág. 181.

Según hemos establecido, este principio no es uno rígido, de aplicación absoluta. *Consejo de Titulares v. Williams Hospitality*, 168 DPR 101, 107 (2006). A manera de excepción, en ciertas instancias procede la retroactividad de una ley cuando así lo indique expresa o tácitamente la Asamblea Legislativa. *Rivera Padilla v. OAT*, 189 DPR 315, 340 (2013); *Asoc. Maestros v. Depto. Educación*, supra. De no surgir de manera diáfana y clara, continúa entonces la presunción de irretroactividad. *Nieves Cruz ex rel. Hernández Nieves v. UPR*, *supra*. Nos desviamos de ese principio "cuando ello es necesario para la transformación y el progreso de situaciones pasadas que deben eliminarse por razones de justicia o interés general". *Íd.*, pág. 158.

En el Derecho de Familia hemos aplicado retroactivamente varias legislaciones. En *Pérez Valdivieso v. León*, 52 DPR 512 (1938), resolvimos que procedía aplicar la entonces nueva causal de divorcio de separación por siete (7) años, aunque

no estuvo vigente cuando se instó la demanda de divorcio. *Íd.* Particularmente, este Tribunal determinó que a raíz del interés público "sus gobiernos se han reservado siempre el poder de regular con entera libertad", por lo cual se aplicó retroactivamente la disposición del entonces Código Civil enmendado. *Íd.*, pág. 518. Ahora bien, no se puede equiparar la institución matrimonial con la doctrina de filiación, dado que en esta última está de por medio un menor, cuyo bienestar y derechos adquiridos a razón de la filiación deben ser el eje de esta Curia.

Por otro lado, en *Ocasio v. Díaz*, 88 DPR 676 (1963), la aplicación retroactiva estaba arraigada en un principio constitucional de que todos los hijos son iguales en nuestro ordenamiento. Por ello, declaramos inconstitucional la clasificación de hijos legítimos e ilegítimos habidas en el Código Civil de 1930. *Íd.* Según establecido, el principio estatutario de irretroactividad no es una norma absoluta que ostente el poder de opacar una disposición constitucional. *Consejo de Titulares v. Williams Hospitality,* supra.

Finalmente, en *Vázquez Vélez v. Caro Moreno*, 182 DPR 803 (2011) resolvimos que aplicaba retroactivamente unas enmiendas realizadas al Código Civil de 1930 mediante la Ley Núm. 215-2009, toda vez que así lo reflejó la legislación de manera táctica. Esta Curia ponderó que la ley dispuso que procedía aplicar retroactivamente a los casos que estaban pendientes en los foros judiciales. *Íd.* A raíz de ello, actuamos de conformidad con la voluntad legislativa.

**c.**

El principio de irretroactividad está atado a que los tribunales no usurpen los poderes de la Asamblea Legislativa. Tal como hemos enunciado, las tres (3) ramas de gobierno constituidas en nuestra Carta Magna –que provienen de la Constitución Federal– tienen diferentes responsabilidades y un ámbito de acción limitado. Art. I, Sec. 2, Const. ELA, LPRA, Tomo I, ed. 2016.; *A.A.R, Ex parte*, supra, págs. 853-854. De ahí se adopta la conocida doctrina política de Separación de Poderes. De modo que esta doctrina protege la libertad de los ciudadanos al evitar que se concentre el poder en una de las ramas. Asimismo, salvaguarda las independencias de las ramas para impedir que una de estas interfiera con la otra. *A.A.R., Ex parte*, supra, págs. 854-855, citando a *Myers v. United States*, 272 US 52, 293 (1926).

A tono con lo anterior, cruzamos las fronteras constitucionales cuando aplicamos retroactivamente una norma, sin que ello fuera la voluntad del Cuerpo Legislativo. Nos adentramos en un asunto de política pública que le compete a la Rama Legislativa determinar. Así pues, conviene recordar que:

> Debemos ser siempre conscientes de las delicadas fronteras constitucionales que existen entre las tres (3) ramas del gobierno. Es nuestra obligación velar por el de la Rama Judicial en aras de evitar trastocar los principios de la separación de poderes y echar al suelo el entendimiento básico de quienes concibieron a esta rama […]. *A.A.R, Ex parte*, supra, pág. 855.

### III

Tras examinar minuciosamente los hechos del presente caso a la luz de la normativa previamente expuesta, es mi posición que no procede aplicar retroactivamente el Código Civil del 2020. Esto responde a tres (3) razones fundamentales. Primeramente, el procedimiento ex parte inició cuando estuvo vigente el Código Civil del 1930. En segundo lugar, la *Petición* entrelaza asuntos sustantivos previo a la solicitud de inscripción, así como la impugnación maternofilial y la afirmación de filiación de la señora R.P.R. Según previamente indicado, la retroactividad de las leyes no debería ocurrir en las causas de acción pendientes que abordan derechos sustantivos. *Cortés Córdova v. Cortés Rosario*, supra. La doctrina de filiación que surge del Código Civil es indiscutiblemente de naturaleza sustantiva, toda vez que concede derechos y obligaciones a los padres, así como a los hijos que provienen de estos. En tercer lugar, la legislación no dispuso —expresa ni tácitamente— la aplicación retroactiva del Código Civil 2020. Más bien se limitó a expresar: "Este Código comienza a regir a los cientos ochenta (180) días después de su aprobación". Art. 1820 del Código Civil de 2020, *supra*.

No puedo obviar que la figura de madre subrogada estuvo ante la consideración de la Asamblea Legislativa previo a la confección del nuevo Código Civil 2020. Particularmente, en

la Exposición de Motivos del P. de la C. 1766 de 7 de septiembre de 2018, 4ta Sesión Ordinaria, 18va Asamblea Legislativa, establece que los avances científicos de reproducción asistida deberían reconocerse y regularse en nuestra jurisdicción. Aun así, no reconoció la filiación mediante reproducción asistida de manera retroactiva en el Código Civil de 2020. Ante ese cuadro fáctico, reitero que no le corresponde a este Tribunal –vía fiat judicial– imponer la retroactividad del Código Civil de 2020 cuando ello no fue la voluntad legislativa.

Aunque en el presente caso aplica el principio de irretroactividad, el menor M.J. no queda desprovisto de una filiación maternofilial con la madre intencional. El vínculo filial entre la señora R.P.R. y el menor M.J. se puede realizar mediante la figura second parent adoption. Esta figura está circunscrita a la filiación adoptiva que permite a una persona adoptar a un menor que tiene otro padre biológico, sin requerirle a este último dar por terminado sus derechos filiales. Art. 138 del Código Civil de 1930, supra.

No se cuestiona la capacidad de la madre intencional de proveerle al menor el amor y cuidado que este necesita. Lo que está en cuestionamiento es el procedimiento mediante el cual se crea o reconoce el vínculo jurídico entre esta y el menor. Es decir, se examina si la madre intencional, la señora R.P.R., puede voluntariamente reconocer al menor M.J. y crear una filiación natural mediante un Acuerdo de Subrogación. Luego de estudiar la normativa vigente al momento de los

hechos, no es posible que la madre intencional pueda reconocer al menor sin que antes impugne la presunción que cobija el vínculo entre la madre subrogada y el menor por razón del alumbramiento. Ante la imposibilidad de controvertir tal presunción, la madre tiene la oportunidad de obtener la relación filial mediante la adopción. No debe perderse de vista que la filiación natural y la adoptiva tienen el mismo fin: conceder derechos y obligaciones a los padres, así como al hijo. En ese sentido, ambas figuras no deben observarse de manera vertical, donde una está por encima de la otra con mayores derechos. *A contrario sensu*, deben verse desde la óptica horizontal, de manera equitativa puesto que ambas proveen los mismos derechos y obligaciones.

## IV

Por los fundamentos anteriormente expuestos, coincido con el hermano Juez Asociado señor Martínez Torres en que no procedía aplicar retroactivamente el Código Civil de 2020 al caso de autos ya que no se desprende así en el nuevo Código Civil. En consecuencia, procedía recurrir a la filiación adoptiva para que la madre intencional obtenga el vínculo filial dado que, al momento de los hechos, el Código Civil de 1930 no reconoció la filiación mediante los métodos de reproducción asistida.

Por lo cual, hubiera devuelto el presente caso al Tribunal de Primera Instancia para que realizara el procedimiento de filiación adoptiva y posterior a ello,

ordenara al Registro Demográfico a inscribir al menor M.J. con el apellido de la señora R.P.R.


                                        Mildred G. Pabón Charneco
                                             Jueza Asociada